## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

WILLY WENDER ACEITUNO,
YOSHI CUENCA VILLAMAR,
RUBEN ARGUERA LOPEZ, EDWIN
GODINEZ, and YAIR ALEXANDER
NAPOLES, *on behalf of themselves
and others similarly situated*,

       Plaintiffs,

   v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, *in her
official capacity as Secretary of
Homeland Security*; U.S. CUSTOMS
AND BORDER PROTECTION;
RODNEY S. SCOTT, *in his official
capacity as Commissioner of
Customs & Border Protectio*n; U.S.
BORDER PATROL; MICHAEL W.
BANKS*, in his official capacity as
Chief of U.S. Border Patrol*; TODD
LYONS*, in his official capacity as
Senior Official Performing the Duties
of the Director of Immigration and
Customs Enforcement*; and SEAN
GALLAGHER, *in his official capacity
as U.S. Immigration and Customs
Enforcement Field Office Director for
Atlanta, Georgia*,

       Defendants.

Civil Action No. 26-146

**CLASS ACTION COMPLAINT
FOR INJUNCTIVE AND
DECLARATORY RELIEF**

## INTRODUCTION

1. In recent months, armed, masked Department of Homeland Security ("DHS") agents have roamed the streets of Charlotte, Durham, Raleigh, and other areas in North Carolina, detaining and arresting people indiscriminately, without following the basic standards required by federal law. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") officers have confronted hundreds of North Carolinians, many of them U.S. citizens or non-citizens with a form of immigration status, as they attempt to walk down the street, go to work, run errands, and pick up their children. In the process, these DHS agents have repeatedly arrested people without probable cause that the person is removable and poses an escape risk. Federal law bars warrantless arrests in these circumstances.

2. These dragnet tactics—like those deployed by DHS in Los Angeles, Chicago, Minneapolis, Portland, Washington, D.C., and Colorado—rely on stopping and arresting individuals in public or semi-public places (including stores, restaurants, worksites, public streets) without reasonable suspicion or probable cause that the people they detain are unlawfully present.[1] Those arrested include non-citizens lawfully present in the country, as well as U.S. citizens. Agents

---

[1] *See How ICE Went Rogue*, American Immigration Council (Feb. 11., 2026), https://perma.cc/M8SB-WP2U; *Federal Judge Prohibits ICE from Making Warrantless Arrests in Colorado*, ACLU Colorado, (Nov. 25, 2025), https://perma.cc/N6CT-PUF6; Rodrique Ngowi, *Court records raise doubts that ICE is detaining the 'worst of the worst' in Maine*, The Maine Monitor (Jan. 24, 2026), https://perma.cc/5DHV-MZ88; Federal Judge Blocks Unlawful Immigration Arrests in Washington, D.C., ACLU District of Columbia (Dec. 3 2025), https://perma.cc/56PG-M9HL; ICE can't make warrantless arrests in Oregon unless there's risk of escape, judge rules, NPR (Feb. 5, 2026), https://perma.cc/D9FP-ZD9P.

are indiscriminately demanding proof of U.S. citizenship and detaining those who fail to provide it. But consistent with core American freedoms, declining to produce proof of citizenship to law enforcement on demand is not a basis for reasonable suspicion or probable cause that a person is undocumented.

3.     DHS's arrests are frequently violent and destructive. Agents smash car windows, drag people from vehicles, confiscate phones and car keys, chase and force vehicles off the road, and force people to the ground to handcuff them. Arrests escalate into dangerous situations that risk the safety of the arrestee and bystanders alike.

4.     As Plaintiffs' experiences show, agents grab people without making any inquiries into citizenship or immigration status or escape risk, often ignoring protestations that the individual has proof of status on their person. Officers handcuff and transport arrested people miles away from arrest sites, dumping them on the side of the road once agents have confirmed that the individuals are lawfully present. Agents wear military combat-style uniforms, carry and brandish weapons, and cover their faces with masks.

5.     These operations are causing severe harm to North Carolina communities, particularly children. Over 30,000 students—around 20% of the school district's enrollment—were absent from Charlotte-Mecklenburg Schools on Monday, November 17, 2025, a day on which CBP agents were in the midst of an

3

operation they dubbed "Charlotte's Web."[2] Similarly, Durham Public Schools reported a 68% increase in student absences that week, and an absence rate of almost 30% the following week.[3] School districts in Chapel Hill-Carrboro and in Wake, Catawba, and Burke counties also reported significant increases in student absences on days when DHS agents were present or announced their plan to conduct operations in nearby areas.[4] When students eventually returned to school, some Latino children arrived with notes pinned to their backpacks reading "I am a citizen."

6.     Many Latino North Carolinians, regardless of immigration status, have been afraid to leave their homes to retrieve basic necessities, like prescriptions or groceries, due to a fear of being racially profiled and arrested by DHS agents.[5]

---

[2] *See* James Farrell, *More than 30,000 absences reported at CMS on Monday, after data revision*, WUNC News (Nov. 18, 2025), https://perma.cc/X52W-8QSB.

[3] *See* T. Keung Hui, *30% of Durham Students Stayed Home during Border Patrol Enforcement Surge*, Raleigh News & Observer (Nov. 25, 2025), https://perma.cc/WD2R-KVAW.

[4] *See* T. Keung Hui & David Raynor, *Attendance Drops in Wake, Durham, Chapel Hill Schools during Border Patrol Surge*, Raleigh News & Observer (Nov. 19, 2025), https://perma.cc/LUC4-F4JG; Dave Faherty, *Increased absences in Catawba County schools amid Border Patrol operations*, WSOC-TV (Nov. 18, 2025), https://perma.cc/ZTP7-UGMW.

[5] *See, e.g.,* Kamrin Baker, *Immigrants in Charlotte fear leaving home amid ICE operations. This Latino-owned grocery chain is bringing food to them*, MSN (Nov. 21, 2025), https://perma.cc/K52H-689C.

7.     Religious leaders across Charlotte have also reported dramatic drops in church attendance during heightened enforcement activity.[6] And during these periods, business owners throughout the state, including U.S. citizen business owners, have closed their businesses out of fear that DHS agents would arrest them, their staff, or customers.[7]

8.     To carry out its dragnet in North Carolina, DHS is engaging in a systematic policy and practice of arresting people in violation of the federal warrantless arrest statute.  Section 287 of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(2), prevents federal agents from making warrantless arrests unless two conditions are met: the arresting officer must have probable cause both that the person arrested (1) is removable from the United States; and (2) poses an immediate escape risk.

9.     DHS is following neither of these federal requirements in North Carolina. Plaintiffs seek injunctive relief to halt DHS's unlawful policies and practices of (1) arresting people in North Carolina for immigration-related violations without warrants and without probable cause to believe that they are removable; and (2) arresting people in North Carolina without warrants and without probable cause to believe that the person is an escape risk.

---

[6] *See* Brian Segovia & Lisa M. Geraci, *Charlotte Mass Attendance Way down during Border Patrol Activity; Parishes Reassure Faithful,* Catholic News Herald (Nov. 21, 2025), https://perma.cc/PS67-KVDC.

[7] *See* Jane Porter, *Triangle Leaders Highlight Business Impacts of Federal Immigration Raids,* INDY (Nov. 25, 2025), https://perma.cc/V7FX-ZWJZ.

10.     The individual Plaintiffs' experiences are representative. DHS agents arrested each of them without a warrant and without probable cause to believe they were removable or any evaluation that they were likely to escape before a warrant could be obtained. Plaintiffs Aceituno, Cuenca, Godinez, and Napoles are U.S. citizens, and Plaintiff Arguera Lopez has a valid visa. If the agents had conducted the requisite escape risk analysis, they would have learned that Plaintiffs have lived in their respective communities for years, have deep family or community ties, have a long history of local employment or schooling, and present no likelihood of escape, let alone probable cause.

11.     Plaintiffs, and many others subject to these unlawful arrests, have suffered physical and emotional harm, have had their daily lives disrupted, and are at substantial risk of future arrest by DHS agents. Plaintiffs ask this Court to enjoin these practices and prevent further irreparable harm.

## PARTIES

12.     **Plaintiff Willy Wender Aceituno** is a 46-year-old Latino man originally from Honduras. He is a U.S. citizen who has resided in Charlotte, North Carolina for over 25 years. His family came to the United States in 2001, and he naturalized in 2019. He lives in a house in Charlotte, which he bought in 2007. He has a 21-year-old U.S. citizen daughter currently in college, and he works primarily in construction. On November 15, 2025, he was arrested by DHS agents without probable cause that he is removable from this country and without probable cause that he poses an escape risk.

13.     **Plaintiff Yoshi Cuenca Villamar** is a 23-year-old Latino man. He is a U.S. citizen who was born in Charlotte, North Carolina, and has lived in Charlotte his entire life. His seven siblings, who are U.S. citizens, also live in Charlotte, North Carolina. He has rented a house for the past three years. He owns a business called Cuenca Lawn Care that provides yard and lawn services. On November 15, 2025, he was arrested by DHS agents without probable cause that he is removable from this country and without probable cause that he poses an escape risk.

14.     **Plaintiff Ruben Arguera Lopez** is a 39-year-old Latino man originally from El Salvador. He first came to the United States in 2003, and he currently has (and at all times pertinent to this complaint, has had) a valid work permit and a U-Visa. A U-Visa is a humanitarian visa provided to individuals who assist law enforcement in investigating serious crimes; it can later be converted to a green card. Mr. Arguera Lopez has lived in Charlotte, North Carolina for 15 years and works as a cook in a local restaurant. On November 17, 2025, he was arrested by DHS agents without probable cause that he is removable from this country and without probable cause that he poses an escape risk.

15.     **Plaintiff Edwin Godinez** is a 29-year-old Latino man born in California. He is a U.S. citizen who owns a house in Spencer, North Carolina and has lived there for the past seven years. Mr. Godinez currently works in construction and previously worked at a nursing home. On January 5, 2026, he

was arrested by DHS agents without probable cause that he is removable from this country and without probable cause that he poses an escape risk.

16. **Plaintiff Yair Alexander Napoles** is a 22-year-old Latino man born in North Carolina. He is a U.S. citizen who was born in Roxboro, North Carolina, and currently lives in Salisbury, North Carolina. He works in construction. On January 5, 2026, he was arrested by DHS agents without probable cause that he is removable from this country and without probable cause that he poses an escape risk.

17. **Defendant U.S. Department of Homeland Security** is the federal agency responsible for administering and enforcing the nation's immigration laws.

18. **Defendant Kristi Noem** is the Secretary of DHS. In that role, she oversees component agencies, including Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Border Patrol. She is sued in her official capacity.

19. **Defendant U.S. Customs and Border Protection (CBP)** is a component agency of DHS that is responsible for, among other things, the processing of individuals attempting to enter or exit the United States at the U.S. border. CBP maintains at least four offices in North Carolina: Greensboro, Charlotte, Morrisville, and Wilmington. CBP agents are involved in making stops and arrests of individuals for civil immigration violations in North Carolina.

20.     **Defendant Rodney S. Scott** is the Commissioner of U.S. Customs and Border Protection. In that capacity, Defendant Scott has direct authority over all CBP policies, procedures, and practices related to stops, arrest, and detention. Defendant Scott is sued in his official capacity.

21.     **Defendant U.S. Border Patrol ("USBP" or "Border Patrol")** is a component agency of CBP and is responsible for the interdiction and processing of those who, without authorization, attempt to enter or leave the United States at its border. Border Patrol agents are involved in making stops and arrests of individuals for civil immigration violations in North Carolina.

22.     **Defendant Michael W. Banks** is the Chief of the U.S. Border Patrol. As Chief of Border Patrol, he has authority over all Border Patrol policies, procedures, and practices regarding immigration stops, arrests, and detention. He is sued in his official capacity.

23.     **Defendant U.S. Immigration and Customs Enforcement (ICE)** is a component agency of DHS. In North Carolina, ICE maintains at least a Charlotte office and is planning to expand or establish offices in Cary and Charlotte.[8] Among other things, ICE carries out stops and arrests of individuals believed to be in violation of civil immigration law, maintains custody over individuals in immigration detention, and is responsible for the management and oversight of the civil immigration detention system.

---

[8] *See* Leah Feiger, *ICE Is Expanding Across the US at Breakneck Speed. Here's Where It's Going Next*, WIRED (Feb. 10, 2026), https://perma.cc/9WR3-DKAM.

9

24.     **Defendant Todd Lyons** is Senior Official Performing the Duties of the Director of ICE. In that capacity, he oversees ICE's functions, including managing enforcement of laws relating to immigration, setting policies governing stops and arrests of individuals by ICE personnel, and managing the civil immigration detention system. Defendant Lyons is sued in his official capacity.

25.     **Defendant Sean Gallagher** is the ICE Field Office Director for Enforcement and Removal Operations in Atlanta, Georgia. As Field Office Director, he oversees decisions concerning arrest, detention, and removal decisions in Georgia, South Carolina, and North Carolina. He is sued in his official capacity.

## JURISDICTION AND VENUE

26.     The Court has jurisdiction under 28 U.S.C. § 1331 (federal question), and 5 U.S.C. § 702 (right of review). It has remedial authority pursuant to 5 U.S.C. §§ 702, 705, and 706 (the Administrative Procedure Act), 28 U.S.C. § 1651 (the All Writs Act), and 28 U.S.C. §§ 2201, 2202 (the Declaratory Judgment Act), and the Court's inherent equitable powers.

27.     Venue is proper in the Western District of North Carolina under 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703 because Defendants are officers or employees of the United States and substantial events giving rise to this action occurred in this District.

# FACTUAL ALLEGATIONS

## FEDERAL LAW PROHIBITS IMMIGRATION ARRESTS WITHOUT PROBABLE CAUSE

28.     Section 287(a)(2) of the Immigration and Nationality Act ("INA"), codified as 8 U.S.C. § 1357(a)(2), prevents an immigration officer from making a civil warrantless arrest *unless* "he has reason to believe" both that (1) "the [noncitizen] so arrested is in the United States in violation of" "any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of [noncitizens]," *and* (2) the noncitizen "is likely to escape before a warrant can be obtained for his arrest."

29.     The "reason to believe" standard in § 1357(a)(2) is the equivalent of "probable cause." *United States v. Segura-Gomez*, No. 4:17-CR-65-FL-1, 2018 WL 6582823, at *6 (E.D.N.C. May 25, 2018), *report and recommendation adopted*, No. 4:17-CR-65-FL-1, 2018 WL 6259222 (E.D.N.C. Nov. 30, 2018). Federal regulations track the statutory limitations on warrantless arrests, *see* 8 C.F.R. § 287.8(c)(2)(i1)-(ii), and further require immigration officers to identify themselves and state the reason for an arrest. *Id*. § 287.8(c)(2)(iii).

30.     Therefore, DHS employees, including ICE and CBP officers, lack legal authority to arrest a person without a warrant under § 1357(a)(2) unless they have probable cause to believe that person is in the United States in violation of immigration laws *and* the person is an escape risk.

31.     Warrantless immigration arrests, like any warrantless arrests, require a determination particularized to the specific person at issue—not a blanket policy

to arrest first and ask questions later. *See Maryland v. Pringle*, 540 U.S. 366, 373 (2003) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.") (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

32.    Defendants are systematically violating these requirements in North Carolina. They are conducting warrantless arrests of North Carolinians without probable cause to believe that they are removable and without probable cause that they pose a risk of escape.

### DHS'S MASS DEPLOYMENT TO AND INCREASING PRESENCE IN NORTH CAROLINA

33.    Over the past year, North Carolinians have experienced a dramatic increase in DHS's presence in the state—especially on the streets of North Carolina cities.

34.    From January 20, 2025, to October 15, 2025 (the last date for which data is available), ICE arrested 3,304 people in North Carolina. That is more than 2.8 times the number of arrests for the same time period in 2024.

35.    In November 2025, DHS launched what it calls "Operation Charlotte's Web," sending hundreds of CBP agents to North Carolina. While this CBP operation has focused largely on Charlotte, DHS agents have also fanned out to other urban areas in the state, including the Research Triangle.

36.    This surge followed a series of similar operations in Chicago, D.C., and Los Angeles, all cities with leaders whom the Trump Administration views as providing insufficient support for federal civil immigration enforcement activities.

As in these cities, and more recently in Minneapolis, DHS has targeted Charlotte because of outspoken opposition by city leaders to policies that would force local law enforcement to perform civil immigration enforcement on behalf of the federal government.[9]

37.     During the Charlotte's Web surge in November 2025, North Carolina General Assembly House Speaker Destin Hall asserted on social media that "Border Patrol is in Charlotte because Sheriff McFadden refused to do his job." And in January 2026, ICE publicly accused Mayor Vi Lyles of adopting "sanctuary policies" that allow undocumented immigrants accused of crimes to elude ICE— despite the realities that a 2024 North Carolina law requires that law enforcement cooperate with immigration authorities and Mayor Lyles has no role in setting bond or administering jail releases.

38.     As in other cities, "[s]ecrecy and confusion seem[] to be part of the playbook" for DHS's activities in North Carolina.[10] Masked agents driving unmarked vehicles and carrying military-style weapons have violently arrested hundreds of people in multiple North Carolina cities. Agents routinely arrest people who appeared Latino or were speaking Spanish, apparently without knowing who they were or whether they were U.S. citizens or lawfully present non-

---

[9] *See* Camilo Montoya-Galvez, *Trump Directs Immigration Authorities to Prioritize Deportations in Democratic-Run Cities*, CBS News (Jun. 16, 2025), https://perma.cc/7JTE-3Q5W.

[10] *See* Chris Kromm, *How North Carolina Rose Up Against Trump's Latest Anti-Immigrant Crackdown*, The Nation (Nov. 25, 2025), https://perma.cc/C2EY-VY2Z.

citizens, and without checking identification or immigration status before detaining them.

39. DHS agents have flooded areas with high concentrations of Latino residents, circling public areas and shopping centers in unmarked SUVs, and detaining people—usually Latino—that they happened to find. DHS's tactics in North Carolina echo those they've used in other cities: they've smashed car windows, stormed church property, and dragged workers out of their workplaces. When Border Patrol agents began to appear in the Durham and Raleigh area, the mayors of both cities said they had no idea the deployment was coming to either city.[11] As in Charlotte, schools in these areas reported dramatically increased absence rates, and businesses in Latino areas, especially those depending on Latino employees and clientele, closed. More than 425 people were arrested during Operation Charlotte's Web in November, and amplified enforcement has persisted throughout the state.[12] Masked DHS agents remain in communities throughout the state conducting warrantless arrests.

40. DHS agents have cast a broad net in their attempts to drive up arrest numbers in North Carolina. Rather than searching for specific individuals, agents are arresting numerous Latino-appearing individuals without any basis to believe these individuals are unlawfully present. Predictably, this race-based approach has

---

[11] *Id.*

[12] *See* Brandon Kingdollar, *ICE Agents Once Again Operating in North Carolina, Activists Say, Including Arrests in Durham,* NC Newsline (Dec. 5, 2025), https://perma.cc/R2Z7-XBLT.

led to the wrongful arrests of numerous U.S. citizens and other lawfully present individuals, including Plaintiffs.

## PLAINTIFFS' UNLAWFUL ARRESTS BY DHS AGENTS

### *A U.S. Citizen Sitting in his Truck*

41.     On Saturday, November 15, 2025, DHS agents approached Plaintiff Willy Wender Aceituno while he was awaiting a food order from a Honduran restaurant in a shopping center parking lot. Mr. Aceituno is a 46-year-old Latino man. He is a U.S. citizen and has lived in North Carolina for over 25 years. He owns a house in Charlotte, which he bought in 2007.

42.     Agents approached Mr. Aceituno, asked for his last name, and asked whether he was a citizen. In response, Mr. Aceituno asked whether he had to answer yes or no. He also asked whether they were looking for someone specific.

43.     The agents responded by repeatedly telling Mr. Aceituno to give them his documents. Mr. Aceituno provided the agents with his REAL ID. The agents asked for a different document demonstrating citizenship, and Mr. Aceituno questioned whether they knew what a REAL ID was, and stated that a person has to be in the country legally to get a REAL ID.

44.     Four agents were part of the initial interaction, which lasted fifteen minutes. Several additional agents lingered nearby in the parking lot. Once the agents scanned Mr. Aceituno's license and confirmed that Mr. Aceituno was a U.S. citizen, they let him enter the restaurant to retrieve his food.

45.     With food in hand, Mr. Aceituno then left the restaurant and was intercepted—a second time—by a different group of CBP agents. He entered his Ford 150 truck, which is registered in his name, put his seatbelt on, and was about to drive away when CBP agents used their vehicles to block him. One vehicle pulled directly in front of his truck, one pulled to the side of his truck, and one pulled behind it. Mr. Aceituno indicated to the agents that he had already identified himself, but an agent yelled "open the door." Mr. Aceituno started recording on his phone and said to the agents in Spanish, "I'm not opening the window."

46.     One agent tapped a baton against the window of the truck and said, "get out." Mr. Aceituno told them: "if you break it, you will pay for it." The agent then used the baton to smash the window, and glass shattered all over Mr. Aceituno. One agent reached for his phone and knocked it to the ground.

47.     Mr. Aceituno told them that his REAL ID was in his back pocket but avoided reaching for it because he was scared the agents might think he was reaching for a weapon.

48.     Two agents dragged him from the vehicle, forced him to the ground, and handcuffed him. In video footage of the arrest, Mr. Aceituno and a bystander who had also witnessed the first interaction can be heard pleading with agents to check his wallet for his identification, which would prove that he had legal immigration status, and telling the agents he is a U.S. citizen.

49.     Specifically, Mr. Aceituno said, "I got my papers ready, I'm a citizen, my wallet is here, check in my wallet." While he was being handcuffed, Mr.

Aceituno repeated at least four different times that he was a citizen and told them again to check his wallet.



50.     One bystander, who recorded both interactions, told the immigration agents, "they just ID'd him, he already ID'd himself, don't you guys f***ing coordinate with each other? why do you guys keep stopping the same guy?"

51.     At no point during the interaction did agents tell Mr. Aceituno why he was being arrested. None of the agents identified themselves or presented a warrant.

52.     The agents wore tactical gear, with their faces covered with black face masks and sunglasses, carrying weapons:



53.     Still without checking his identification or taking any apparent steps to confirm whether he was lawfully present in the country, the agents handcuffed Mr. Aceituno and then—as he and bystanders continued to repeat that he was a citizen whose ID had just been checked by different agents—placed him in one of their vehicles, where he sat with other Latinos who had been arrested. At no point was Mr. Aceituno asked about his family, community ties, employment history, or how long he had lived in Charlotte. At no point did Mr. Aceituno make any effort to run away from the scene.

54.     Each vehicle held four agents, each of whom was armed. Mr. Aceituno continued to repeatedly state that he was a citizen.

55.     After driving around for ten minutes, one of the agents finally looked into Mr. Aceituno's wallet, ran his REAL ID through a system, and stated that he was a U.S. citizen with no criminal record. They pulled over and told Mr. Aceituno to get out.

56.    Mr. Aceituno was bloody from the encounter. Knowing he was stranded far from his truck, he asked the agents for a ride back to his car, but they threatened to arrest him again if he did not walk away.

57.    Mr. Aceituno walked back to his truck, which took twenty to twenty-five minutes. He was covered in blood and glass and felt like he was going to pass out. Mr. Aceituno called the local police, filed a police report, and then went to the hospital to get his neck and arm checked out. He also had to have his truck rekeyed because the agents did not return his keys to him, and he was not able to find the key until much later.

58.    Mr. Aceituno experienced insomnia, anxiety, flashbacks, and significant neck pain after the incident. He did not go to work for two weeks after the incident because he feared being detained again by immigration agents.

59.    To this day, Mr. Aceituno does not feel comfortable going out in public because he knows that even his REAL ID—proof of lawful status—will not protect him from being handcuffed and taken away in an unmarked vehicle. Despite being a U.S. citizen, he was stopped twice by CBP agents on the same day and threatened with a third arrest even after agents verified his citizenship.

60.    If Mr. Aceituno hears that agents are in his neighborhood, he plans to lock himself in his house and stay inside until they go somewhere else.

61.    He has also struggled to deal with the aftermath of the situation because so much is out of his control. Mr. Aceituno fears being arrested again by DHS agents.

62.     When agents killed two people in Minneapolis and Mr. Aceituno learned about it, his first thought was that he should be thankful that they only assaulted him because others were being killed.

63.     Mr. Aceituno struggles to watch the news because it triggers thoughts of his arrest by CBP agents and exacerbates his deep fear of leaving his house and running into immigration agents again. He is afraid to leave the house to engage in his normal activities, like going to work or picking up food from a restaurant.

### A U.S. Citizen Performing Landscaping Work

64.     Plaintiff Yoshi Cuenca Villamar is a 23-year-old Latino man who was born in Charlotte and has lived in North Carolina his entire life with his seven siblings. Mr. Cuenca owns a business called Cuenca Lawn Care that provides yard and lawn services.

65.     Mr. Cuenca was at work on November 15, 2025, performing yard clean-up work outside a private residence in Charlotte, when CBP agents grabbed him from behind and pushed him to the ground. He had not seen them approach because his back was turned to them. He was wearing a backpack-style leaf blower at the time.

66.     When Mr. Cuenca turned around to figure out who pushed him, he saw four masked agents in uniforms that said, "POLICE" and "U.S. Border Patrol." They immediately attempted to handcuff him once he was on the ground.

67.     Mr. Cuenca's brothers, who are his co-workers and are also U.S. citizens, started recording as soon as they saw the agents knock him down.

68. As two agents pulled out handcuffs and grabbed Mr. Cuenca's wrists, Mr. Cuenca's brother said to the agents, "we're from here, I don't know what you're doing bro. What are you doing?"

69. Mr. Cuenca reached for the straps on the leaf blower to remove it from his back because it was uncomfortable. One agent said, "don't struggle," even though video footage shows that Mr. Cuenca was sitting on the ground, barely moving.



70. His brother again shouted that they were all U.S. citizens and asked what the agents were doing. The agents proceeded to handcuff Mr. Cuenca and asked him only whether he spoke English. The agents never asked for his ID before putting him in the vehicle.

71. The agents called for backup. Two additional vehicles containing eight additional agents arrived, and they placed Mr. Cuenca into one of the vehicles and drove away.

72.     Agents did not ask Mr. Cuenca any questions concerning his ties to the community or anything else that would bear on escape risk. Mr. Cuenca did not attempt to get away at any point during the encounter.

73.     The agents never told Mr. Cuenca or his brothers why they were arresting him. The agents did not present a warrant or indicate that they even knew Mr. Cuenca's name prior to grabbing him and throwing him in the vehicle.

74.     After spending twenty to thirty minutes driving around and talking on walkie-talkies to try to find the nearest detention center, the agents pulled out Mr. Cuenca's wallet from his pocket and found his driver's license. The agents did not believe Mr. Cuenca's license was a real license because it did not have a star on it. One agent threatened to return to the work site to pick up the other two men, who were Mr. Cuenca's brothers.

75.     Mr. Cuenca told the agents it was a valid license, and they could scan or do anything they wanted with it. Mr. Cuenca's social security card was also in his wallet, but the agents did not pull that out.

76.     While in the vehicle, Mr. Cuenca asked for the names of the agents, but the agents refused to provide them.

77.     The agents took a picture of the front and back of the license and, after a few minutes, confirmed that Mr. Cuenca was a citizen. While the agents were running the license, one agent asked how long Mr. Cuenca had lived here, and he replied that he was "born and raised" in North Carolina.

78.    The agents dropped Mr. Cuenca off on the side of the road and threw his wallet at him before departing. He had left his phone in his work truck, so he did not have any way to contact anyone.

79.    Mr. Cuenca walked to a nearby business and used their phone to call his brothers to come pick him up.

80.    Mr. Cuenca was left traumatized with visible marks on his wrists where agents had handcuffed him. He fears being detained again without any consideration of his individual circumstances.

81.    Mr. Cuenca dreads going back to the house and yard where the DHS agents arrested him, but he must because it is one of his work sites. He feels particularly exposed and susceptible to being picked up again by immigration agents because he is required to work outside as part of his job.

82.    In general, Mr. Cuenca tries to avoid places where CBP or ICE might be even though he is a U.S. citizen. He is more alert to his surroundings now but recognizes that there is not much he can do to prevent this from happening again.

**A Man on His Way to Work**

83.    Plaintiff Ruben Arguera Lopez is a 39-year-old Latino man originally from El Salvador. He first came to the United States in 2003, and he currently has (and at all times relevant to this Complaint has had) a valid work permit and a U-Visa, a humanitarian visa provided to individuals who assist law enforcement in investigating serious crimes.

84.    Mr. Arguera Lopez has lived in Charlotte, North Carolina for fifteen years and works as a cook in a local restaurant. His two brothers also live in North Carolina.

85.    On November 17, 2025, Mr. Arguera Lopez was driving to his job in Charlotte when he noticed three SUVs driving close to him. The car is registered in his name, and he was driving under the speed limit. At least one SUV turned on the lights on the hood. One of the three SUVs pulled in front of his car, boxing him in and forcing him to slow and stop his car. The vehicle windows were tinted.

86.    Five agents approached his car; two went to the passenger side, while three approached the driver's side. The agents' uniforms said "POLICE" and each agent was wearing a black mask.

87.    The agents asked Mr. Arguera Lopez to roll his windows down, which he did. They asked where he was from, but he exercised his right to remain silent. An agent then began asking Mr. Arguera Lopez how he came to this country and why. Mr. Arguera Lopez continued to exercise his right to remain silent.

88.    None of the agents identified themselves as federal agents or officers. They continued to ask questions, including asking where Mr. Arguera Lopez was going, how many years he had lived in the U.S., whether he had family here, and whether he worked. Mr. Arguera Lopez remained silent for approximately ten minutes.

89.    Around 10 minutes in, the agents told Mr. Arguera Lopez that they would take him with them if he did not answer. He told them that he has a U-Visa.

90. The agents ordered Mr. Arguera Lopez to get out of the car. He complied and got out of his vehicle.

91. The agents repeated their questions, asking where he was going and asking how he came to the U.S. Mr. Arguera Lopez again remained silent.

92. The agents then put him in handcuffs. Mr. Arguera Lopez told them that he has a right to an attorney and stated that they were only doing this because he is Latino.

93. The agents tried to put him into the SUV at one point, but Mr. Arguera Lopez told them again that he has a U-Visa and a work permit. He was still in handcuffs, so he was unable to take out the documents to show them.

94. As they were grabbing and pulling him toward the vehicle, Mr. Arguera Lopez tried to stay calm. At no point did he try to run or flee. He instead asked them to please let him go and reiterated that he has legal status.

95. After approximately an hour of questioning, the agents finally asked Mr. Arguera Lopez where his work permit was and pulled it out of his wallet. The agents then ran his information and let him go.

96. At no point did they tell Mr. Arguera Lopez why he was being arrested. None of the agents identified themselves, presented a warrant, or indicated that they knew Mr. Arguera Lopez prior to stopping him.

97. Mr. Arguera Lopez has suffered significant psychological issues after seeing how quickly and easily his liberty can be taken away. He has trouble sleeping and is uncomfortable going out in public. When he goes on a walk or a run, which

are pastimes he used to enjoy, he now feels anxious and highly aware of his surroundings.

98.    Mr. Arguera Lopez fears being arrested again without consideration of his individual circumstances.

99.    He is currently looking for a therapist to help him process this incident and better cope with the fear it has instilled in him. He is still affected by this every day and needs help healing.

### Two Brothers Driving a Car

100.    Plaintiff Edwin Godinez is a 29-year-old Latino man. Mr. Godinez currently works in construction. At the time of this incident, he was working at a nursing home. He was born in California but has lived in North Carolina for over 25 years. In 2019, Mr. Godinez bought a house in Spencer, North Carolina and has lived there for the past seven years. One of his brothers lives with him at his house.

101.    Plaintiff Yair Alexander Napoles is Mr. Godinez's 22-year-old brother, who was born in North Carolina. Mr. Napoles currently lives in Salisbury, North Carolina, and works in construction. Mr. Godinez's and Mr. Napoles's mother, who is also a U.S. citizen, lives near them.

102.    On January 5, 2026, Mr. Godinez and Mr. Napoles were stopped at a red light in Salisbury when the car behind them put on lights. The car was unmarked, but the lights seemed similar to a police car, so the two brothers pulled over.

103. Two ICE agents approached the car in bulletproof vests that said "POLICE" on them. One agent went to each side of the car. Mr. Godinez and Mr. Napoles both rolled down the windows.

104. The agents did not identify themselves but asked for identification. Mr. Godinez and Mr. Napoles handed over their IDs and told the agents they are U.S. citizens.

105. Mr. Napoles took his phone out and asked if he could record for his safety. The officer said "sure," and pulled up his mask to cover his face. He then asked Mr. Godinez and Mr. Napoles how they got into the United States and they explained again that they are citizens. One agent then left to run their names.

106. Additional agents pulled up behind their car. The agents were armed. Mr. Godinez started recording, but a new agent came up to the driver's side window and told Mr. Godinez that they were not free to record because they were being detained.

107. The agent reached into the driver's side window and tried to grab Mr. Godinez's phone while grabbing him by the chest. The agents repeatedly told Mr. Godinez to turn the recording off.

108. The agents then unlocked the door through the window, yanked it open, forcefully pinned Mr. Godinez against his seat, and grabbed his phone out of his hand. Mr. Napoles put his arm out to try to protect Mr. Godinez from the agents. The agent threatened to handcuff them and then knocked one of Mr.

27

Godinez's earrings out, punched him in the abdomen, and knocked the wind out of him.



109. After Mr. Napoles started speaking Spanish, agents came to his side of the car, reached into the vehicle, opened the door, unbuckled Mr. Napoles's seatbelt, and tried to yank him out of the car too. Mr. Napoles feared that if they got him out of the car and onto the ground, they would begin kicking him. The agents knocked Mr. Napoles's phone out of his hand but ultimately couldn't get him out of the car.

110. After approximately fifteen minutes of blocking Mr. Godinez and Mr. Napoles in, attempting to violently yank them out of the car, and attempting to stop them from recording agents, the original agent came back with the IDs and allowed them to leave.

111. At no point did the agents identify their names, present a warrant, or explain why Mr. Godinez and Mr. Napoles were being arrested. The agents did not

ask any questions about community ties, employment history, or how long they had lived in North Carolina (except to ask if Mr. Godinez lived with his parents after Mr. Godinez volunteered the information that he was coming from his parents' house).

112.    Mr. Napoles's chest was bruised from the violence, and he had to miss two days of work while he recovered. He was traumatized and shocked by the incident. Every time Mr. Napoles sees a car that looks similar to the vehicles the agents drove, he thinks it is a DHS vehicle and is filled with fear that he will be detained again.

113.    Mr. Godinez had a scratch below his chin where the officer grabbed him. He has also had trouble sleeping since the incident. The night of the incident, Mr. Godinez had a nightmare and woke up with a panic attack in the middle of the night. Since then, Mr. Godinez has suffered several additional panic attacks.

114.    Mr. Godinez also has recurring thoughts and fears about agents showing up at his workplace and trying to take him again. Mr. Godinez is especially fearful of agents stopping and arresting him again because the videos of the incident were widely distributed online. After Mr. Godinez saw that two people were killed by ICE agents in Minneapolis, his fear and panic escalated even more.

115.    Mr. Godinez and Mr. Napoles's mother went to the emergency room the night of the incident because she was having a prolonged panic attack after witnessing the agents attempt to drag her two children out of the car and punch Mr. Godinez.

116.     Mr. Godinez and Mr. Napoles were never informed why their car was stopped or why they were arrested. Because DHS agents have been pursuing Latinos in their communities, they both remain scared that agents will target them again without any consideration of their individual circumstances. Neither of them intend to leave their communities because that is their home, but they are scared that they will be arrested again, or even killed.

## PUTATIVE CLASS MEMBERS UNLAWFULLY ARRESTED BY DHS AGENTS

### *A U.S. Citizen, Arrested Twice in Two Days*

117.     Gerardo Ortiz, a U.S. citizen, was arrested twice by DHS agents in Charlotte during Operation Charlotte's Web—once on Saturday, November 15, and again on Sunday, November 16. One of the arrests occurred while Mr. Ortiz was protesting. DHS agents came out of a van, tied his hands behind his back, and demanded to see his identification, before transporting him 20 blocks, holding him in a parking lot for a period of time, and then releasing him.[13] News reports did not provide details on the other arrest.

118.     Mr. Ortiz, born in Puerto Rico, speaks English with an accent. There was no other apparent basis for his arrest.[14]

---

[13] *See* George Chidi, '*I Lose My Liberty in That Moment': Charlotte Shuts Down as Citizens and Noncitizens Alike Face ICE Arrests*, The Guardian (Nov. 20, 2025), https://perma.cc/K6Z4-QWMU.

[14] *Id.*

119.    Mr. Ortiz described the emotional impact of the arrest: "I felt like I lose my liberty in that moment. . . . I was so nervous when I got home. I was crying like a baby, and it's so terrible."[15]

### A U.S. Citizen at Work

120.    DHS agents have also fanned out elsewhere in the state, conducting operations—including similar patterns of warrantless arrests—in Raleigh, Durham, and Cary,[16] Lenoir, and Blowing Rock.[17]

121.    On November 18, 2025, Fernando Vasquez Orea—a U.S. citizen—was approached by CBP agents at a construction site where he works in Cary. [18]

122.    The agents gave no indication they knew Mr. Vasquez's identity or had a warrant to detain him. The agents' first question to Mr. Vasquez was, "where are you from?" They placed Mr. Vasquez in handcuffs, searched him, pulled out his wallet, and saw his North Carolina Real ID (which demonstrates legal immigration status or citizenship). Nevertheless, rather than release him, they loaded him into a vehicle and drove away. After he told them he was born in Raleigh, North

---

[15] *Id.*

[16] *See* Suzanne Gamboa & Julia Ainsley, *Immigration Arrests Reported in Raleigh-Durham Area*, NBC News (Nov. 19, 2025), https://perma.cc/53S6-JRM5.

[17] *See Immigration Enforcement Fears Grow in Asheville amid Statewide Expansion of Operations*, YouTube (last visited Feb. 20, 2026), https://www.youtube.com/shorts/D7-XHF56Bzg.

[18] *See* Brandon Kingdollar, *'They Basically Just Kidnapped Me': US Citizen Taken by Border Patrol in Cary,* NC Newsline (Nov. 20, 2025), https://perma.cc/2AX5-B53A.

Carolina, and agents finished going through the contents of his wallet, they abruptly pulled the vehicle over, let him out, and threw his wallet at him.[19]

123.    At no point did they ask him any questions about his home, family, work, other community ties, or any other indicator of escape risk.

124.    Mr. Vasquez, who has no criminal history and has never had an interaction with law enforcement before, walked away from this incident afraid that he could be harassed, arrested, or taken at any time, without any consideration of his individual circumstances.

***Congregants Performing Landscaping Work at a Church***

125.    On Saturday morning, November 15, 2025, a group of 15-20 congregants were gathered at a church in east Charlotte, performing landscaping work on the church property while their children played and their spouses cooked a meal. Without consent or a warrant, armed and masked DHS agents ran onto the church property. The church, located off Albemarle Road in Charlotte, has a gate that extends across its entrance, which was closed.[20]

---

[19] *Id.*

[20] *See* Nick Sullivan*, Church members flee as federal agents arrive at east Charlotte place of worship*, Charlotte Observer (Nov. 17, 2025), https://perma.cc/B529-GF3Q; Brody Carter, *Sacred Ground or Enforcement Zone? ICE Raids Test Church Community in Charlotte*, The Christian Broadcast Network (Dec. 12, 2025), https://perma.cc/Z4WF-DQZ3.



126.    After entering the church property, DHS agents approached a church member who had been helping with the landscaping project. The agents asked no questions, showed no paperwork, and presented no identification before taking the church member, who was originally from El Salvador, away. The church member's wife and child were inside the church at the time.[21]



[21] *Id.*

127.    The church congregants were terrified by what happened on the church property that morning. For example, a 15-year-old church member reported that he initially fled into the surrounding woods because of DHS agents' actions, even though he is a U.S. citizen. News reporting shows church members crying and holding one another in the aftermath of the raid. The church suspended its work around its property in response to members feeling unsafe.[22]

**IMPACT ON NORTH CAROLINA COMMUNITIES AND BUSINESSES**

*A Laundromat Owner*

128.    DHS agents have appeared to target businesses and workplaces, seeking out Latino people generally, rather than particular people for whom they had warrants.

129.    David Rebolloso is a U.S. citizen who served 20 years in the U.S. Air Force. His father was born in Mexico, and his mother, who was part Sioux, was born in Texas. They married in Mexico and then moved to the Rio Grande Valley in Brownsville, Texas, where Mr. Rebolloso was born and raised.

130.    After decades working in the medical field and living in Apex, Mr. Rebolloso retired and moved to Charlotte. Approximately nine years ago, he opened a laundromat in the El Mariachi shopping center on North Tryon Street in Charlotte. The laundromat and the shopping center have many Latino patrons. Other nearby businesses include El Mariachi Supermercado y Restaurante, Panadería Odalys, Paletería Mich Tocumbo, and Emely's.

---

[22] *Id.*

131. On November 16, 2025, as he was heading to work, Mr. Rebolloso's wife and stepdaughter called him from the laundromat. They were crying and quite frantic. They told him that Border Patrol and ICE agents were chasing people around the parking lot of the El Mariachi shopping center, as well as up and down North Tryon Street.

132. When Mr. Rebolloso arrived at the El Mariachi shopping center, he learned that customers in his laundromat that day had run out of the back of the store because they were afraid that Border Patrol agents were going to enter the store and arrest them.

133. Mr. Rebolloso checked the security cameras for his store, which showed people inside the laundromat running away because Border Patrol agents were chasing people outside, including one instance of someone running from the parking lot into the laundromat while being chased by a Border Patrol agent. Mr. Rebolloso's store's security footage showed a masked federal immigration agent in a green uniform with white lettering across the front, running up to the front door after chasing someone.



134. Customers at Mr. Rebolloso's laundromat were so frightened that day by federal immigration agents that some left behind their clothes in the washers and dryers and did not return to pick them up. Even though Mr. Rebolloso offered to provide pick-up and drop-off services for his customers, many were too afraid to open their doors.

135. The activities of DHS agents have impacted Mr. Rebolloso's business. His customers usually spend one to two hours doing their laundry. But because people were so leery of the federal immigration agents, far fewer people—including customers who are U.S. citizens—frequented his laundromat following the activities of November 16, 2025.[23] Mr. Rebolloso estimated he had lost more than 50% of his profits during the first month following the November 2025 activity.[24]

---

[23] *See* Desiree Mathurin, *Charlotte's Latino Shops Weather Border Patrol Raids: Rattled Customers, Empty Lots*, Charlotte Observer (Nov. 20, 2025), https://perma.cc/UBM3-KFHX.

[24] *See* Julian Berger, *Immigrant-Owned Businesses in Charlotte Struggle One Month after Border Patrol Crackdown*, WUNC News (Dec. 16, 2025), https://perma.cc/5QCP-VR85.

His staff, who are all U.S. citizens, also expressed fear about being arrested just because they are Latino.

136. On November 16, 2025, and in the following days, Mr. Rebolloso saw people who looked to be Latino being stopped, chased, and grabbed by federal agents in Charlotte. Although Mr. Rebolloso is a U.S. citizen, he is afraid of being stopped and possibly arrested by DHS agents based on the color of his skin.

### A Bakery Owner

137. Manuel "Manolo" Betancur was born and raised in Colombia, where he served in the Colombian Navy. He later came to the United States and became a U.S. citizen. An entrepreneur for over 30 years, Mr. Betancur owns and operates a number of small businesses in Charlotte, including Manolo's Bakery on Central Avenue. Manolo's Bakery is well known for its bread, pastries, coffee, and desserts prepared in Latin traditions. Based on its physical location in Charlotte and the food it prepares and sells, a significant portion of its customers are originally from Central and South America.

138. Mr. Betancur is an active member of the National Small Business Association's Leadership Council and has received numerous awards and commendations for his work and civic leadership.

139. On Saturday, November 15, 2025, as he started walking to his bakery around 9:00 a.m., Mr. Betancur saw multiple SUVs with dark windows driving aggressively on the street. The cars were driving very fast, darting in and out of traffic. On multiple instances, he saw cars stop, and what appeared to be federal

immigration agents jumping out. The people coming out of the vehicles were all wearing green uniforms with some lettering on the front; many appeared to be wearing masks. These agents ran up to people walking on the sidewalk, grabbed them, quickly put them in handcuffs, and drove off with them in their vehicles. The people being grabbed all appeared to be Latino or non-white. He saw at least three instances of this happening that morning.

140.    Based on what he witnessed, Mr. Betancur called his staff at Manolo's Bakery and told them to shut the doors. He was afraid that federal immigration agents might enter the bakery and place his Latino customers and staff in danger. Based on those concerns and in an effort to protect his customers and staff, Mr. Betancur kept Manolo's Bakery closed for a week. During that time, Mr. Betancur became aware of U.S. citizens being detained by immigration agents even though the people being detained had identification on them. As a result, he started carrying his passport with him because he was afraid of being stopped and possibly arrested based on the color of his skin.

141.    Only hours after reopening the bakery on November 24, 2025, Mr. Betancur observed more federal immigration activity just feet away from the bakery, renewing his fears.[25]

142.    The consequences of shutting down Manolo's Bakery due to the activities of federal immigration agents were significant. Mr. Betancur estimated

---

[25] *See* Eli Brand, *Manolo's Bakery Reopens amid Immigration Concerns*, WSOC-TV (Nov. 24, 2025), https://perma.cc/YJ9X-P89W.

that he lost between approximately $50,000-$64,000, as well as his biggest wholesale customer, due to being closed.

143. Manolo's Bakery normally has around 20 people on staff, some of whom are U.S. citizens and some who are non-citizens who are lawfully present in the country. As a result of the November raids, Manolo's Bakery lost multiple employees because they did not feel safe coming to work, even though they were citizens or lawfully present; they were too afraid that federal immigration agents would still arrest them.

144. Months after the start of "Operation Charlotte's Web," Mr. Betancur still gets scared whenever he sees an SUV nearby, especially one with dark windows.

**THE UNLAWFUL AND ONGOING THREAT POSED BY DHS AGENTS**

145. DHS operations in North Carolina have been increasing for months, and have persisted since the November surge. On November 20, 2025, a DHS spokesperson confirmed: "The operation [in North Carolina] is not over and it is not ending anytime soon."[26] Following this post, in late November, Siembra NC, a grassroots community organization in North Carolina, received a report that 50 additional DHS agents were to be deployed to North Carolina in December 2025.[27]

---

[26] *See* Gary D. Robertson & John Seewer, *Charlotte Immigration Crackdown Goes On, Homeland Security Says, despite Sheriff Saying It Ended*, AP News (Nov. 20, 2025), https://perma.cc/XQ26-5MF6.

[27] *See* Brandon Kingdollar, *ICE Agents Once Again Operating in North Carolina, Activists Say, including Arrests in Durham,* NC Newsline (Dec. 5, 2025), https://perma.cc/R2Z7-XBLT.

146.     In Durham, in early December, several individuals were arrested on the way to interviews at a U.S. Citizenship and Immigration Services offices, including a lawful permanent resident and two mothers arriving for green card interviews.[28] And Mecklenburg County Sheriff Garry McFadden has publicly stated that, based on his conversations with federal officials, he expects increased enforcement activities in 2026.

147.     Immigration officers' footprint in North Carolina is growing. The "One Big Beautiful Bill," signed into law in July 2025, designates $170 billion to immigration enforcement, including more than $45 billion for additional ICE detention space.

148.     In North Carolina, CBP currently maintains four known offices, and ICE maintains at least one office. ICE also plans to expand its physical presence by leasing new ICE office buildings in Cary and Charlotte.[29]

149.     A Freedom of Information Act lawsuit filed by the ACLU of North Carolina recently yielded documents showing that ICE intends to establish as many as three new detention centers in North Carolina, to confine people DHS arrests in the state, including possibly in Greensboro and/or Winton.[30] Records

---

[28] *Id.*

[29] *See* Leah Feiger*, ICE Is Expanding Across the US at Breakneck Speed. Here's Where It's Going Next*, WIRED (Feb. 10, 2026), https://perma.cc/4PRM-6KQQ.

[30] *See ACLU FOIA Litigation Reveals ICE Actively Considering Opening Seven New Immigration Detention Centers*, ACLU of North Carolina (Jan. 29, 2026), https://perma.cc/CRR9-7C58.

also show that DHS is considering opening new Virginia-based detention centers close to the Virginia-North Carolina border.[31]

150.    Additionally, documents obtained by the *New York Times* this month revealed that ICE is considering transforming a warehouse in Concord, North Carolina into a new detention center.[32]  Upon information and belief, these plans anticipate and will facilitate increased immigration enforcement activity within North Carolina.

151.    DHS agents continue to carry out indiscriminate warrantless arrests throughout the State, as evidenced by ICE agents' January 2026 assault of Plaintiffs Godinez and Napoles.

152.    These ongoing and growing operations in North Carolina perpetuate harm to Plaintiffs and class members and expose them to an intolerable risk of unlawful arrests.

### DHS'S SIMILAR PRACTICES IN OTHER JURISDICTIONS

153.    The warrantless arrest policy in North Carolina aligns with DHS's practices in other places where it has surged enforcement. In those places, courts have found consistent and systematic efforts by DHS to subject individuals to warrantless arrests made without probable cause of escape risk, which courts in those jurisdictions have held unlawful under § 1357(a)(2). *See Castañon Nava v.*

---

[31] *Id.*

[32] *See* Madeleine Ngo, Hamed Aleaziz & Allison McCann, *As ICE Buys Up Warehouses, Even Some Trump Voters Say No,* N.Y. Times (Feb. 18, 2026), https://perma.cc/3B3T-E52J.

*Dep't of Homeland Sec.*, 805 F. Supp. 3d 823, 858, 861 (N.D. Ill. 2025); *Ramirez Ovando v. Noem*, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *15 (D. Colo. Nov. 25, 2025); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417-BAH, 2025 WL 3465518, at *26-27 (D.D.C. Dec. 2, 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 735 (E.D. Cal. 2025); *M-J-M-A & Victor Cruz Gamez v. Hermosillo*, No. 6:25-CV-02011-MTK, 2026 WL 303612, at *1 (D. Or. Feb. 4, 2026).

154.   In each of these cases, district courts preliminarily enjoined DHS's practice of arresting individuals without a warrant and without probable cause to believe they present an escape risk.

155.   This nationwide pattern of unlawful conduct also reverses established DHS practice, which itself was prompted by litigation. In *Castañon Nava v. Dep't of Homeland Security*, plaintiffs sued DHS in May 2018 to challenge unlawful warrantless arrests in the Chicago area. 435 F. Supp. 3d 880, 885 (N.D. Ill. 2020). The plaintiffs alleged that ICE agents arrested and detained each individual plaintiff without making an individualized determination that the person was likely to escape before a warrant could be obtained, in violation of 8 U.S.C. § 1357(a)(2). That litigation resulted in a settlement, approved on February 8, 2022, in which DHS agreed to promulgate and follow a "Broadcast Statement of Policy"— a policy that simply required agents to do what 8 U.S.C. § 1357(a)(2) requires—to ensure that warrantless arrests are only made when an agent makes an individualized assessment of probable cause.

156. The Broadcast Statement of Policy requires DHS officers to consider the totality of the circumstances in evaluating a person's "likelihood of escape," including community ties and prior attempts to evade authorities. *Castañon Nava*, No. 1:18-cv-03757 (Feb. 7, 2022), Dkt. No. 155-1 (Broadcast Statement of Policy), at ¶ 1. The policy also requires that, following a warrantless arrest, DHS officers document its facts and circumstances "as soon as practicable," including "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." *Id.* at ¶ 2.

157. DHS has systematically disregarded this policy in North Carolina and other places where it has increased enforcement. And it has attempted to cancel the policy altogether. In June 2025, DHS announced that it would no longer follow the Broadcast Policy. But the policy remains in effect, as the district court in *Nava* confirmed in a February 17, 2026 order. *See* Order, *Castañon Nava*, No. 1:18-cv-03757 (Feb. 16, 2026), Dkt. No. 301.

158. Along similar lines, ICE's prior longstanding policy and practice, for at least fifteen years, required ICE agents to complete a "Field Operations Worksheet" (FOW) by providing details about their target and then submit the completed form to a supervisor for specific approval prior to conducting any operation to arrest an immigrant in the United States.

159. Without explanation or even announcement, DHS recently changed its policy to stop requiring completion of the FOW, and to stop requiring subsequent specific supervisory approval prior to conducting operations to arrest

a noncitizen in the United States. Under ICE's policy and practice before the recent change, the FOW was used in almost every arrest made by the Enforcement and Removal Operations division of ICE, the only exceptions being instances in which ICE was called to assist local law enforcement agencies.

160. As other courts have concluded, DHS has been systematically ignoring the Broadcast Policy and the requirements of § 1357(a)(2) since the start of 2025.

161. As in North Carolina, DHS has increased operations in Los Angeles, California; Portland, Oregon; Washington, D.C., and across the state of Colorado. During these operations, DHS agents—driving unmarked vehicles, wearing camouflage or tactical-style uniforms, covering their faces with masks, and carrying military-style weapons—have conducted raids and made hundreds of arrests. Agents have routinely arrested groups of people who appeared Latino or were speaking Spanish, apparently without knowing who they were ahead of time or checking identification or immigration status before detaining them. They have targeted businesses and workplaces, apparently targeting Latino people generally, rather than particular people for whom they had warrants. They have routinely used excessive force in these arrests, including smashing car windows and forcibly pulling people from their cars.

162. Most recently, federal agents have implemented similar policies and practices in Minnesota, with up to thousands of federal agents—often masked, armored, and carrying assault rifles and chemical munitions—on the streets of Minneapolis, St. Paul, and the greater Twin Cities area, as well as other locations

in Minnesota. DHS agents have shot and killed two U.S. citizens on the streets of Minneapolis: a 37-year-old mother during a traffic encounter, and a 37-year-old intensive care nurse for the Department of Veterans Affairs.

163.    Nor are DHS agents receiving training that might curb or prevent this unlawful behavior—in fact, such training is being slashed. As a former ICE attorney informed Congress just this week, ICE has pared away "classes that teach the Constitution, our legal system, firearms training, the use of force, lawful arrests, proper detention and the limits of officers' authority," to the point that "ICE is teaching cadets to violate the Constitution."[33]

## DHS'S PUBLIC ACKNOWLEDGMENTS OF ITS UNLAWFUL BEHAVIOR

164.    DHS's disregard for the warrantless arrest statute is also clear from its public statements about its arrest practices.

165.    DHS has repeatedly acknowledged in public statements that agents use the lower "reasonable suspicion" standard—not "probable cause"—to make arrests. In response to a lawsuit filed in the District of Columbia regarding warrantless arrests in September 2025, a DHS spokeswoman said, "DHS law enforcement uses 'reasonable suspicion' to make arrests."[34]

---

[33] See Nicholas Nehamas & Hamad Aleasiz, *Training for New ICE Agents Is 'Deficient' and 'Broken,' Whistle-Blower Says*, N.Y. Times (Feb. 23, 2026), https://perma.cc/M7RQ-SHYH.

[34] See Teo Armus & Jenny Gathright, *Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.,* Washington Post (Sept. 25, 2025), https://perma.cc/22QL-NS88.

166. The list of similar statements from DHS is long. For example, DHS made similar statements in an October 6, 2025, press release[35] and a November 19, 2025, news article.[36] On January 16, 2026, the official DHS account on X (formerly Twitter) published posts stating "[l]aw enforcement uses 'reasonable suspicion' to make arrests."[37]

167. DHS has likewise acknowledged in public statements that agents conduct immigration enforcement arrests without assessing escape risk, as required by law. In an October 1, 2025, press release, DHS stated, "If and when we do encounter individuals subject to arrest, our law enforcement is trained to ask a series of well-determined questions to determine status and removability," with no mention of any assessment of escape risk.[38]

168. DHS recently underscored its disregard for the requirement to perform an individualized assessment of escape risk in a Memorandum issued on

---

[35] *See DHS Debunks Governor Pritzker's Harmful Lies About Operation Midway Blitz in Chicago, Federal Law Enforcement*, Homeland Security (Nov. 19, 2025), https://perma.cc/NBY6-YTH4 ("Under the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement used 'reasonable suspicion' to make arrests.").

[36] *See* Mauricio Casillas, *Lawsuit Could Limit How ICE Conducts Arrests in DC*, NBC4 Washington (Nov. 19, 2025), https://perma.cc/NXV4-Q592 ("Under the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement uses 'reasonable suspicion' to make arrests.").

[37] *See* Homeland Security [@DHSgov], *False. A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity. Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution. The Supreme Court has already ruled that such actions are in line with the Constitution*, X (Jan. 16, 2026), https://perma.cc/3GQQ-BXN6.

[38] *See DHS Debunks New York Times False Reporting: DHS Does NOT Deport U.S. Citizens*, Homeland Security (Nov. 18, 2025), https://perma.cc/2PVQ-W5Z7.

January 28, 2026, by Defendant Lyons (the "Lyons Memo"). The Lyons Memo—issued to all ICE personnel—announced that the Administration would be applying a new interpretation of § 1357(a)(2)'s "likely to escape" requirement. The Lyons Memo authorizes officers to make warrantless arrests whenever they determine a person "is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained."[39]

169.   The factors that the Lyons Memo counsels ICE officers to consider include a series of innocuous circumstances, like presence in a vehicle. Indeed, the Lyons Memo seems to sweep in virtually anyone stopped in a traffic stop or even traveling on a sidewalk: "age and health" (which suggests that anyone not visibly disabled, elderly, or a small child is an escape risk) and "ability to promptly depart the scene" (which encompasses anyone who can walk or has access to a bike or vehicle) are permissible risk factors.

170.   Following the issuance of the Lyons Memo, DHS has made clear that it continues to engage in warrantless arrests without probable cause. DHS's spokesperson told multiple media outlets that the Lyons Memo is "nothing new" and argued that "authorities under 1357 and, of course, reasonable suspicion are protected by the U.S. Constitution."[40]

---

[39] *See* Memorandum from Todd M. Lyons to All ICE Personnel (Jan. 28, 2026), https://perma.cc/W98Q-DVYD; Hamed Aleaziz & Charlie Savage, *ICE Expands Power of Agents to Arrest People Without Warrants*, N.Y. Times (Jan. 30, 2026), https://perma.cc/5J82-ZYN5.

[40] *See* Ashley Oliver, *ICE Reveals Legal Theory Behind Warrantless Immigration Arrests*, Fox News (Feb. 3, 2026), https://perma.cc/ANN9-E5KU; Anthony Iafrate, *Nothing But Green Lights: ICE Memo Expands Agents' Warrantless Arrest Powers*, Daily Caller (Jan. 31, 2026), https://perma.cc/HY3E-AFLU.

171.    The Lyons Memo is another confirmation of ICE's policy and practice in North Carolina of making warrantless arrests without the probable cause required by law, and an attempt to render meaningless the "likely to escape" requirement, gutting the protections Congress has enacted.

## CLASS ACTION ALLEGATIONS

172.    Plaintiffs Willy Aceituno, Yoshi Cuenca Villamar, Ruben Arguera Lopez, Edwin Godinez, and Yair Alexander Napoles bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

173.    Mr. Aceituno, Mr. Cuenca, Mr. Arguera Lopez, Mr. Godinez, and Mr. Napoles seek to represent the following class and subclasses:

174.    **Warrantless Arrests Class**: All persons who, since November 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in North Carolina.

- **Removability Subclass**: All persons who, since November 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in North Carolina without probable cause that the person is a non-citizen who is subject to removal from the United States.

- **Escape Risk Subclass**: All persons who, since November 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in North Carolina without

probable cause that the person is likely to escape before a warrant can be obtained.

175.    Plaintiffs reserve the right to amend or modify the class and subclass definitions as appropriate.

176.    The proposed class and subclasses satisfy the prerequisites of Rule 23(a) and 23(b)(2).

177.    They easily satisfy the numerosity requirement of Rule 23(a)(1). Although the number of individuals who have been or will be subject to unlawful stops and arrests by Defendants under these policies is not known with precision, class members number in the hundreds. Since November 1, 2025, federal agents publicized the arrests of more than 425 people in North Carolina, indicating that they have detained scores more than the individuals whose arrests were publicized.[41] The frequent detentions of U.S. citizens and other lawfully present individuals who are later released on the same day are unlikely to be counted among these official arrest figures, even though they often involve handcuffing, physical assault, property confiscation, or forced transportation, or otherwise meet the legal criteria for arrest. The vast majority of these stops and arrests have been carried out without a warrant. Defendants are indiscriminately stopping and arresting people throughout the state without reasonable suspicion or probable cause, as illustrated by the numerous stories of Plaintiffs and witnesses in this case.

---

[41] *See* Carolina Bowyer & Ciara Lankford, *Over 425 Arrested in Charlotte Immigration Operation*, NewsNation (Dec. 3, 2025), https://perma.cc/4WDD-APFX.

178. The proposed class and subclasses satisfy the commonality requirement of Rule 23(a)(2) as they share common issues of fact or law, including but not limited to whether Defendants' policies and practices violate 8 U.S.C. § 1357(a)(2).

179. The proposed class and subclasses also satisfy the typicality requirement of Rule 23(a)(3). The claims of the proposed class representatives are typical of the classes because they were stopped without reasonable suspicion, arrested without a warrant and without probable cause of removability or escape risk.

180. Plaintiffs are adequate class representatives, as required by Rule 23(a)(4), as they have no conflict of interest with the putative class members, will fairly and adequately protect the interests of the class, and understand and accept their responsibilities as class representatives. They have also retained qualified counsel with adequate resources and significant experience to prosecute their claims.

181. The proposed class and subclasses satisfy the requirements of Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, as they have policies and practices to which everyone in the class and subclasses is subject. Final injunctive or declaratory relief therefore is appropriate to the class and subclasses as a whole.

182.    Counsel for Plaintiffs have extensive experience litigating class actions and cases involving civil and constitutional rights generally and are therefore qualified to be certified as class counsel pursuant to Rule 23(g).

## CLAIMS FOR RELIEF

### Count I

### Warrantless Arrests without Individualized Removability Determinations

### Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), and 5 U.S.C. §§ 704, 706(2)(C)

183.    On behalf of the Class and the Removability Risk Subclass, Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

184.    Defendants arrested Plaintiffs without warrants. Before each arrest, Defendants failed to make the required individualized finding that the person arrested was in violation of the immigration laws.

185.    Defendants made each of these arrests without a warrant and without "reason to believe" that Plaintiffs were "in the United States in violation of any [immigration] law or regulation" in violation of 8 U.S.C. § 1357(a)(2).

186.    These arrests were part of Defendants' policy, pattern, and/or practice of making warrantless arrests without probable cause of removability.

187.    DHS's ongoing and increasing presence and enforcement activity in North Carolina, as well as its public statements that it intends to continue the

51

Charlotte's Web campaign, demonstrate that Defendants' illegal arrest tactics are ongoing.

188. Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized status determination is final agency action that is ultra vires and in excess of statutory jurisdiction, authority, or limitations under 8 U.S.C. § 1357(a)(2). *See* 5 U.S.C. §§ 704, 706(2)(C).

189. This Court has inherent equitable authority to enjoin violations of the federal law by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

190. This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

191. Individual Plaintiffs and Class members have no plain, adequate, or complete remedy at law to address the wrongs described herein. The relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

### Count II

### Warrantless Arrests without Individualized Escape Risk Determinations

### Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii) and 5 U.S.C. §§ 704, 706(2)(C)

192. On behalf of the Class and the Escape Risk Subclass, Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

193. Defendants arrested Plaintiffs without warrants. Before each arrest, Defendants failed to make the required individualized finding that the person arrested posed a flight risk.

194. Defendants made each of these arrests without a warrant and without "reason to believe" that Plaintiffs and members of the Escape Risk Subclass were "likely to escape before a warrant can be obtained for [their] arrest" in violation of 8 U.S.C. § 1357(a)(2).

195. These arrests were part of Defendants' policy, pattern, and/or practice of using warrantless arrests.

196. DHS's ongoing and increasing presence and enforcement activity in North Carolina, as well as its public statements that it intends to continue the Charlotte's Web campaign, demonstrate that Defendants' illegal arrest tactics are ongoing.

197. Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized fight risk determination is final agency action that is ultra vires and in excess of statutory jurisdiction, authority, or limitations under 8 U.S.C. § 1357(a)(2). *See* 5 U.S.C. §§ 704, 706(2)(C).

198. This Court has inherent equitable authority to enjoin violations of the federal law by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

199. This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

200. The relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

1. Certify the Warrantless Arrests Class, Removability Subclass, and Escape Risk Subclass as described above, and appoint Mr. Aceituno, Mr. Cuenca, Mr. Arguera Lopez, Mr. Godinez, and Mr. Napoles as class representatives;

2. Appoint the undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

3. Declare unlawful Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the person being arrested is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

4. Declare unlawful Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the person being arrested is likely to escape before a warrant can be obtained as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), and in excess

of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

5.     Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the person being arrested is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens in violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii);

6.     Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the person being arrested is likely to escape before a warrant can be obtained in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

7.     Issue permanent injunctive relief preventing Defendants from engaging in the conduct described above;

8.     Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge, at a time and in a manner agreed upon with Plaintiffs, all records collected and maintained about Plaintiffs and class members from their unlawful arrests, including any derivative information;

9.     Award Plaintiffs their costs and attorney's fees; and

10.     Issue any and all other such relief as the Court deems appropriate.

Dated: February 24, 2026

Respectfully submitted,

Spencer Amdur**
Oscar Sarabia Roman**
**ACLU Foundation Immigrants' Rights Project**
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org

*Counsel for all Plaintiffs*

Kathryn Huddleston**
Lucia Goin**
**ACLU Foundation Immigrants' Rights Project**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org
lgoin@aclu.org

*Counsel for all Plaintiffs*

Jacob H. Sussman
NC Bar No. 31821
**Southern Coalition for Social Justice**
P.O. Box 51280
Durham, NC 27717
jsussman@scsj.org
T: (919) 323-3380 (ext. 129)

*Counsel for all Plaintiffs*

**Pro hac vice** motion forthcoming

/s/ Kristi Graunke
Kristi Graunke
NC Bar No. 51612
Corina Scott*
NC Bar No. 64573
Jaclyn Maffetore
NC Bar No. 50849
**ACLU of North Carolina Legal Foundation**
P.O. Box 28004
Raleigh, NC 27611
kgraunke@acluofnc.org
cscott@acluofnc.org
jmaffetore@acluofnc.org
T (Graunke): (919) 354-5066
*application to WDNC pending

*Counsel for all Plaintiffs*

Johanna M. Hickman**
DC Bar No. 981770
Adnan Perwez**
DC Bar No. 90027532
Steven Y. Bressler**
DC Bar No. 482492
Brian Netter**
DC Bar No. 979362
**Democracy Forward Foundation**
P.O. Box 34553
Washington, DC 20043
hhickman@democracyforward.org
aperwez@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org
T: (202) 448-9090

*Counsel for Plaintiffs Cuenca, Arguera Lopez, Godinez and Napoles*