| | |
|---|---|
| WILLY WENDER ACEITUNO, YOSHI CUENCA VILLAMAR, RUBEN ARGUERA LOPEZ, EDWIN GODINEZ, and YAIR ALEXANDER NAPOLES, on behalf of themselves and others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN,[1] in his official capacity as Secretary of Homeland Security; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of Customs & Border Protection; U.S. BORDER PATROL; MICHAEL W. BANKS, in his official capacity as Chief of U.S. Border Control; TODD LYONS, in his official capacity as Senior Officer Performing the Duties of the Director of Immigration and Customs Enforcement; and SEAN GALLAGHER, in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for Atlanta, Georgia,<br><br>    Defendants. | |

## UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

---

[1] Under Federal Rule of Civil Procedure 25(d), Secretary Mullin is automatically substituted for his predecessor, Kristi Noem.

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................... 1

BACKGROUND

    A. Legal standard for warrantless arrests.................................................. 2

    B. Plaintiffs' complaint .............................................................................. 3

ARGUMENT

    A. Rule 12(b)(1) standard ......................................................................... 8

    B. Plaintiffs lack standing to seek injunctive relief ................................. 9

        1. Standing to seek injunctive relief based on a future harm requires Plaintiffs to show that the future harm is "certainly imminent" ................................................................. 9

        2. Plaintiffs have not alleged facts supporting a threat of future harm that is both real and certainly imminent ............. 14

    C. The Administrative Procedure Act divests this Court of subject-matter jurisdiction to adjudicate Plaintiffs' claims because they do not allege facts describing final agency action........................ 18

    D. The Court lacks jurisdiction to grant classwide relief.......................... 25

CONCLUSION................................................................................................. 26

# TABLE OF AUTHORITIES

Page

**Cases**

*Beck v. McDonald,*
848 F.3d 262 (4th Cir. 2017) .................................................................. 11, 12, 13, 15

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ...................................................................................... 20

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ........................................................................................ 7

*Baker v. Carr,*
369 U.S. 186 (1962) ........................................................................................ 9

*Bennett v. Spear,*
520 U.S. 154 (1997) .................................................................................. 19, 24

*Biden v. Texas,*
597 U.S. 785 (2022) ...................................................................................... 24

*Black Lives Matter L.A. v. City of Los Angeles,*
113 F.4th 1249 (9th Cir. 2024)....................................................................... 21

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1987) ................................................................................ passim

*City of New York v. U.S. Dep't of Defense,*
913 F.3d 423 (4th Cir. 2019) ......................................................................... 19

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................................................................ 9, 10, 13, 18

*Durden v. United States,*
736 F.3d 296 (4th Cir. 2013) ........................................................................... 8

*Escobar Molina v. U.S. Dep't of Homeland Sec.,*
811 F. Supp. 3d 1 (D.D.C. 2025) ................................................................ 17, 18

*M-J-M-A v. Hermosillo,*
No. 6:25-cv-2011F. Supp. 3d —,2026 WL 562063 (D. Or. Feb. 27, 2026) ........ 17, 18

*Federal Trade Comm'n. v. Standard Oil Co. of Calif.,*
449 U.S. 232 (1980) ...................................................................................... 19

*Garland v. Gonzalez,*
596 U.S. 543 (2022) ................................................................. 25, 26

*Holmes v. Elephant Ins. Co.,*
156 F.4th 413 (4th Cir. 2025)................................................... passim

*Hussen v. Noem,*
No. 26-cv-324, — F. Supp. 3d —, 2026 WL 657936
(D. Minn. Mar. 9, 2026)......................................................... 3, 11, 17

*Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n,*
105 F.4th 627 (4th Cir. 2024)............................................. 18, 19, 20, 23

*Kerns v. United States,*
585 F.3d 187 (4th Cir. 2009) ................................................... 8

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................. 9

*Molina v. U.S. Dep't of Homeland Sec.,*
Civil Action No. 25-3417, — F. Supp. 3d —, 2026 WL 1256234
(D.D.C. May 7, 2026) ........................................................... 22

*Morales v. Chadbourne,*
793 F.3d 208 (1st Cir. 2015)................................................... 3

*Murthy v. Missouri,*
603 U.S. 43 (2024) .............................................................. 12, 13

*N.S. v. Dixon,*
141 F.4th 279 (D.C. Cir. 2025)................................................ 26

*Noem v. Vasquez Perdomo,*
146 S. Ct. 1 (2025) .............................................................. 11, 17

*O'Shea v. Littlejohn,*
414 U.S. 488 (1974) ............................................................. 17

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.,*
578 U.S. 590 (2016) ............................................................. 24

*United States v. Manbeck,*
744 F.2d 360 (4th Cir. 1984) .................................................. 24

*United States v. Puebla-Zamora,*
996 F.3d 535 (8th Cir. 2021) .................................................. 3

iv

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ......................................................................... 19

*Widakuswara v. Lake*,
   No. 25-5145, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ...................................... 21

**<u>Statutes</u>**

5 U.S.C. § 551 ....................................................................................................... 1

5 U.S.C. § 551(13) ............................................................................................... 19

5 U.S.C. § 706(2) .................................................................................................. 7

8 U.S.C. § 1226(a) ................................................................................................ 3

8 U.S.C. § 1229 .................................................................................................. 26

8 U.S.C. § 1252(f)(1)................................................................................. 1, 2, 25, 26

8 U.S.C. § 1357................................................................................................... 26

8 U.S.C. § 1357(a)(2) .................................................................................... passim

8 U.S.C. §§ 1221–1231 ...................................................................................... 25

8 U.S.C. §§ 1225(b)(2) ....................................................................................... 26

8 U.S.C. §§ 1226................................................................................................ 26

**<u>Rules</u>**

Federal Rule of Civil Procedure 12(b)(1) .............................................................. 8

Federal Rule of Civil Procedure 25(d)..................................................................... i

**<u>Regulations</u>**

8 C.F.R. § 287.8(c)(2)(i) ............................................................................ 3, 20, 21

8 C.F.R. §§ 236.1(b)(1) ....................................................................................... 3

Case 3:26-cv-00146-SCR-WCM    Document 24    Filed 06/08/26    Page 5 of 33

The United States has moved to dismiss Plaintiffs' complaint under Federal Civil Rule of Civil Procedure 12(b)(1).  Plaintiffs lack standing to sue Defendants for the injunctive relief they seek because the prospective injuries they allege are not sufficiently imminent to present a substantial risk of future harm.  This Court also lacks subject-matter jurisdiction to review Plaintiffs' claims under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and under the Immigration and Nationality Act, 8 U.S.C. § 1252(f)(1).

**<u>INTRODUCTION</u>**

This Court should dismiss Plaintiffs' action because they lack standing to seek the injunctive relief they ask this Court to grant.  Plaintiffs' complaint alleges that during the fall of 2025, officers with U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) surged into the Charlotte, North Carolina, area and conducted an operation, during which certain individuals were subject to warrantless arrests without probable cause to believe that the individuals were removable from the United States or posed an immediate escape risk.  WDNC Case No. 3:26CV146, Doc. 1 ¶¶ 5, 9, 35–36.  Plaintiffs are five Latino men who allege that each of them was arrested without probable cause to believe he was removable from the United States or to believe he posed an escape risk.  *Id.*, Doc. 1 ¶¶ 13–16.  Although Plaintiffs conclusively assert that the ICE surge operation will continue indefinitely, the facts they allege do not support that assertion.  And none of the facts alleged supports standing because they do not describe circumstances suggesting that any one of the plaintiffs faces a substantial

1

risk that he will again be subject to a warrantless arrest at the hands of immigration officers who lack probable cause to believe he is removable and likely to escape, let alone that such arrest is imminent.

This Court should also dismiss Plaintiffs' complaint because this Court lacks subject-matter jurisdiction under the Administrative Procedure Act and the Immigration and Nationality Act. The Administrative Procedure Act only authorizes judicial review of final agency action. And the Supreme Court and this Court have made clear that agency action is only "final" if it is the culmination of a decisionmaking process intended to result in final agency action. An agency's written policy is the best evidence of its final action. Plaintiffs' complaint, which relies primarily on news articles and isolated statements from the DHS representatives, does not allege final agency action.

Section 242(f)(1) of the Immigration and Nationality Act also limits this Court's jurisdiction. *See* 8 U.S.C. § 1252(f)(1). That provision precludes this Court from granting classwide injunctive relief against immigration authorities based on acts they performed while conducting certain enforcement activities under the Act, including the detention, examination, and removal of aliens under § 287(a)(2) of the Act, 8 U.S.C. § 1357(a)(2). Because that relief is exactly what Plaintiffs seek and because they seek classwide relief, § 242(f)(1) divests this Court of subject-matter jurisdiction over Plaintiffs' complaint.

<u>**BACKGROUND**</u>

**A. Legal standard for warrantless arrests.**

2

Section 287 of the Immigration and Nationality Act authorizes immigration officers to "arrest any alien in the United States" without a warrant when there is "reason to believe" that the alien "is in the United States in violation of" federal immigration law "and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). The regulations of the Department of Homeland Security mirror this requirement. 8 C.F.R. § 287.8(c)(2)(i)–(ii). Circuit courts of appeals have equated the "reason to believe" standard with probable cause. *See United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021); *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015). After a warrantless arrest, according to a January 28, 2026, memorandum issued by ICE's Acting Director, Todd M. Lyons, and distributed to all ICE personnel, ICE officers "must 'clearly, succinctly, and contemporaneously document' in Form I-213 'all factors considered in determining that the alien was likely to escape before the warrant could be obtained.'" *Hussen v. Noem*, No. 26-cv-324, — F. Supp. 3d —, 2026 WL 657936, at *27 (D. Minn. Mar. 9, 2026) (quoting "Lyons Memo"). Designated immigration officers may also issue a Form I-200 administrative warrant to arrest and detain an alien pending removal proceedings. *See* 8 U.S.C. § 1226(a); 8 C.F.R. §§ 236.1(b)(1), 287.5(e)(2).

## B. Plaintiffs' complaint

As noted above, Plaintiffs are five Latino men who allege that they were unlawfully subject to a warrantless arrest in or near Charlotte, North Carolina. ECF 1 ¶¶ 12–16. Plaintiffs allege that Plaintiffs Willy Wender Aceituno and Yoshi

3

Cuenca Villamar were arrested on November 15, 2025. *Id.* ¶¶ 13, 14, 41. Plaintiff

Ruben Arguera Lopez was arrested two days later, on November 17, in what

Plaintiffs describe as "the midst" of "Operation Charlotte's Web" — an immigration-

enforcement effort "[l]aunched" by immigration officers in November of 2025 into

the Charlotte area. *Id.* ¶¶ 5, 14, 35. And Plaintiffs Edwin Godinez and Yair

Alexander Napoles were arrested in early January of 2026. *Id.* ¶¶ 15–16. Plaintiffs

allege that Aceituno, Cuenca, Godinez, and Napoles are United States citizens,

while Lopez has a visa that authorizes him to live and work in the United States.

*Id.* ¶¶ 10, 83.

Plaintiffs allege that at the time they filed their complaint in February of

2026, Department of Homeland Security (DHS) agents had, in "recent months"

confronted, detained, or arrested "hundreds of North Carolinians, many of them

U.S. citizens or non-citizens with a form of immigration status." *Id.* 1 ¶ 1.

Plaintiffs allege that agents were targeting areas with "high concentrations of

Latino residents" and were "arresting numerous Latino-appearing individuals

without any basis to believe these individuals are unlawfully present." *Id.*, Doc. 1

¶¶ 39-40. These detentions and arrests were conducted "indiscriminately,"

according to the complaint, and without "following the basic standards required by

federal law." *Id.* ¶¶ 1, 177.

Plaintiffs allege that DHS "is engaging in a systematic policy and practice" of

making warrantless arrests without probable cause to believe that the detainee was

removable from the United States and posed an immediate escape risk. *Id.* ¶¶ 8–9.

Plaintiffs assert in their complaint that their experiences are representative because they were arrested without probable cause and had agents conducted the required likelihood-of-escape analysis, they would have learned that none of the plaintiffs presented a risk that they were likely to escape. *Id.* ¶¶ 3, 10.

Plaintiffs allege that Operation Charlotte's Web "largely focused on Charlotte" but that DHS agents had "also fanned out to other urban areas in the state," including Durham and Raleigh." *Id.* ¶¶ 35, 39. Citing news reports, Plaintiffs allege that more than 425 people were arrested during Operation Charlotte's Web in November of 2025. *Id.* ¶ 39. Plaintiffs also allege that "[m]asked DHS agents remain in communities throughout the state conducting warrantless arrests." *Id.* ¶ 40.

Plaintiffs allege that they and other United States citizens were arrested under circumstances establishing that arresting officers lacked probable cause to believe they were removable from the United States or that there was a likelihood of their escape. *Id.* ¶¶ 49, 53–55, 66–77, 87–96, 105–11, 117, 121–23. Plaintiffs also allege that they do not feel comfortable going out and fear future arrests by DHS agents. *Id.* ¶¶ 59–63, 80–82, 97–99, 114, 116.

Plaintiffs allege reports that increased immigration enforcement continues in North Carolina, relying on "several arrests" in Durham, North Carolina, in December of 2025; a "report" from a "grassroots community organization" that "50 additional DHS agents were to be deployed to North Carolina," also in December of 2025; and the "expectation" of Mecklenburg County Sheriff McFadden that there

5

would be "increased enforcement activities" in 2026. *Id.* ¶¶ 145–46. Plaintiffs also rely on the arrests of Plaintiffs Godinez and Napoles in January of 2026 to support their allegation that there exist "ongoing and growing operations in North Carolina" that will "perpetuate harm to Plaintiffs and class members" by exposing them to "an intolerable risk of unlawful arrests." *Id.* ¶ 152.

The Department of Homeland Security, according to the complaint, has disregarded its own policies requiring its officers to ensure that warrantless arrests are made based on an individualized assessment of probable cause. *Id.* ¶¶ 155–60. DHS has also, Plaintiffs allege, acknowledged that its agents use "the lower 'reasonable suspicion' standard" when making arrests, instead of probable cause. *Id.* ¶¶ 165–66, 170. And Plaintiffs allege that the agency now interprets "likely to escape" to be satisfied when an officer determines that an individual is unlikely to be located at the scene of their encounter or another clearly identifiable location once the officer obtains an administrative warrant. *Id.* ¶ 168.

Seeking to represent a class and two subclasses, Plaintiffs define the class to include "[a]ll persons who, since November 1, 2025, have or will be subject to a warrantless arrest for immigration purposes" by the Department of Homeland Security in North Carolina. *Id.* ¶ 174. Plaintiffs define two subclasses: (1) individuals in the class who "have been or will be subject to a warrantless arrest" without probable cause to believe the person is a non-citizen subject to removal from the United States; and (2) individuals who "have been or will be subject to a

6

warrantless arrest" without probable cause to believe the person "is likely to escape before a warrant can be obtained." *Id.*

Plaintiffs assert two causes of action in their complaint. In Count One of their complaint, Plaintiffs allege that their warrantless arrests were conducted without "reason to believe" that they were "'in the United States in violation of any [immigration] law or regulation' in violation of 8 U.S.C. § 1357(a)(2)." *Id.* ¶ 185. Plaintiffs allege that Defendants' "policy, pattern and/or practice of making warrantless arrests without the required individualized status determination" is a "final agency action." *Id.* ¶ 188. And Plaintiffs allege that this Court has "inherent equitable authority to enjoin violations of the federal law by federal officers," relying on *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). *Id.* ¶ 189. Plaintiffs allege further that this Court may hold and set aside Defendants' actions under the Administrative Procedure Act, 5 U.S.C. § 706(2). In Count Two, Plaintiffs make the same legal claims against Defendants based on their alleged failure "to make the required individualized finding that the person arrested posed a flight risk." *Id.* ¶ 193–99.

In their prayer for relief, Plaintiffs ask this Court to (1) certify the class and subclasses described in the complaint; (2) declare unlawful, vacate, and set aside Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the arrestee is removable from the United States and is likely to escape; (3) issue permanent injunctive relief preventing Defendants from "engaging in the conduct described" in

the complaint; (4) order Defendants to expunge all records collected and maintained about Plaintiffs and all class members from their unlawful arrests; and (5) award Plaintiffs costs and attorney's fees. *Id.* at 54–55.

**ARGUMENT**

This Court should dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs lack standing. This Court should also dismiss Plaintiffs' complaint because this Court lacks subject-matter jurisdiction under the Administrative Procedure Act and the Immigration and Nationality Act to grant Plaintiffs the relief they seek.

### A. Rule 12(b)(1) standard

A defendant contesting subject-matter jurisdiction may (1) attack the veracity of the allegations contained in the complaint or (2) contend that, even assuming that the complaint's allegations are true, the complaint fails to describe facts upon which jurisdiction is proper. *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). When, as here, a defendant argues that the complaint fails to allege facts supporting a court's exercise of subject-matter jurisdiction, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

8

**B.    Plaintiffs lack standing to seek injunctive relief.**

      1.    *Standing to seek injunctive relief based on a future harm requires Plaintiffs to show that the future harm is "certainly imminent."*

Article III standing requires (1) an injury in fact that is "concrete and particularized"; (2) "a causal connection between the injury and the conduct complained of," such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) a likelihood that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  A plaintiff lacks standing unless the plaintiff demonstrates "a 'personal stake in the outcome.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1987) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  "Abstract injury is not enough."  *Id.*  And where a plaintiff seeks injunctive relief, "past exposure to illegal conduct does not in itself show a present case or controversy," unless that exposure is accompanied by "continuing, present adverse effects."  *Id.* at 102 (cleaned up).

Importantly, not only must the plaintiff demonstrate that he is exposed to future harm, but he must also show that his future harm is "actual or imminent." *Lujan*, 504 U.S. at 564.  The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up) (emphasis in original).  And "[a] future harm is not imminent just because there is an 'objectively reasonable likelihood'

9

that it will someday come to pass." *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 429 (4th Cir. 2025) (quoting *Clapper*, 568 U.S. at 410).

Applying this rule, the Supreme Court rejected the plaintiff's standing argument in *Lyons*, where Lyons, who had previously been subject to a chokehold by the police that rendered him unconscious and damaged his larynx, sought to enjoin the City of Los Angeles to bar its police department from using unconstitutional control holds. *Id.* at 98, 105. The Court explained that Lyons's standing "depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 107. And the allegations that Lyons had earlier been subject to an unconstitutional chokehold *and* that the police in Los Angeles "routinely appl[ied] chokeholds in situations where they [were] not threatened" was not enough. *Id.* The Court described that allegation as falling "*far short* of the allegations that would be necessary to establish a case or controversy between these parties." *Id.* (emphasis added). The Court noted that five months had elapsed since the chokehold incident and Lyons's filing his complaint, without any allegation of further "unfortunate" encounters between Lyons and the police, rejecting the suggestion that "the 'odds' that Lyons . . . would be subjected to a chokehold without any provocation whatsoever" was "sufficient to make out a federal case for equitable relief." *Id.* at 108. The Court explained, in response to Lyons's policy-and-practice argument, that Lyons's "lack of standing [did] not rest on the termination of the police practice but on the speculative nature of his claim that he [would] again experience injury as the result of that practice even if continued." *Id.* at 109.

10

The Supreme Court has recently reinforced this standard by granting a stay in a similar case alleging a policy and pattern-and-practice of indiscriminately stopping individuals without reasonable suspicion of immigration violations. *See Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025); *Id.* at *2–3 (Kavanaugh, J., concurring). Although the Court did not elaborate on why it viewed the United States as likely to succeed on the merits, Justice Kavanaugh explained in a concurrence that under the "Court's decision in [*Lyons*], plaintiffs likely lack[ed] Article III standing to seek a broad injunction restricting immigration officers from making these investigative stops." *Id.* at *2 (Kavanaugh, J., concurring). Justice Kavanaugh explained that in his view, the plaintiffs did not have "standing to obtain future injunctive relief . . . merely because [they] experienced past harm and fear its recurrence." *Id.* He explained further that notwithstanding the plaintiffs' past experience of harm, they "no good basis to believe that law enforcement [would] unlawfully stop *them* in the future" and "certainly no good basis for believing that any stop of the plaintiffs [was] imminent." *Id.* (emphasis in original).

The Fourth Circuit has also emphasized the requirement that plaintiffs seeking injunctive relief show that the future injury caused by the acts they allege is imminent. *See Holmes*, 156 F.4th at 429–33. In *Beck v. McDonald*, the Fourth Circuit rejected a claim of future harm as adequate to support standing where the plaintiffs alleged that 33% of those whose data was stolen during a data breach would become victims of identity theft. 848 F.3d 262, 275 (4th Cir. 2017). Accepting that estimate as true, the Fourth Circuit held that because that

11

assumption would mean that 66% of those affected by the data breach would not become victims of identity theft, that risk fell "far short of establishing a 'substantial risk' of harm" sufficient to support standing. *Id.* at 276. The court made clear that an "attenuated chain of possibilities" leading to the harm a plaintiff anticipates is not sufficient to support Article III standing. *Id.* at 275. And because the data thieves must select, from thousands of others, the personal information of the named plaintiffs and successfully use that information to steal their identities for the harm to materialize, this "attenuated chain" could not "confer standing." *Id.*

The Fourth Circuit similarly rejected a claim of standing as too speculative in *Holmes*, another case involving stolen data, some of which had been found on the dark web. *Holmes*, 156 F.4th at 430. The court explained that the plaintiffs "offer[ed] only a 'speculative chain of possibilities'" supporting their claim of imminent harm. *Id.* at 431 (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). Although acknowledging that hackers list personal information on the dark web hoping that someone will buy it, "no particular piece of personal information is guaranteed to be seen or sold." *Id.* The Fourth Circuit concluded that "[w]ithout more, it is unrealistic to assume that identity thieves will imminently acquire the driver's license number of any given plaintiff." *Id.* Significantly, the Fourth Circuit in *Holmes* rejected decisions by numerous circuits that had upheld standing under similar circumstances. *Id.* at 432. The court explained that many of those cases "appear to implicitly require only a reasonable probability of future harm — a looser

12

notion of imminence urged by the dissent" in the Supreme Court's decision in *Clapper* "but rejected by the majority." *Id.*

The Fourth Circuit has also held that a plaintiff cannot "backdoor standing" by alleging emotional distress "'based on a nonparanoid fear'" of future harm. *Holmes*, 156 F.4th at 434 (quoting *Clapper*, 568 U.S. at 416). In both *Beck* and *Holmes*, the court held that the plaintiffs' claims of emotional distress and fear of further harm were not sufficient to support Article III standing. *Id.* at 434–35; *Beck*, 848 F.3d at 272. As the court in *Holmes* explained, "[t]hough a plaintiff does not choose to suffer emotional distress the way he might choose to spend time or money, a plaintiff can freely allege emotional distress in every case with little fear of disproof." *Holmes*, 156 F.4th at 434.

The Fourth Circuit's rejection of "emotional distress" based on a fear of some future injury as sufficient to support standing to seek injunctive relief is consistent with the Supreme Court's same recognition in *Lyons*. The Court in *Lyons* rejected Lyons's claim of injury-in-fact based on his fear that "he would be choked in any future encounter with the police." *Lyons*, 461 U.S. at 107 n.8. The Court explained that "[i]t is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Id.* "The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

13

2. *Plaintiffs have not alleged facts supporting a threat of future harm that is both real and certainly imminent.*

These authorities foreclose any claim of standing by Plaintiffs. Similar to the plaintiff in *Lyons* who alleged that the Los Angeles Police Department was engaging in a practice and policy of violating detainees' constitutional rights, Plaintiffs allege that DHS has relaxed its warrantless-arrest policies and is engaging in a practice of violating citizens' and lawful residents' constitutional rights when they are suspected of violating immigration laws. Plaintiffs cannot demonstrate, however, that even taking as true their allegations that they previously were arrested without probable cause to believe they were removable or likely to escape, they are at a "substantial risk" of imminently being arrested again without probable cause to believe they are removable and likely to escape or that such an arrest would be caused by the alleged policy.

Moreover, according to data from the United States Census Bureau, in July of 2025, there were more than 1.3 million individuals in North Carolina of Hispanic descent. *See United States Census Bureau Quick Facts*, North Carolina (2025).[2] And there are more than 168,800 individuals of Hispanic descent in Charlotte. *See id.*, Charlotte, North Carolina (2025).[3] Plaintiffs allege that Operation Charlotte's Web resulted in more than 425 arrests in November of 2025. ECF 1 ¶ 39. Even assuming arrests only targeted Latinos, the risk of any individual being subject to

---

[2] Available at https://www.census.gov/quickfacts/fact/table/NC/PST045225.
[3] Available at https://www.census.gov/quickfacts/fact/table/charlottecitynorthcarolina/PST045225.

an unlawful warrantless arrest during the height of the immigration-enforcement surge was approximately .0025%. Plaintiffs' alleged facts do not come close to supporting the conclusion that any of them has anywhere near a 33% chance of future harm — in other words, well below a threshold risk of future harm the Fourth Circuit has described as "far short" of the substantial risk required to confer standing. *Beck*, 848 F.3d at 275.

For these same reasons, even if Plaintiffs could satisfy the substantial-risk requirement, their complaint also fails to describe any risk of harm that is "imminent." A fraction of a 1% chance of unlawful arrest at the height of the surge does not describe an imminent risk of harm. Additionally, Plaintiffs allege generally that DHS has increased enforcement in North Carolina. But they also allege that Lopez was arrested on November 17, "in the midst" of Operation Charlotte's Web, which began on November 15. *See Press Release*, Department of Homeland Security (Nov. 15, 2025).[4] Although ICE and CBP operated in Charlotte and other areas of North Carolina both before and after the immigration-enforcement surge, Plaintiffs have not demonstrated that any area of North Carolina has been subject to a concentration of DHS officers anywhere near the concentration of officers in and around Charlotte between November 15 and 20, 2025 — or that any similar surge in enforcement activity is anticipated in the future, imminently or otherwise.

---

[4] Available at https://www.dhs.gov/news/2025/11/15/dhs-launches-operation-charlottes-web-target-criminal-illegal-aliens-terrorizing.

The Supreme Court's decisions in *Lyons* and the Fourth Circuit's decisions in *Beck* and *Holmes* also make clear that Plaintiffs' allegations that they fear re-arrest without consideration of their individual circumstances also fail to confer standing. The Fourth Circuit has recognized that fear of future harm based on past harm is "not paranoid," but the court held that this fear is not sufficient to support standing because "a plaintiff can freely allege emotional distress in every case with little fear of disproof." *Holmes*, 156 F.4th at 434. And the Supreme Court put it even more directly, holding that "[t]he emotional consequences of a prior act are not a sufficient basis for an injunction," unless there is "a real and immediate threat of future injury." *Lyons*, 461 U.S. at 107 n.8. Indeed, just like in *Lyons*, Plaintiffs have not alleged that they have even encountered immigration agents again, let alone that they have been illegally arrested in the months since their initial arrests. Because Plaintiffs have not alleged a threat of future injury that is both real and "*certainly impending*," their allegations of emotional consequences arising out of their earlier arrests do not support Article III standing to seek injunctive relief.

Even taking as true Plaintiffs allegations that there is a policy to conduct arrests without probable cause, that is still insufficient to demonstrate a concrete imminent injury. In *Lyons*, after all, the Court assumed there was a routine practice of employing an illegal chokehold, yet that unwritten policy did not establish that the plaintiff would be subjected to that chokehold anytime soon. *Lyons*, 461 U.S. at 105. The District of Minnesota reached the same conclusion, finding there was an illegal policy of warrantless arrests without probable cause but

16

plaintiffs had "'no good basis to believe that law enforcement [would] unlawfully stop or arrest them in the future based on prohibited factors — and certainly no good basis for believing that any stop or arrest of the plaintiffs [was] imminent.'" *Hussen v. Noem*, No. 26-cv-324, — F. Supp. 3d —, 2026 WL 657936, at *41–42 (D. Minn. Mar. 9, 2026) (cleaned up) (quoting *Vasquez Perdomo*, 146 S. Ct. at 1, *2 (2025) (Kavanaugh, J., concurring)). Explaining its holding that the plaintiffs lacked standing, the district court in *Hussen* noted that none of the plaintiffs had been "unlawfully stopped or arrested a second time." *Id.* The court also rejected the plaintiffs' argument that their allegations of "ongoing psychological harm" conferred standing. *Id.*, 2026 WL 657936, at *42. The court explained that when the Supreme Court referred to "continuing, present adverse effects," it was referring to "the defendant's ongoing unlawful treatment of the plaintiffs, not the lingering effects of the plaintiffs' injury." *Id.* (discussing *O'Shea v. Littlejohn*, 414 U.S. 488, 495–96 (1974)). Here, in order to establish standing, Plaintiffs would have to be imminently likely encounter agents again and imminently likely to be arrested without a warrant and without probable cause, because of the alleged policy. This attenuated chain of events is too speculative to support standing.

Two district courts have held that plaintiffs have Article III standing based on similar allegations made by Plaintiffs in their complaint, but both applied a more relaxed standard than the standard embraced by the Fourth Circuit. *See M-J-M-A v. Hermosillo*, No. 6:25-cv-2011, — F. Supp. 3d —, 2026 WL 562063, at *15–*16 (D. Or. Feb. 27, 2026); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d

1, 33–37 (D.D.C. 2025). The *M-J-M-A* court applied a Ninth Circuit standing rule that is simply inconsistent with the Fourth Circuit's better interpretation of *Lyons*, *Clapper*, and other Supreme Court decisions. *See M-J-M-A*, 2026 WL 562063, at *15–*16. Under that formulation, a plaintiff has standing to seek injunctive relief as long as "exposure" to an unconstitutional policy constitutes an "ongoing harm," even if "the likelihood of a future stop of a particular individual plaintiff" is not "high." The *Escobar* court similarly held that the plaintiffs had standing to seek injunctive relief as long as the alleged facts were sufficient to support "the reality of the threat of repeated injury." *Id.* at 33–35. The existence of *a threat* of repeated injury is not sufficient, however, to confer standing under *Clapper*, *Lyons*, *Holmes*, and *Beck*. The threat of harm must instead be "*certainly imminent,*" and a risk of future harm of 33% is "far short" of a sufficient risk of future harm. *Clapper*, 568 U.S. at 409 (emphasis in original). Like the district court in *Hussen*, therefore, this Court should reject the standing holdings in *M-J-M-A* and *Escobar* because the reasoning of those decisions is not persuasive and conflicts with Supreme Court and Fourth Circuit authority that binds this Court.

C. **The Administrative Procedure Act divests this Court of subject-matter jurisdiction to adjudicate Plaintiffs' claims because they do not allege facts describing final agency action.**

The Administrative Procedure Act waives the federal government's sovereign immunity "to permit judicial review of only 'final agency actions.'" *Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (cleaned up) (quoting 5 U.S.C. § 704). "Because 'sovereign immunity is

18

jurisdictional in nature,' finality under the [Act] is a jurisdictional requirement." *Id.* (quoting *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 430 (4th Cir. 2019)).

Subject-matter jurisdiction is, therefore, "lacking if the plaintiff fails to challenge a particular 'agency action' that is fit for review." *City of New York*, 913 F.3d at 430. "The term 'action' as used in the Act is a term of art that does not include all conduct" on the part of the government. *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). Instead, the Administrative Procedure Act defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

The Supreme Court has articulated a two-part test for determining whether alleged agency action is "final": (1) The agency's action "mark[s] the consummation of the agency's decisionmaking process"; and (2) The agency's action is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178–79 (1997). To meet the first part of the test, the agency's action "must not be of a merely tentative or interlocutory nature." *Id.* at 179. This finality requirement ensures that judicial intervention does not deny an agency the "opportunity to correct its own mistakes and to apply its expertise." *Federal Trade Comm'n. v. Standard Oil Co. of Calif.*, 449 U.S. 232, 242 (1980). It also avoids "piecemeal review," which is "inefficient" and might prove to be "unnecessary" upon the agency's completion of its process. *Id.*

When determining whether an agency action is final, the Fourth Circuit looks first "to the statutes and regulations that govern the agency action at issue." *Jake's Fireworks*, 105 F.4th at 631. "When examining the consummation prong of *Bennett*, the decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action is properly attributable to the agency itself or represents the culmination of that agency's consideration of an issue." *Id.* (cleaned up). "An action that is 'informal, or only the ruling of a subordinate official, or tentative' ordinarily does not conclude an agency's decisionmaking process." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967)).

Applying this rule, Plaintiffs do not allege a final agency action. The Immigration and Nationality Act and its implementing regulations make clear that immigration officers may only conduct warrantless arrests of those they believe removable if there is "reason to believe" that the alien "is in the United States in violation of" federal immigration law "and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)–(ii). This written guidance binds immigration officers and requires they conduct the individualized probable-cause assessment Plaintiffs suggest the agency has repudiated.

Nor do Plaintiffs' allegations support the existence of an unwritten policy or practice. Though Plaintiffs assert generally in their complaint that ICE and CBP officers conducted warrantless arrests in North Carolina between November of 2025

20

and the date they filed their complaint in February of 2026, they rely primarily on the increase of immigration officers' presence during Operation Charlotte's Web, similar surge operations in other cities, and increasing immigration enforcement generally. ECF 1 ¶¶ 34–40, 145–52, 161–63. They also rely on anecdotes and media reports that speak generally of arrests of individuals of Hispanic descent and describe allegations against DHS. *See*, *e.g.*, *id.* Plaintiffs assert, for example, that during the surge operation in Charlotte, agents arrested individuals, "apparently without knowing who they were or whether they were U.S. citizens or lawfully present non-citizens." *Id.* ¶ 38. Plaintiffs also assert that although DHS had agreed to comply with § 287(a)(2) in the settlement of an action filed in the Northern District of Illinois in 2018, the agency tried to retract its compliance with that settlement in June of 2025 and "systematically disregarded" the policy in North Carolina. *Id.* ¶¶ 155–57. Plaintiffs admit, however, that the policy "remain[ed] in effect" at the time they filed their complaint. *Id.* ¶ 157.

At bottom, Plaintiffs are relying on a handful of allegedly bad arrests to infer a broader policy. But Plaintiffs cannot simply aggregate separate encounters into a single agency action, especially in the law-enforcement context where each encounter is fact specific. *See Widakuswara v. Lake*, No. 25-5145, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (unpublished decision); *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258-62 (9th Cir. 2024) (rejecting Fourth Amendment class action that "appear[ed] to require individual fact-finding"). And even if those facts could support a finding of an *unwritten* policy, it would be

21

insufficient to constitute final agency action in the face of *written* policies, including regulations, requiring officers to adhere to the standard described in § 287(a)(1).

None of these allegations supports a finding that DHS engaged in a decisionmaking process that culminated in final agency action, repudiating application of the § 287(a)(2) standard for warrantless arrests and determining that immigration officers were authorized to execute ultra vires warrantless arrests. Indeed, even if there were confusion about the standard ICE officers were applying in practice, ICE put that speculation to rest in its January 2026 "Lyons Memo." In that memo, ICE made clear that before executing a warrantless arrest, immigration officers must have "probable cause to believe that: (1) the subject is a removable alien; *and* (2) the subject is 'likely to escape' before a warrant for his arrest can be obtained.'" *Molina v. U.S. Dep't of Homeland Sec.*, Civil Action No. 25-3417, — F. Supp. 3d —, 2026 WL 1256234, at *3 (D.D.C. May 7, 2026) (emphasis in original) (quoting Lyons Memo). The memorandum defined "likely to escape" and described seven non-exhaustive factors that an officer could consider in determining whether the subject was "likely to remain at the scene of the encounter." *Id.* These include the subject's behavior before and during the encounter, including a refusal to follow commands or evade officers; the subject's ability and means to "promptly depart" the scene; the subject's age and health; the subject's possession of what appear to be fraudulent documents; and whether the subject presented information the officer suspects is false. *Id.*

Plaintiffs suggest that this memorandum "announced" a "new interpretation" of § 287(a)(2)'s likely-to-escape requirement. ECF 1 ¶ 168. But the memorandum makes clear what § 287(a)(2) and the agency's regulations already make crystal clear: Officers must have probable cause to believe the person they are arresting is a removable alien *and* likely to escape before a warrant for his arrest can be obtained. Plaintiffs may believe the likely-to-escape factors the memorandum describes are inadequate, but that allegation does not support a finding that the agency has taken final action to disregard § 287(a)(2). And in any event, the statute considers the "likelihood of the person escaping before a warrant can be obtained for his arrest," not flight risk or chance the person would appear at a hearing. That inquiry is inherently tied to whether officers can readily relocate the individual, either at the scene or a readily identifiable location based on the totality of the circumstances. The Lyons Memo is fully consistent with the statute. The existence of the Lyons Memo also proves that there was no consummation of a decision-making process to adopt an unwritten policy contrary to the Lyons Memo or statutory and regulatory authority.

The Court should also reject Plaintiffs' suggestion in their complaint that statements by agency personnel that § 287(a)(2) requires "reasonable suspicion" to make arrests demonstrate a change in agency policy. First, these statements, allegedly made in a press release, news article, or X posts or made by individual DHS representatives do not have the indicia of the consummation of an agency decisionmaking process. *See Jake's Fireworks*, 105 F.4th at 631. Second,

construing such statements as final agency action would be especially problematic because "reason to believe," the standard used in § 287(a)(2), sounds sufficiently like "reasonable suspicion," such that even jurists have gotten confused between the "reason to believe" or probable-cause standard, on the one hand, and the reasonable-suspicion standard, on the other hand. *See, e.g., United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984) ("Some confusion exists in the area of warrantless detentions because there are 'seizures' of a person which are limited and need only a reasonable suspicion, . . . and there are 'seizures' of a person which are so restrictive that they are indistinguishable from an arrest and require probable cause . . . .").

Even if Plaintiffs' complaint satisfied the first requirement of agency final action, the facts alleged in their complaint do not allege an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178–79. This second *Bennett* requirement demands that the "legal consequences" of the challenged action are "direct and appreciable." *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). An internal directive can meet this test if it binds agency staff to engage in conduct that affects third parties. *See Biden v. Texas*, 597 U.S. 785, 808–09 (2022).

Plaintiffs' complaint fails this test because they have not alleged facts suggesting that the unwritten policy or practice they allege requires all immigration officers to make all warrantless arrests *without* conducting an individualized assessment of probable cause to believe the arrestee is removable and poses a risk

24

of escape. That would be odd given the contrary written Lyons Memo. Moreover, there is nothing stopping officers from finding probable cause before making an arrest. Because they do not allege a policy that binds agency staff to disregard § 287(a)(2), they have not alleged final agency action, and this Court lacks jurisdiction to review the challenged agency action under the Administrative Procedure Act.

### D.  The Court lacks jurisdiction to grant classwide relief.

Classwide relief would be impermissible even if Plaintiffs had standing and Plaintiffs alleged final agency action because § 242(f)(1) of the Immigration and Nationality Act prevents courts from enjoining Defendants on behalf of a class of individuals. *See* 8 U.S.C. § 1252(f)(1). Section 242(f)(1) deprives any court, except the Supreme Court, of authority to "enjoin or restrain the operation of [8 U.S.C. §§ 1221–1231] other than with respect to the application of such provisions to an individual alien against whom proceedings" under those statutory provisions "have been initiated." *Id.* The Supreme Court has noted that "[t]hose provisions charge the Federal Government with the implementation and enforcement of the immigration laws governing the *inspection*, *apprehension*, *examination*, and *removal* of aliens." *Garland v. Gonzalez*, 596 U.S. 543, 549–50 (2022) (emphasis added). "Accordingly," the Court explained, Congress's restriction on classwide orders that enjoin or restrain "the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them." *Id.* at 550. "[T]he operation of the provisions is a reference not just to the statute itself but to the way

25

Case 3:26-cv-00146-SCR-WCM   Document 24   Filed 06/08/26   Page 30 of 33

that it is being carried out." *Id.* For instance, § 242(f)(1) governs classwide injunctive relief related to detention (8 U.S.C. §§ 1225(b)(2), 1226) and the initiation of removal proceedings (8 U.S.C. § 1229). Warrantless arrests under 8 U.S.C. § 1357(a)(2), are a paradigmatic means of enforcing or implementing detention and the initiation of proceedings. *See Garland*, 596 U.S. at 550.

In fact, the D.C. Circuit held that § 242(f)(1) precluded a classwide injunction against arrests by U.S. Marshals under 8 U.S.C. § 1357 because it "enjoined the Marshals from arresting and detaining any criminal defendant suspected of a civil immigration violation, which includes arrests made with a warrant issued pursuant to § 1226(a) and the detention of any alien charged with any of the crimes listed in § 1226(c)." *N.S. v. Dixon*, 141 F.4th 279, 289-90 (D.C. Cir. 2025). This was so even though the Marshals lacked all authority to carry out such arrests and even though some arrests were warrantless. *Id.* A classwide injunction related to warrantless immigration arrests, therefore, "enjoin[s] or restrain[s] the operation of" those covered provisions. *See* 8 U.S.C. § 1252(f)(1). The same result should obtain here. The classwide injunctive relief sought by Plaintiffs in this case would unlawfully limit the government's ability to conduct warrantless arrests and would restrict "the way that" 8 U.S.C. §§ 1226 and 1229 are "being carried out" by the government on a classwide basis. *Gonzalez*, 596 U.S. at 550.

<u>**CONCLUSION**</u>

For all of the reasons described above, this Court should dismiss Plaintiffs' complaint with prejudice.

26

Respectfully submitted, this 8th day of June, 2026.

RUSS FERGUSON
UNITED STATES ATTORNEY


s/Amy E. Ray
Assistant United States Attorney
N.C. Bar No. 22762
Room 233, US Courthouse
100 Otis Street
Asheville, NC 28801
Tel: 828-259-0662
Fax: 828-271-4327
E-mail: Amy.Ray@usdoj.gov

27

## CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024 and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 8th day of June, 2026.

s/Amy E. Ray
Assistant United States Attorney
