**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

WILLY WENDER ACEITUNO, YOSHI CUENCA VILLAMAR, RUBEN ARGUERA LOPEZ, EDWIN GODINEZ, and YAIR ALEXANDER NAPOLES, *on behalf of themselves and others similarly situated*,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of Customs & Border Protection*; U.S. BORDER PATROL; ROSARIO "PETE" VASQUEZ*, in his official capacity as Chief of U.S. Border Patrol*; DAVID J. VENTURELLA*, in his official capacity as Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement*; and SEAN GALLAGHER, *in his official capacity as U.S. Immigration and Customs Enforcement Field Office Director for Atlanta, Georgia*,

Defendants.

Civil Action No. 26-146

**AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1. Over the past year, armed, masked Department of Homeland Security ("DHS") agents have roamed the streets of Charlotte, Durham, Raleigh, and other areas in North Carolina, detaining and arresting people indiscriminately, without following the basic standards required by federal law. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") officers have stopped, detained, and arrested hundreds of North Carolinians, many of them U.S. citizens or non-citizens with lawful immigration status, as they attempt to walk down the street, go to work, run errands, and pick up their children. The Fourth Amendment prohibits immigration officers from conducting investigative stops unless they have reasonable articulable suspicion that the stopped person is removable. Federal law further bars immigration officers from making arrests unless the arresting officers have probable cause to believe that the arrestee is removable and probable cause to believe that that the arrestee poses an escape risk.

2. These dragnet tactics—like those deployed by DHS in Los Angeles, Chicago, Minneapolis, Portland, Washington, D.C., and Colorado—rely on stopping and arresting individuals in public or semi-public places (including stores, restaurants, worksites, and public streets) without reasonable suspicion that the people they stop or probable cause that the people they arrest are unlawfully present.[1] Those arrested include non-citizens lawfully present in the

---

[1] *See How ICE Went Rogue*, Am. Immigr. Council (Feb. 11., 2026), https://perma.cc/M8SB-WP2U; Chase Woodruff, *ICE 'routinely' made unlawful warrantless arrests in Colorado, federal judge finds*, Colo. Newsline (Nov. 25, 2025), https://perma.cc/EAN3-HN3Z; Rodrique Ngowi,

country, as well as U.S. citizens. Agents are indiscriminately demanding proof of U.S. citizenship and detaining those who do not provide it. But consistent with core American freedoms, an individual declining to produce proof of citizenship to law enforcement on demand is not a basis for reasonable suspicion or probable cause that the person is a non-citizen, much less removable from the United States.

3. DHS's arrests are frequently violent and destructive. Agents smash car windows, drag people from vehicles, confiscate phones and car keys, chase and force vehicles off the road, and force people to the ground to handcuff them. Arrests escalate into dangerous situations that risk the safety of the arrestee and bystanders alike.

4. As Plaintiffs' experiences show, agents frequently stop people to question them about citizenship or immigration status without reasonable suspicion that they are removable, particularly targeting those they perceive to be Latino.

5. As Plaintiffs' experiences also show, these unlawful stops routinely escalate into unlawful arrests, in which agents grab people without making any inquiries into citizenship or immigration status or escape risk, often while ignoring protestations that the individual has proof of status on their person.

---

*Court records raise doubts that ICE is detaining the 'worst of the worst' in Maine*, The Maine Monitor (Jan. 24, 2026), https://perma.cc/5DHV-MZ88; Salvadore Rizzo & Emma Uber, *Federal judge limits warrantless immigration arrests in D.C.*, Washington Post (Dec. 3 2025) https://perma.cc/RBS6-HAKF; The Associated Press, *ICE can't make warrantless arrests in Oregon unless there's risk of escape, judge rules*, NPR (Feb. 5, 2026), https://perma.cc/D9FP-ZD9P.

Officers handcuff and transport arrested people miles away from arrest sites, dumping them on the side of the road once agents have confirmed that the individuals are lawfully present. Agents wear military combat-style uniforms, carry and brandish weapons, and cover their faces with masks, heightening the terror and confusion felt by individuals subjected to these encounters.

6. These operations are causing severe harm to North Carolina communities, particularly children. Over 30,000 students—around 20% of the school district's enrollment—were absent from Charlotte-Mecklenburg Schools on Monday, November 17, 2025, a day on which CBP agents were in the midst of a named immigration enforcement operation—part of their ongoing increased immigration enforcement in North Carolina—they dubbed "Charlotte's Web."[2] Similarly, Durham Public Schools reported a 68% increase in student absences that week, and an absence rate of almost 30% the following week.[3] School districts in Chapel Hill-Carrboro and in Wake, Catawba, and Burke counties also reported significant increases in student absences on days when DHS agents were present or announced their plan to conduct operations in nearby areas.[4] When students

---

[2] *See* James Farrell, *More than 30,000 absences reported at CMS on Monday, after data revision*, WUNC News (Nov. 18, 2025), https://perma.cc/X52W-8QSB.

[3] *See* T. Keung Hui, *30% of Durham Students Stayed Home during Border Patrol Enforcement Surge*, Raleigh News & Observer (Nov. 25, 2025), https://perma.cc/WD2R-KVAW.

[4] *See* T. Keung Hui & David Raynor, *Attendance Drops in Wake, Durham, Chapel Hill Schools during Border Patrol Surge*, Raleigh News & Observer (Nov. 19, 2025), https://perma.cc/LUC4-F4JG; Dave Faherty, *Increased absences in Catawba County schools amid Border Patrol operations*, WSOC-TV (Nov. 18, 2025), https://perma.cc/ZTP7-UGMW.

eventually returned to school, some Latino children arrived with notes pinned to their backpacks reading, "I am a citizen."

7. Many Latino North Carolinians, regardless of immigration status, have been afraid to leave their homes to retrieve basic necessities, like prescriptions or groceries, or perform other routine activities due to the risk of being racially profiled and arrested by DHS agents.[5]

8. Especially during the "Charlotte's Web" operation, religious leaders across Charlotte have reported dramatic drops in church attendance due to heightened enforcement activity.[6] And business owners throughout the state, including U.S.-citizen business owners, have repeatedly closed their businesses due to the risk that DHS agents would arrest them, their staff, or customers.[7] Foot traffic to businesses in Latino neighborhoods remains lower than normal.

9. To carry out its dragnet in North Carolina, DHS is engaging in a systematic policy and practice of stopping people without reasonable suspicion to believe they are removable, as required by the Fourth Amendment.

10. DHS is also engaging in a systematic policy and practice of arresting people in violation of the federal warrantless arrest statute. Section 287 of the

---

[5] *See, e.g.*, Kamrin Baker, *Immigrants in Charlotte fear leaving home amid ICE operations. This Latino-owned grocery chain is bringing food to them*, MSN (Nov. 21, 2025), https://perma.cc/K52H-689C.

[6] *See* Brian Segovia & Lisa M. Geraci, *Charlotte Mass Attendance Way down during Border Patrol Activity; Parishes Reassure Faithful,* Catholic News Herald (Nov. 21, 2025), https://perma.cc/PS67-KVDC.

[7] *See* Jane Porter, *Triangle Leaders Highlight Business Impacts of Federal Immigration Raids,* INDY (Nov. 25, 2025), https://perma.cc/V7FX-ZWJZ.

Immigration and Nationality Act, 8 U.S.C. § 1357(a)(2), prevents federal agents from making warrantless arrests unless two conditions are met: the arresting officer must have probable cause both that the person arrested (1) is removable from the United States; and (2) poses an immediate escape risk.

11. DHS is following neither of these federal requirements in North Carolina. Plaintiffs seek injunctive relief to halt DHS's unlawful policies and practices of (1) stopping people in North Carolina without reasonable suspicion that they are removable; (2) arresting people in North Carolina for immigration-related violations without warrants and without probable cause to believe that they are removable; and (3) arresting people in North Carolina without warrants and without probable cause to believe that the person is an escape risk.

12. The individual Plaintiffs' experiences are representative. DHS agents stopped each of them without reasonable suspicion that they were removable and arrested each of them without a warrant and without probable cause to believe they were removable or any evaluation that they were likely to escape before a warrant could be obtained. Plaintiffs Aceituno, Cuenca, Godinez, Vazquez Orea, and Napoles are U.S. citizens, and Plaintiff Arguera Lopez has immigration status (U-visa). Agents had no probable cause to believe that any of the Plaintiffs were removable. And if the agents had conducted the requisite escape risk analysis, which they did not, they would have learned that Plaintiffs have lived in their respective communities for years, have deep family or community ties, have a long

history of local employment or schooling, and present no likelihood of escape, let alone probable cause.

13. Plaintiffs, and many others subject to these unlawful arrests, have suffered physical and emotional harm, have had their daily lives disrupted, and are at substantial risk of future arrest by DHS agents. Plaintiffs' efforts to mitigate their risk of future stops and arrests are causing them ongoing irreparable harm—but Plaintiffs nevertheless remain likely to be stopped and arrested due to DHS agents' ongoing implementation of their unlawful policies and practices. Plaintiffs ask this Court to enjoin these policies and practices and prevent further irreparable harm.

## PARTIES

14. **Plaintiff Willy Wender Aceituno** is a 47-year-old Latino man originally from Honduras. He is a U.S. citizen who has resided in Charlotte, North Carolina for over 25 years. His family came to the United States in 2001, and he naturalized in 2019. He lives in a house in Charlotte, which he bought in 2007. He has a 21-year-old U.S. citizen daughter currently in college, and he works primarily in construction. On November 15, 2025, DHS agents stopped him without reasonable suspicion that he was removable from this country and arrested him without probable cause that he was removable and without probable cause that he posed an escape risk.

15. **Plaintiff Yoshi Cuenca Villamar** is a 23-year-old Latino man. He is a U.S. citizen who was born in Charlotte, North Carolina, and has lived in Charlotte his entire life. His seven siblings, who are U.S. citizens, also live in

Charlotte, North Carolina. He has rented a house for the past three years. He owns a business called Cuenca Lawn Care that provides yard and lawn services. On November 15, 2025, DHS agents stopped him without reasonable suspicion that he was removable from this country and arrested him without probable cause that he was removable from this country and without probable cause that he posed an escape risk.

16. **Plaintiff Ruben Arguera Lopez** is a 40-year-old Latino man originally from El Salvador. He first came to the United States in 2003, and he currently has (and at all times pertinent to this complaint, has had) a valid work permit and a U-Visa. A U-Visa is a humanitarian visa provided to individuals who assist law enforcement in investigating serious crimes; it can later be converted to permanent residency (a green card). Mr. Arguera Lopez has lived in Charlotte, North Carolina for 15 years and works as a cook in a local restaurant. On November 17, 2025, DHS agents stopped him without reasonable suspicion that he was removable and arrested him without probable cause that he was removable from this country and without probable cause that he posed an escape risk.

17. **Plaintiff Edwin Godinez** is a 30-year-old Latino man born in California. He is a U.S. citizen who owns a house in Spencer, North Carolina and has lived there for the past seven years. Mr. Godinez currently works in construction and previously worked at a nursing home. On January 5, 2026, DHS agents stopped him without reasonable suspicion that he was removable and

arrested him without probable cause that he was removable from this country and without probable cause that he posed an escape risk.

18. **Plaintiff Yair Alexander Napoles** is a 23-year-old Latino man born in North Carolina. He is a U.S. citizen who was born in Roxboro, North Carolina, and currently lives in Salisbury, North Carolina. He works in construction. On January 5, 2026, DHS agents stopped him without reasonable suspicion that he was removable and arrested him without probable cause that he was removable from this country and without probable cause that he posed an escape risk.

19. **Plaintiff Fernando Vazquez Orea** is a 19-year-old Latino man and U.S. citizen, born in Raleigh, North Carolina. He currently lives in Apex, North Carolina. On November 18, 2025, DHS agents stopped him without reasonable suspicion that he was unlawfully present in the U.S. and arrested him without probable cause that he was removable from the country and without probable cause that he posed an escape risk.

20. **Defendant U.S. Department of Homeland Security** is the federal agency responsible for administering and enforcing the nation's immigration laws.

21. **Defendant Markwayne Mullin**[8] is the Secretary of DHS. In that role, he oversees component agencies, including Immigration and Customs

---

[8] Pursuant to Fed. R. Civ. P. 25(d), Defendant Markwayne Mullin is automatically substituted for Defendant Kristi Noem.

Enforcement, U.S. Customs and Border Protection, and U.S. Border Patrol. He is sued in his official capacity.

22. **Defendant U.S. Customs and Border Protection (CBP)** is a component agency of DHS that is responsible for, among other things, the processing of individuals attempting to enter or exit the United States at the U.S. border. CBP maintains at least four offices in North Carolina: Greensboro, Charlotte, Morrisville, and Wilmington. CBP agents are involved in making stops and arrests of individuals for civil immigration violations in North Carolina.

23. **Defendant Rodney S. Scott** is the Commissioner of U.S. Customs and Border Protection. In that capacity, Defendant Scott has direct authority over all CBP policies, procedures, and practices related to stops, arrest, and detention. Defendant Scott is sued in his official capacity.

24. **Defendant U.S. Border Patrol ("USBP" or "Border Patrol")** is a component agency of CBP and is responsible for the interdiction and processing of those who, without authorization, attempt to enter or leave the United States at its border. Border Patrol agents are involved in making stops and arrests of individuals for civil immigration violations in North Carolina.

25. **Defendant Rosario Vasquez**[9] the Chief of the U.S. Border Patrol. As Chief of Border Patrol, he has authority over all Border Patrol policies,

[9] Pursuant to Fed. R. Civ. P. 25(d), Defendant Rosario Vasquez is automatically substituted for Defendant Michael W. Banks.

procedures, and practices regarding immigration stops, arrests, and detention. He is sued in his official capacity.

26. **Defendant U.S. Immigration and Customs Enforcement (ICE)** is a component agency of DHS. In North Carolina, ICE maintains at least a Charlotte office and is planning to expand or establish offices in Cary and Charlotte.[10] Among other things, ICE carries out stops and arrests of individuals believed to be in violation of civil immigration law, maintains custody over individuals in immigration detention, and is responsible for the management and oversight of the civil immigration detention system.

27. **Defendant David J. Venturella**[11] is Senior Official Performing the Duties of the Director of ICE. In that capacity, he oversees ICE's functions, including managing enforcement of laws relating to immigration, setting policies governing stops and arrests of individuals by ICE personnel, and managing the civil immigration detention system. Defendant Lyons is sued in his official capacity.

28. **Defendant LaDeon Francis**[12] is the ICE Field Office Director for Enforcement and Removal Operations in Atlanta, Georgia. As Field Office Director, he oversees decisions concerning stop, arrest, detention, and removal

[10] *See* Leah Feiger, *ICE Is Expanding Across the US at Breakneck Speed. Here's Where It's Going Next*, WIRED (Feb. 10, 2026), https://perma.cc/9WR3-DKAM.

[11] Pursuant to Fed. R. Civ. P. 25(d), Defendant David J. Venturella is automatically substituted for Defendant Todd Lyons.

[12] Pursuant to Fed. R. Civ. P. 25(d), Defendant LaDeon Francis is automatically substituted for Defendant Sean Gallagher.

decisions in Georgia, South Carolina, and North Carolina. He is sued in his official capacity.

## JURISDICTION AND VENUE

29. The Court has jurisdiction under 28 U.S.C. § 1331 (federal question), and 5 U.S.C. § 702 (right of review). It has remedial authority pursuant to 5 U.S.C. §§ 702, 705, and 706 (the Administrative Procedure Act), 28 U.S.C. § 1651 (the All Writs Act), 28 U.S.C. §§ 2201, 2202 (the Declaratory Judgment Act), and the Court's inherent equitable powers.

30. Venue is proper in the Western District of North Carolina under 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703 because Defendants are officers or employees of the United States and substantial events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### THE CONSTITUTION AND FEDERAL LAW PROHIBIT IMMIGRATION STOPS WITHOUT REASONABLE SUSPICION AND IMMIGRATION ARRESTS WITHOUT PROBABLE CAUSE

31. The Fourth Amendment to the U.S. Constitution constrains DHS officers from stopping people, including to question them about their citizenship and immigration status, "on less than a reasonable suspicion that they may be aliens." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). The subsequent detention must be "carefully tailored to its underlying justification," and—because the predicate for an investigative stop is less than probable cause—"an investigative detention must be temporary and last no longer than is necessary

to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

32. Section 287(a)(2) of the Immigration and Nationality Act ("INA"), codified as 8 U.S.C. § 1357(a)(2), prevents an immigration officer from making a civil warrantless arrest *unless* "he has reason to believe" both that (1) "the [noncitizen] so arrested is in the United States in violation of" "any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of [noncitizens]," *and* (2) the noncitizen "is likely to escape before a warrant can be obtained for his arrest."

33. The "reason to believe" standard in § 1357(a)(2) is the equivalent of "probable cause." *United States v. Segura-Gomez*, No. 4:17-CR-65-FL-1, 2018 WL 6582823, at *6 (E.D.N.C. May 25, 2018), *report and recommendation adopted*, No. 4:17-CR-65-FL-1, 2018 WL 6259222 (E.D.N.C. Nov. 30, 2018). Federal regulations track the statutory limitations on warrantless arrests, *see* 8 C.F.R. § 287.8(c)(2)(i1)-(ii), and further require immigration officers to identify themselves and state the reason for an arrest. *Id.* § 287.8(c)(2)(iii).

34. Therefore, DHS employees, including ICE and CBP officers, lack legal authority to arrest a person without a warrant under § 1357(a)(2) unless they have probable cause to believe that person is in the United States in violation of immigration laws *and* the person is an escape risk.

35. Warrantless immigration arrests, like any warrantless arrests, require a determination particularized to the specific person at issue—not a blanket policy to arrest first and ask questions later. *See Maryland v. Pringle*, 540 U.S. 366, 373 (2003) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.") (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

36. Defendants are systematically violating these requirements in North Carolina. They are stopping North Carolinians without reasonable suspicion to believe they are removable and conducting warrantless arrests without probable cause to believe that the arrestees are removable and without probable cause that they pose a risk of escape.

**DHS'S MASS STOPS AND ARRESTS IN NORTH CAROLINA**

37. Since early 2025, DHS has drastically increased its presence in the state of North Carolina—especially on the streets of North Carolina cities.

38. From January 20, 2025, to October 15, 2025, ICE arrested 3,304 people in North Carolina. That is more than 2.8 times the number of arrests for the same time period in 2024.

39. In November 2025, DHS launched what it calls "Operation Charlotte's Web," sending hundreds of CBP agents to North Carolina. While this CBP operation has focused largely on Charlotte, DHS agents have also fanned out to other urban areas in the state, including the Research Triangle.

40. This surge followed a series of similar operations in Chicago, D.C., and Los Angeles, all cities with leaders whom the Trump Administration views as providing insufficient support for federal civil immigration enforcement activities. As in these cities, and more recently in Minneapolis, DHS has targeted Charlotte because of outspoken opposition by city leaders to policies that would force local law enforcement to perform civil immigration enforcement on behalf of the federal government.[13]

41. In November 2025, North Carolina General Assembly House Speaker Destin Hall asserted on social media that "Border Patrol is in Charlotte because Sheriff McFadden refused to do his job." And in January 2026, ICE publicly accused Mayor Vi Lyles of adopting "sanctuary policies" that allow undocumented immigrants accused of crimes to elude ICE—despite the realities that a 2024 North Carolina law requires that law enforcement cooperate with immigration authorities and Mayor Lyles has no role in setting bond or administering jail releases.

42. As in other cities, "[s]ecrecy and confusion seem[] to be part of the playbook" for DHS's activities in North Carolina.[14] Masked agents driving unmarked vehicles and carrying military-style weapons have violently arrested

---

[13] *See* Camilo Montoya-Galvez, *Trump Directs Immigration Authorities to Prioritize Deportations in Democratic-Run Cities*, CBS News (Jun. 16, 2025), https://perma.cc/7JTE-3Q5W.

[14] *See* Chris Kromm, *How North Carolina Rose Up Against Trump's Latest Anti-Immigrant Crackdown*, The Nation (Nov. 25, 2025), https://perma.cc/C2EY-VY2Z.

hundreds of people in multiple North Carolina cities. Agents routinely arrest people who appear Latino or are speaking Spanish, apparently without knowing who they are or whether they are U.S. citizens or lawfully present non-citizens, and without checking identification or immigration status before detaining them.

43. DHS agents have flooded areas with high concentrations of Latino residents, circling public areas and shopping centers in unmarked SUVs, and detaining people—usually Latino—whom they happen to find. DHS's tactics in North Carolina echo those they've used in other cities: they've smashed car windows, stormed church property, and dragged workers out of their workplaces. When Border Patrol agents began to appear in the Durham and Raleigh area, the mayors of both cities said they had no idea the deployment was coming to either city.[15] As in Charlotte, schools in these areas have reported dramatically increased absence rates, and businesses in Latino areas, especially those depending on Latino employees and clientele, have closed. More than 425 people were arrested during Operation Charlotte's Web in November, and amplified enforcement has persisted throughout the state.[16] Masked DHS agents remain in communities throughout the state conducting suspicionless stops and warrantless arrests.

44. DHS agents have cast a broad net in their attempts to drive up arrest numbers in North Carolina. Rather than searching for specific individuals, agents

[15] *Id.*

[16] *See* Brandon Kingdollar, *ICE Agents Once Again Operating in North Carolina, Activists Say, Including Arrests in Durham,* NC Newsline (Dec. 5, 2025), https://perma.cc/R2Z7-XBLT.

are instead stopping Latino-appearing individuals, based on their apparent race and ethnicity and without any basis to believe these individuals are unlawfully present in the United States. As Plaintiffs' experiences show, these unlawful stops frequently escalate into arrests, in violation of federal law and constitutional protections. Predictably, DHS's policies have led to the wrongful stops and arrests of numerous U.S. citizens and other lawfully present individuals, including Plaintiffs.

45. First, Defendants have pursued a pattern and practice of stopping and questioning Latinos in North Carolina without the reasonable suspicion required by law, as reflected in the accounts of Plaintiffs and other class members detailed herein.

46. Defendants target predominantly Latino neighborhoods, businesses, and gathering places in their operations.

47. Carolina Migrant Network, an organization that provides legal services, received the largest number of calls for assistance on its hotline from five zip codes in and around Charlotte that correspond with neighborhoods with substantial Latino populations. Carolina Migrant Network has received reports of DHS agents targeting predominantly Latino apartment complexes.

48. Siembra NC, a grassroots community organization in North Carolina, has likewise received a significant increase in the number of calls to its hotline from the East Charlotte area and South Charlotte, two predominantly Latino neighborhoods, both during the November 2025 Charlotte's Web operation and

more recently. Since March 2026, Siembra has received numerous reports of arrests following traffic stops by DHS agents who did not present warrants and did not appear to be targeting specific individuals. Rather, these traffic stops appeared to be targeting work vehicles traveling in the early morning in East and South Charlotte, predominantly Latino areas.

49. These stops often escalate into arrests, and Defendants have likewise pursued a pattern and practice of conducting immigration arrests without probable cause either of removability or that the person is a flight risk, as required by law.

50. North Carolina is home to a sizable Latino population: around 11% of the total statewide population, as of 2020.[17] Nearly two-thirds of Latino North Carolinians are U.S.-born citizens, and one in three was born and raised in North Carolina. Of the one-third of Latino North Carolinians who are foreign-born, many are now naturalized citizens or otherwise have legal immigration status.[18] Appearing Latino, by itself, is not a fact supporting reasonable suspicion or probable cause of unlawful presence in the U.S.

**THE ONGOING AND ESCALATING THREAT POSED BY DHS AGENTS IN NORTH CAROLINA**

51. DHS operations in North Carolina have been increasing since early 2025 and have persisted since the November surge. On November 20, 2025, a

[17] Michael Cline, *Hispanic Population is Fastest Growing Population in North Carolina*, OSBM (May 1, 2023), https://perma.cc/N6RA-D23W

[18] *Id.*

DHS spokesperson confirmed: "The operation [in North Carolina] is not over and it is not ending anytime soon."[19] Following this post, in late November, Siembra received a report that 50 additional DHS agents were to be deployed to North Carolina in December 2025.[20]

52. In Durham, in early December, several individuals were arrested on the way to interviews at a U.S. Citizenship and Immigration Services offices, including a lawful permanent resident and two mothers arriving for green card interviews.[21] And Mecklenburg County Sheriff Garry McFadden has publicly stated that, based on his conversations with federal officials, predicted increased enforcement activities in 2026.

53. Immigration officers' footprint in North Carolina is growing. The "One Big Beautiful Bill," signed into law in July 2025, designates $170 billion to immigration enforcement, including more than $45 billion for additional ICE detention space.

---

[19] *See* Gary D. Robertson & John Seewer, *Charlotte Immigration Crackdown Goes On, Homeland Security Says, despite Sheriff Saying It Ended*, AP News (Nov. 20, 2025), https://perma.cc/XQ26-5MF6.

[20] *See* Brandon Kingdollar, *ICE Agents Once Again Operating in North Carolina, Activists Say, including Arrests in Durham,* NC Newsline (Dec. 5, 2025), https://perma.cc/R2Z7-XBLT.

[21] *Id.*

54. In North Carolina, CBP currently maintains four known offices, and ICE maintains at least one office. ICE also plans to expand its physical presence by leasing new ICE office buildings in Cary and Charlotte.[22]

55. A Freedom of Information Act lawsuit filed by the ACLU of North Carolina in October 2025 yielded documents showing that ICE intends to establish as many as three new detention centers in North Carolina, to confine people DHS arrests in the state.[23] Records also show that DHS is considering opening new Virginia-based detention centers close to the Virginia-North Carolina border.[24] ICE is now preparing to re-open a 1,320-bed prison in Winton, NC—owned by GEO Group, a private prison operator—as an ICE detention center by the end of 2026. This facility will be among the largest immigration detention centers on the East Coast.[25]

56. Additionally, documents obtained by the *New York Times* in February 2026 revealed that ICE is considering transforming a warehouse in Concord, North Carolina into a new detention center.[26] Upon information and belief, these plans

---

[22] *See* Leah Feiger, *ICE Is Expanding Across the US at Breakneck Speed. Here's Where It's Going Next*, WIRED (Feb. 10, 2026), https://perma.cc/4PRM-6KQQ.

[23] *See ACLU FOIA Litigation Reveals ICE Actively Considering Opening Seven New Immigration Detention Centers*, ACLU of North Carolina (Jan. 29, 2026), https://perma.cc/CRR9-7C58.

[24] *Id.*

[25] Eduardo Medina and Hamed Aleaziz, *ICE Detention Center in North Carolina to Be Among Largest on East Coast*, N.Y. Times (July 24, 2026), https://perma.cc/2UYQ-JE3M.

[26] *See* Madeleine Ngo, Hamed Aleaziz & Allison McCann, *As ICE Buys Up Warehouses, Even Some Trump Voters Say No,* N.Y. Times (Feb. 18, 2026), https://perma.cc/3B3T-E52J.

anticipate and will facilitate increased immigration enforcement activity within North Carolina.

57. The number of ICE arrests in North Carolina has continued to escalate. Between January and July 2026, ICE arrested 4,949 people in North Carolina, more than double the number arrested during the same time period in 2025.[27]

58. This pattern of increased immigration enforcement in North Carolina is consistent with the overall increase in immigration arrests, nationwide, which reached record highs in June and July of 2026. As of July 2026, ICE was arresting 1,600 people per day, on average, nationwide:

[27] Deportation Data Project, Administrative Arrests Dataset, https://deportationdata.org/index.html (accessed Sept. 25, 2026) (filtered to "apprehension state" = "North Carolina" and by date), https://perma.cc/7KJG-GFA4.




*(Source: New York Times, Aug. 26, 2026)*[28]

59. Nationwide, ICE arrests of individuals with no criminal history have risen at the highest rate:




[28] Albert Sun & Allison McCann, *ICE Arrests Soar as People With No Criminal Record Are Increasingly Targeted*, N.Y. Times (Aug. 27, 2026) https://perma.cc/7Y56-7QB7.

*(Source: New York Times, Aug. 26, 2026)*[29]

60. Two advocacy organizations that maintain hotlines and receive calls from impacted community members have received ongoing reports of warrantless immigration arrests, especially since March 2026.

61. As detailed below, Plaintiffs and other witnesses have also observed the ongoing presence of street-level immigration enforcement operations in Charlotte since November 2025, especially in predominantly Latino neighborhoods.

62. The prevalence of these ongoing operations—and their targeting of and impact on North Carolina's Latino communities, in particular—is reflected in ongoing reductions in both school attendance and small business foot traffic. A *Bloomberg Businessweek* analysis of data from small businesses along the Central Avenue corridor in Charlotte found a significant slowdown in foot traffic that persisted for at least five months following the November 2025 "Charlotte's Web" operation, and attendance rates at public schools in targeted East Charlotte neighborhoods remained below normal as of at least February 2026.[30]

63. These ongoing and growing operations in North Carolina perpetuate harm to Plaintiffs and class members and expose them to an intolerable risk of unlawful arrests.

---

[29] *Id.*

[30] Augusta Saraiva, *ICE Raids Did Lasting Damage to American Businesses*, Bloomberg (May 21, 2026), https://perma.cc/7T5E-AXK9.

## PLAINTIFFS' UNLAWFUL ARRESTS BY DHS AGENTS

### *A U.S. Citizen Sitting in his Truck*

64. On Saturday, November 15, 2025, DHS agents approached Plaintiff Willy Wender Aceituno while he was awaiting a food order from a Honduran restaurant in a shopping center parking lot. Mr. Aceituno is a 47-year-old Latino man. He is a U.S. citizen and has lived in North Carolina for over 25 years. He owns a house in Charlotte, which he bought in 2007.

65. Agents approached Mr. Aceituno, asked for his last name, and asked whether he was a citizen. In response, Mr. Aceituno asked whether he had to answer yes or no. He also asked whether they were looking for someone specific.

66. The agents responded by repeatedly telling Mr. Aceituno to give them his documents. Mr. Aceituno provided the agents with his REAL ID. The agents asked for a different document demonstrating citizenship, and Mr. Aceituno questioned whether they knew what a REAL ID was, and stated that a person has to be in the country legally to get a REAL ID.

67. Four agents were part of the initial interaction, which lasted fifteen minutes. Several additional agents lingered nearby in the parking lot. Once the agents scanned Mr. Aceituno's license and confirmed that Mr. Aceituno was a U.S. citizen, they let him enter the restaurant to retrieve his food.

68. With food in hand, Mr. Aceituno then left the restaurant and was intercepted—a second time—by a different group of CBP agents. He had entered his Ford 150 truck, which is registered in his name, put his seatbelt on, and was

about to drive away, when CBP agents suddenly used their vehicles to block him. One vehicle pulled directly in front of his truck, one pulled to the side of his truck, and one pulled behind it. Mr. Aceituno indicated to the agents that he had already identified himself, but an agent yelled "open the door." Mr. Aceituno started recording on his phone and said to the agents in Spanish, "I'm not opening the window."

69. One agent tapped a baton against the window of the truck and said, "get out." Mr. Aceituno told them: "if you break it, you will pay for it." The agent then used the baton to smash the window, and glass shattered all over Mr. Aceituno. One agent reached for his phone and knocked it to the ground.

70. Mr. Aceituno told them that his REAL ID was in his back pocket but avoided reaching for it because he was scared the agents might think he was reaching for a weapon.

71. Two agents dragged him from the vehicle, forced him to the ground, and handcuffed him. In video footage of the arrest, Mr. Aceituno and a bystander who had also witnessed the first interaction can be heard pleading with agents to check his wallet for his identification, which would prove that he had legal immigration status, and telling the agents he is a U.S. citizen.

72. Specifically, Mr. Aceituno said, "I got my papers ready, I'm a citizen, my wallet is here, check in my wallet." While he was being handcuffed, Mr. Aceituno repeated at least four different times that he was a citizen and told them again to check his wallet.




73. One bystander, who recorded both interactions, told the immigration agents, “they just ID’d him, he already ID’d himself, don’t you guys f***ing coordinate with each other? why do you guys keep stopping the same guy?”

74. At no point during the interaction did agents tell Mr. Aceituno why he was being arrested. None of the agents identified themselves or presented a warrant.

75. The agents wore tactical gear, with their faces covered with cloth black face masks and sunglasses, carrying weapons:




76. Still without checking his identification or taking any apparent steps to confirm whether he was lawfully present in the country, the agents handcuffed Mr. Aceituno and then—as he and bystanders continued to repeat that he was a citizen whose ID had just been checked by different agents—placed him in one of their vehicles, where he sat with other Latinos who had been arrested. At no point was Mr. Aceituno asked about his family, community ties, employment history, or how long he had lived in Charlotte. At no point did Mr. Aceituno make any effort to run away from the scene.

77. Each vehicle held four agents, each of whom was armed. Mr. Aceituno continued to repeatedly state that he was a citizen.

78. After driving around for ten minutes, one of the agents finally looked into Mr. Aceituno's wallet, ran his REAL ID through a system, and stated that he was a U.S. citizen with no criminal record. They pulled over and told Mr. Aceituno to get out.

79. Mr. Aceituno was bloody from the encounter. Knowing he was stranded far from his truck, he asked the agents for a ride back to his car, but they threatened to arrest him again if he did not walk away.

80. Mr. Aceituno walked back to his truck, which took twenty to twenty-five minutes. He was covered in blood and glass and felt like he was going to pass out. Mr. Aceituno called the local police, filed a police report, and then went to the hospital to get his neck and arm checked out. He also had to have his truck rekeyed because the agents did not return his keys to him, and he was not able to find the key until much later.

81. Mr. Aceituno experienced insomnia, anxiety, flashbacks, and significant neck pain after the incident. He did not go to work for two weeks after the incident because he feared being detained again by immigration agents.

82. He has struggled to deal with the aftermath of the situation because so much is out of his control. Mr. Aceituno fears being arrested again by DHS agents.

83. When agents killed two people in Minneapolis and Mr. Aceituno learned about it, his first thought was that he should be thankful that they only assaulted him because others were being killed.

84. Mr. Aceituno struggles to watch the news because it triggers thoughts of his arrest by CBP agents and exacerbates his deep fear of leaving his house and running into immigration agents again. More recently, Mr. Aceituno has observed a sharp increase in ICE activity in his predominantly Latino neighborhood,

especially in the past three months. He sees people being arrested in his neighborhood at least three times per week. He has also seen and heard about ICE agents routinely arresting Latino people who are visiting food trucks or driving work trucks and vans, and eight of his Latino co-workers have been arrested at job sites or on the street. He tries to minimize time outside of his house because even engaging in normal activities, like going to work or picking up food, puts him at risk of re-arrest.

85. ICE has a heavy presence at the local businesses in Mr. Aceituno's neighborhood that are owned by Latino people or have a lot of Latino patrons. In early August 2026, for example, ICE agents raided several different stores right down the street from Mr. Aceituno's house and arrested 17 people in one day.

86. Mr. Aceituno has observed that ICE agents primarily target his neighborhood on South Boulevard and neighborhoods on Central Avenue, which are all neighborhoods in Charlotte with a lot of Latino residents. Given the constant ICE presence in his neighborhood, Mr. Aceituno is at substantial risk of being re-arrested, but he cannot afford to move to a new neighborhood.

87. Mr. Aceituno avoids Latino-owned and -patronized food trucks, gas stations, and grocery stores in his neighborhood because he is at risk of re-arrest. The grocery store he used to patronize is 3 minutes away from his house, but he no longer feels comfortable going there because ICE targets the store constantly. Instead, he travels to a grocery store 15 minutes away in a predominantly white neighborhood, expending time and money to travel longer distances. These

feelings of marginalization and exclusion in his own neighborhood have had a lasting psychological impact on Mr. Aceituno.

88. Before his arrest, Mr. Aceituno moved around in public freely and never thought twice about going out to run routine errands. After his arrest, he no longer feels comfortable spending time in public. When he has to go out to complete necessary errands, he is on high alert. As a U.S. citizen, he is frustrated because he wants to be able to go to local businesses in his neighborhood if he so desires, but he is forced to avoid businesses he used to consistently patronize because he is at risk of being targeted and arrested based solely on the way he looks. Mr. Aceituno knows that ICE is currently targeting Latino men in work vehicles. He has witnessed such stops, and eight of his co-workers were arrested. He is at risk of being stopped and arrested again because he drives a truck with a ladder and other work tools, just like the other vehicles that have been targeted in his neighborhood. He has no choice but to drive his truck because there is no other way to transport his tools to job sites.

89. Mr. Aceituno drives his work truck seven days a week and typically has to drive between 1 to 2 hours each day for his job. Driving his work truck so frequently, and for relatively long distances, puts him at an increased risk of re-arrest, but he has no choice but to do so because he must work to make a living. He carries his identification everywhere he goes, even though he is a U.S. citizen and is not legally required to do so.

90. To this day, Mr. Aceituno does not feel comfortable going out in public because based on his prior experience he knows that he is at risk of being handcuffed and taken away in an unmarked vehicle. Despite being a U.S. citizen, he was stopped twice by CBP agents on the same day, arrested during the second encounter, and threatened with another arrest even after agents verified his citizenship.

91. While Mr. Aceituno alters his movements and routines where possible to try to avoid encountering ICE agents, he cannot afford to move to a different neighborhood with less ICE presence or avoid driving his work truck to job sites. As a result, Mr. Aceituno is at substantial risk of being subjected again to Defendants' unlawful and unconstitutional policies.

***A U.S. Citizen Performing Landscaping Work***

92. Plaintiff Yoshi Cuenca Villamar is a 23-year-old Latino man who was born in Charlotte and has lived in North Carolina his entire life with his seven siblings. Mr. Cuenca owns a business called Cuenca Lawn Care that provides yard and lawn services.

93. Mr. Cuenca was at work on November 15, 2025, performing yard clean-up work outside a private residence in Charlotte, when CBP agents grabbed him from behind and pushed him to the ground. He had not seen them approach because his back was turned to them. He was wearing a backpack-style leaf blower at the time.

94. When Mr. Cuenca turned around to figure out who pushed him, he saw four masked agents in uniforms that said, “POLICE” and “U.S. Border Patrol.” They immediately attempted to handcuff him once he was on the ground.

95. Mr. Cuenca’s brothers, who are his co-workers and are also U.S. citizens, started recording as soon as they saw the agents knock him down.

96. As two agents pulled out handcuffs and grabbed Mr. Cuenca’s wrists, Mr. Cuenca’s brother said to the agents, “we’re from here, I don’t know what you’re doing bro. What are you doing?”

97. Mr. Cuenca reached for the straps on the leaf blower to remove it from his back because it was uncomfortable. One agent said, “don’t struggle,” even though video footage shows that Mr. Cuenca was sitting on the ground, barely moving.



98. His brother again shouted that they were all U.S. citizens and asked what the agents were doing. The agents proceeded to handcuff Mr. Cuenca and

asked him only whether he spoke English. The agents never asked for his ID before putting him in the vehicle.

99. The agents called for backup. Two additional vehicles containing eight additional agents arrived, and they placed Mr. Cuenca into one of the vehicles and drove away.

100. Agents did not ask Mr. Cuenca any questions concerning his ties to the community or anything else that would bear on escape risk. Mr. Cuenca did not attempt to get away at any point during the encounter.

101. The agents never told Mr. Cuenca or his brothers why they were arresting him. The agents did not present a warrant or indicate that they even knew Mr. Cuenca's name prior to grabbing him and throwing him in the vehicle.

102. After spending twenty to thirty minutes driving around and talking on walkie-talkies to try to find the nearest detention center, the agents pulled out Mr. Cuenca's wallet from his pocket and found his driver's license. The agents did not believe Mr. Cuenca's license was a real license because it did not have a star on it. One agent threatened to return to the work site to pick up the other two men, who were Mr. Cuenca's brothers.

103. Mr. Cuenca told the agents it was a valid license, and they could scan or do anything they wanted with it. Mr. Cuenca's social security card was also in his wallet, but the agents did not pull that out.

104. While in the vehicle, Mr. Cuenca asked for the names of the agents, but the agents refused to provide them.

105. The agents took a picture of the front and back of the license and, after a few minutes, confirmed that Mr. Cuenca was a citizen. While the agents were running the license, one agent asked how long Mr. Cuenca had lived here, and he replied that he was "born and raised" in North Carolina.

106. The agents dropped Mr. Cuenca off on the side of the road and threw his wallet at him before departing. He had left his phone in his work truck, so he did not have any way to contact anyone.

107. Mr. Cuenca walked to a nearby business and used their phone to call his brothers to come pick him up.

108. Mr. Cuenca was left traumatized with visible marks on his wrists where agents had handcuffed him. He fears being detained again without any consideration of his individual circumstances.

109. Mr. Cuenca dreads going back to the house and yard where the DHS agents arrested him, but he must because it is one of his work sites. He feels particularly exposed and susceptible to being picked up again by immigration agents because he is required to work outside as part of his job.

110. In general, Mr. Cuenca tries to avoid places where CBP or ICE might be even though he is a U.S. citizen. He is more alert to his surroundings now but recognizes that there is not much he can do to prevent this from happening again.

111. Over the summer of 2026, Mr. Cuenca has seen many news reports and social media posts about immigration agents arresting many people, especially at job sites, construction sites, and gas stations.

112. One morning, in mid-July 2026, he arrived to do yard work at a property in a predominantly Latino neighborhood in South Charlotte. He was just getting his lawn mower out of his truck when two unmarked vehicles boxed in a construction van that was parked across the street from him, and ICE agents jumped out of the vehicles. Mr. Cuenca was terrified. He immediately loaded his equipment back into his truck and left as quickly as possible, observing as he pulled away that the agents were arresting multiple people from the van.

113. Mr. Cuenca was too afraid to return to that property that day, which delayed the $100 payment he would have gotten from his client on that day had he been able to complete the yard work. Based on his prior experience, he knows that his citizenship will not shield him from re-arrest and he understands that ICE often arrests people in that neighborhood. But he has several clients who live in the neighborhood, so he does not have a choice but to continue going there to work, even though he is at risk of being stopped and arrested again.

114. Mr. Cuenca also used to frequently work at houses on Park Road in Charlotte, which also has a heavy ICE presence. He stopped taking work at two of his clients' houses in that area because the risk of re-arrest was so high. He lost $100 per day of yard work per client when he stopped taking jobs there. Mr. Cuenca kept one of his clients in that area, however, because it is one of his long-time clients. He knows he is at substantial risk going to the client's house because that neighborhood almost always has ICE agents present.

115. Before he starts work each day, Mr. Cuenca checks WhatsApp and Facebook groups to see where ICE is reported to be present, so he can try to avoid those neighborhoods and work somewhere else that day. He knows, however, that it is not possible to avoid them at all times because they are constantly on main roads and highways and they move around quickly.

116. Mr. Cuenca has seen a lot of social media posts recently describing arrests of Latino men in work trucks in the Charlotte area. He is at risk of re-arrest every day because he must drive his work truck 7 days a week for his job.

117. Mr. Cuenca is at substantial risk of being subjected again to Defendants' unlawful and unconstitutional policies.

***A Man on His Way to Work***

118. Plaintiff Ruben Arguera Lopez is a 40-year-old Latino man originally from El Salvador. He first came to the United States in 2003, and he currently has (and at all times relevant to this Complaint has had) a valid work permit and a U-Visa, a humanitarian visa provided to individuals who assist law enforcement in investigating serious crimes.

119. Mr. Arguera Lopez has lived in Charlotte, North Carolina for fifteen years and works as a cook in a local restaurant. His two brothers also live in North Carolina.

120. On November 17, 2025, Mr. Arguera Lopez was driving to his job in Charlotte when he noticed three SUVs driving close to him. The car is registered in his name, and he was driving under the speed limit. At least one SUV turned on

the lights on the hood. One of the three SUVs pulled in front of his car, boxing him in and forcing him to slow and stop his car. The vehicle windows were tinted.

121. Five agents approached his car; two went to the passenger side, while three approached the driver's side. The agents' uniforms said "POLICE" and each agent was wearing a black mask.

122. The agents asked Mr. Arguera Lopez to roll his windows down, which he did. They asked where he was from, but he exercised his right to remain silent. An agent then began asking Mr. Arguera Lopez how he came to this country and why. Mr. Arguera Lopez continued to exercise his right to remain silent.

123. None of the agents identified themselves as federal agents or officers. They continued to ask questions, including asking where Mr. Arguera Lopez was going, how many years he had lived in the U.S., whether he had family here, and whether he worked. Mr. Arguera Lopez remained silent for approximately ten minutes.

124. Around 10 minutes in, the agents told Mr. Arguera Lopez that they would take him with them if he did not answer. He told them that he has a U-Visa.

125. The agents ordered Mr. Arguera Lopez to get out of the car. He complied and got out of his vehicle.

126. The agents repeated their questions, asking where he was going and asking how he came to the U.S. Mr. Arguera Lopez again remained silent.

127. The agents then put him in handcuffs. Mr. Arguera Lopez told them that he has a right to an attorney and stated that they were only doing this because he is Latino.

128. The agents tried to put him into the SUV at one point, but Mr. Arguera Lopez told them again that he has a U-Visa and a work permit. He was still in handcuffs, so he was unable to take out the documents to show them.

129. As they were grabbing and pulling him toward the vehicle, Mr. Arguera Lopez tried to stay calm. At no point did he try to run or flee. He instead asked them to please let him go and reiterated that he has legal status.

130. After approximately an hour of questioning, the agents finally asked Mr. Arguera Lopez where his work permit was and pulled it out of his wallet. The agents then ran his information and let him go.

131. At no point did they tell Mr. Arguera Lopez why he was being arrested. None of the agents identified themselves, presented a warrant, or indicated that they knew Mr. Arguera Lopez prior to stopping him.

132. Mr. Arguera Lopez has suffered significant psychological issues after seeing how quickly and easily his liberty can be taken away. He has trouble sleeping and is uncomfortable going out in public. When he goes on a walk or a run, which are pastimes he used to enjoy, he now feels anxious and highly aware of his surroundings.

133. He is currently looking for a therapist to help him process this incident and better cope with the fear it has instilled in him. He is still affected by this every day and needs help healing.

134. In July 2026, Mr. Arguera Lopez began seeing increased ICE activity again in his neighborhood and around Charlotte. He is therefore now at even greater risk of being stopped and arrested again. He has seen videos of construction workers being arrested by ICE while eating outside a restaurant and of a worker being arrested at a job site. He also personally witnessed ICE agents standing around unmarked vehicles in the parking lot of a store, one day in late July, when he was on his way to work. He drove away quickly and carefully, trying not to draw attention to himself.

135. Mr. Arguera Lopez also closely monitors a Facebook group that reports ICE sightings, and he checks it at least twice per day, including always checking before he leaves work to go home at the end of the day. If he sees that ICE agents have been reported near his route home, which happens frequently, he takes a different route to try to avoid them.

136. Many Latinos in Mr. Arguera Lopez's community are afraid to leave their homes, even to purchase groceries.

137. Mr. Arguera Lopez is at substantial risk of being subjected again to Defendants' unlawful and unconstitutional policies.

*Two Brothers Driving a Car*

138. Plaintiff Edwin Godinez is a 30-year-old Latino man. Mr. Godinez currently works in construction. At the time of this incident, he was working at a nursing home. He was born in California but has lived in North Carolina for over 25 years. In 2019, Mr. Godinez bought a house in Spencer, North Carolina and has lived there for the past seven years. One of his brothers lives with him at his house.

139. Plaintiff Yair Alexander Napoles is Mr. Godinez's 23-year-old brother, who was born in North Carolina. Mr. Napoles currently lives in Salisbury, North Carolina, and works in construction. Mr. Godinez's and Mr. Napoles's mother, who is also a U.S. citizen, lives near them.

140. On January 5, 2026, Mr. Godinez and Mr. Napoles were stopped at a red light in Salisbury when the car behind them put on lights. The car was unmarked, but the lights seemed similar to a police car, so the two brothers pulled over.

141. Two ICE agents approached the car in bulletproof vests that said "POLICE" on them. One agent went to each side of the car. Mr. Godinez and Mr. Napoles both rolled down the windows.

142. The agents did not identify themselves but asked for identification. Mr. Godinez and Mr. Napoles handed over their IDs and told the agents they are U.S. citizens.

143. Mr. Napoles took his phone out and asked if he could record for his safety. The officer said "sure," and pulled up his mask to cover his face. He then

asked Mr. Godinez and Mr. Napoles how they got into the United States and they explained again that they are citizens. One agent then left to run their names.

144. Additional agents pulled up behind their car. The agents were armed. Mr. Godinez started recording, but a new agent came up to the driver's side window and told Mr. Godinez that they were not free to record because they were being detained.

145. The agent reached into the driver's side window and tried to grab Mr. Godinez's phone while grabbing him by the chest. The agents repeatedly told Mr. Godinez to turn the recording off.

146. The agents then unlocked the door through the window, yanked it open, forcefully pinned Mr. Godinez against his seat, and grabbed his phone out of his hand. Mr. Napoles put his arm out to try to protect Mr. Godinez from the agents. The agent threatened to handcuff them and then knocked one of Mr. Godinez's earrings out, punched him in the abdomen, and knocked the wind out of him.



147. After Mr. Napoles started speaking Spanish, agents came to his side of the car, reached into the vehicle, opened the door, unbuckled Mr. Napoles's seatbelt, and tried to yank him out of the car too. Mr. Napoles feared that if they got him out of the car and onto the ground, they would begin kicking him. The agents knocked Mr. Napoles's phone out of his hand but ultimately couldn't get him out of the car.

148. After approximately fifteen minutes of blocking Mr. Godinez and Mr. Napoles in, attempting to violently yank them out of the car, and attempting to stop them from recording agents, the original agent came back with the IDs and allowed them to leave.

149. At no point did the agents identify their names, present a warrant, or explain why Mr. Godinez and Mr. Napoles were being arrested. The agents did not ask any questions about community ties, employment history, or how long they had lived in North Carolina (except to ask if Mr. Godinez lived with his parents

after Mr. Godinez volunteered the information that he was coming from his parents' house).

150. Mr. Napoles's chest was bruised from the violence, and he had to miss two days of work while he recovered. He was traumatized and shocked by the incident. Every time Mr. Napoles sees a car that looks similar to the vehicles the agents drove, he thinks it is a DHS vehicle and is filled with fear that he will be detained again.

151. Mr. Godinez had a scratch below his chin where the officer grabbed him. He has also had trouble sleeping since the incident. The night of the incident, Mr. Godinez had a nightmare and woke up with a panic attack in the middle of the night. Since then, Mr. Godinez has suffered several additional panic attacks.

152. Mr. Godinez also has recurring thoughts and fears about agents showing up at his workplace and trying to take him again. Mr. Godinez is especially fearful of agents stopping and arresting him again because the videos of the incident were widely distributed online. After Mr. Godinez saw that two people were killed by ICE agents in Minneapolis, his fear and panic escalated even more.

153. Mr. Godinez and Mr. Napoles's mother went to the emergency room the night of the incident because she was having a prolonged panic attack after witnessing the agents attempt to drag her two children out of the car and punch Mr. Godinez.

154. Mr. Godinez and Mr. Napoles were never informed why their car was stopped or why they were arrested. Because DHS agents have been pursuing

Latinos in their communities, they both remain scared that agents will target them again without any consideration of their individual circumstances. Neither of them intend to leave their communities because that is their home, but they are scared that they will be arrested again, or even killed.

155. Mr. Godinez is aware of increased ICE enforcement in June, July, and August 2026, across North Carolina, and he has a friend whose father was stopped on his way to work, arrested by ICE, and then deported.

156. Starting in August 2026, Mr. Godinez has seen ICE agents in his neighborhood. The individuals wear vests that say "POLICE," and they drive unmarked vehicles. He primarily sees them patrolling in Salisbury and China Grove, which have high concentrations of Latino residents. He personally witnessed ICE agents pull someone over and handcuff them in China Grove, which triggered his fears of re-arrest and violence. He left the area as quickly as possible.

157. Mr. Godinez joined a WhatsApp group and Facebook group that track the locations of ICE agents in North Carolina. His mother regularly sends him updates from those groups, and he checks them at least once per day so he can try to avoid the streets and locations where ICE agents are operating. He observes which streets they are conducting operations on so he can try to avoid them, and he tries to take back roads, rather than main streets or highways, to reduce his chances of encountering ICE agents.

158. Mr. Godinez estimates that he spends around 6 hours each week monitoring information about ICE presence and activity, which is time he used to spend going to the gym or hanging out with friends prior to his arrest.

159. Despite his vigilance, Mr. Godinez recognizes that the information he gets from the groups is imperfect, and it quickly goes stale because ICE agents move around quickly.

160. Mr. Godinez has to drive on public roads to go to work, so he nevertheless is at substantial risk of being stopped and arrested under Defendants' unlawful policies again. He carries his passport with him wherever he goes as a result of his concern about violent arrest by ICE.

161. Mr. Godinez lives in Spencer, North Carolina, but works in Sanford, North Carolina. His commute to work is 1 hour and 40 minutes every Monday and Friday. He stays overnight in Sanford from Monday night to Thursday night. ICE is frequently on the road he takes to get to his job.

162. Mr. Godinez is also frequently required to drive past the spot where he was previously arrested. It is on a main road that he must take from his mom's house to get to most places, like fast food restaurants, Wal-Mart, or any shop in the center of town. He worries all the time that he will be arbitrarily re-arrested in that area.

163. Mr. Godinez's younger brother lives in Concord, North Carolina, and Mr. Godinez goes there several times a month to visit him. Mr. Godinez is extremely close with his brother, and that relationship is very important to him, so

he does not want to stop seeing him. However, Mr. Godinez's brother works in a predominantly Latino neighborhood with a lot of Latino-owned businesses, which makes Mr. Godinez nervous because ICE regularly patrols there.

164. Mr. Godinez is at substantial risk of being stopped and arrested again by ICE, because he continues to drive, work, and live in Latino neighborhoods that ICE continues to target.

165. Mr. Godinez is particularly wary of construction sites and spending any time in Home Depot or Lowe's parking lots because ICE heavily targets those places in Concord, China Grove, and Charlotte. As a result, Mr. Godinez avoids those stores entirely now.

166. Mr. Godinez remains extremely careful and vigilant whenever he's in public, yet he's frustrated that he—a U.S. citizen—has had to continue living this cautiously for months on end to attempt to decrease the likelihood of re-arrest.

167. Mr. Napoles is also aware of increased ICE enforcement in North Carolina, especially in the past two months. ICE agents are frequently present in his neighborhood. He feels particularly exposed at his job because he works in construction at outdoor job sites.

168. Mr. Napoles is a member of two community messaging groups, covering the Salisbury area near his home and the Charlotte area where he frequently works, that report ICE sightings. He checks those groups daily before leaving for work and then again before driving home, so he can attempt to avoid ICE agents on the road.

169. Mr. Napoles often changes his route based on ICE sightings reported in the community groups, adding time and inconvenience to his drive, to try to avoid ICE agents. For example, on August 10, 2026, Mr. Napoles saw in a group that ICE was reported to be on I-485, so he took a different road home, even though it added 20 additional minutes to his trip home.

170. Mr. Napoles knows that ICE agents move around quickly and do not stay in one place for long, so he fears another arrest is inevitable, despite his efforts to avoid places with reported ICE sightings.

171. Mr. Napoles is particularly concerned about being detained again because he drives a truck carrying construction tools, and ICE frequently targets Latino men driving work trucks for stops and arrests. Mr. Napoles hears about arrests of Latino men in work trucks nearly every day.

172. Mr. Napoles avoids markets and events where Latino people gather because he fears ICE might show up. He has also generally stopped going out in public, unless it is necessary for work. Mr. Napoles used to hate being at home and loved exploring new places and spending time outdoors. Since his arrest, he no longer thinks exploring new neighborhoods or places is worth the risk of being re-arrested. As a result, he has lost his enjoyment of several outdoor activities. He even stopped fishing, which used to be one of his favorite pastimes.

173. Mr. Napoles and Mr. Godinez are at substantial risk of being subjected again to Defendants' unlawful and unconstitutional policies.

***A U.S. Citizen at Work***

174. On November 18, 2025, Fernando Vazquez Orea—a U.S. citizen—was approached by CBP agents at a construction site where he works in Cary. [31]

175. The agents gave no indication they knew Mr. Vazquez Orea's identity or had a warrant to detain him. The agents' first question to Mr. Vasquez Orea was, "where are you from?" and they spoke to him in Spanish. He declined to answer their questions at first, as is his right, and he tried to step away from the area, but the agents cornered him.

176. They placed Mr. Vazquez Orea in handcuffs, searched him, pulled out his wallet, and saw his North Carolina Real ID (which demonstrates legal immigration status or citizenship). Nevertheless, rather than release him, they loaded him into a vehicle and drove away. After he told them he was born in Raleigh, North Carolina, and only after agents finished going through the contents of his wallet, they abruptly pulled the vehicle over, let him out, and threw his wallet, IDs, and other cards at him.[32]

177. At no point did they ask him any questions about his home, family, work, other community ties, or any other indicator of escape risk.

[31] *See* Brandon Kingdollar, *'They Basically Just Kidnapped Me': US Citizen Taken by Border Patrol in Cary,* NC Newsline (Nov. 20, 2025), https://perma.cc/2AX5-B53A.

[32] *Id.*

178. Agents stranded Mr. Vazquez Orea in a wooded area on the side of the road. He ran about a half a mile back to his job site because he had no other way to get back.

179. Mr. Vazquez Orea, who has no criminal history and has never had an interaction with law enforcement before, walked away from this incident afraid that he could be harassed, arrested, or taken at any time, without any consideration of his individual circumstances. He has trouble sleeping and is constantly looking over his shoulder. For months after his arrest, he did not feel comfortable going out to eat or to the gym. He no longer goes to several Latino-owned business out of fear that he will be stopped and arrested again. He even stopped going to one of his favorite spots to get food because ICE frequently targets that area and the risk of re-arrest is too high.

180. Over the past two months, Mr. Vazquez Orea constantly hears about ICE arrests on the local news, has seen ICE agents on the road and has heard that they are making arrests at Jordan Lake where people—mostly Latino—go to cool off in the summer.

181. He works in landscaping and often works at job sites in predominantly Latino neighborhoods, putting him at ongoing risk of being unlawfully stopped and arrested again. In fact, just last week (mid-September 2026), Mr. Vazquez Orea had to return to the job site where he was previously arrested for work. He was very nervous to return and was on high alert every time he heard a car coming down the road because he knew he was at substantial risk of re-arrest in that neighborhood.

182. Mr. Vazquez Orea is at substantial risk of being subjected again to Defendants' unlawful and unconstitutional policies.

## PUTATIVE CLASS MEMBERS UNLAWFULLY ARRESTED BY DHS AGENTS

### *A U.S. Citizen, Arrested Twice in Two Days*

183. Gerardo Ortiz, a U.S. citizen, was arrested twice, upon information and belief without a warrant, by DHS agents in Charlotte during Operation Charlotte's Web—once on Saturday, November 15, and again on Sunday, November 16. One of the arrests occurred while Mr. Ortiz was protesting. DHS agents came out of a van, tied his hands behind his back, and demanded to see his identification, before transporting him 20 blocks, holding him in a parking lot for a period of time, and then releasing him.[33]

184. Mr. Ortiz, born in Puerto Rico, speaks English with an accent. There was no other apparent basis for his arrest.[34]

185. Mr. Ortiz described the emotional impact of the arrest: "I felt like I lose my liberty in that moment. . . . I was so nervous when I got home. I was crying like a baby, and it's so terrible."[35]

---

[33] *See* George Chidi, '*I Lose My Liberty in That Moment': Charlotte Shuts Down as Citizens and Noncitizens Alike Face ICE Arrests*, The Guardian (Nov. 20, 2025), https://perma.cc/K6Z4-QWMU.

[34] *Id.*

[35] *Id.*

***Congregants Performing Landscaping Work at a Church***

186. On Saturday morning, November 15, 2025, a group of 15-20 congregants were gathered at a church in east Charlotte, performing landscaping work on the church property while their children played and their spouses cooked a meal. Without consent or a warrant, armed and masked DHS agents ran onto the church property. The church, located off Albemarle Road in Charlotte, has a gate that extends across its entrance, which was closed.[36]



187. After entering the church property, DHS agents approached a church member who had been helping with the landscaping project. The agents asked no questions, showed no paperwork, and presented no identification before taking the

[36] *See* Nick Sullivan, *Church members flee as federal agents arrive at east Charlotte place of worship*, Charlotte Observer (Nov. 17, 2025), https://perma.cc/B529-GF3Q; Brody Carter, *Sacred Ground or Enforcement Zone? ICE Raids Test Church Community in Charlotte*, The Christian Broadcast Network (Dec. 12, 2025), https://perma.cc/Z4WF-DQZ3.

church member, who was originally from El Salvador, away. The church member's wife and child were inside the church at the time.[37]



188. The church congregants were terrified by what happened on the church property that morning. For example, a 15-year-old church member reported that he initially fled into the surrounding woods because of DHS agents' actions, even though he is a U.S. citizen. Church members cried and held one another in the aftermath of the raid. The church suspended its work around its property in response to members feeling unsafe.[38]

***Families Visiting a National Forest***

189. On July 26, 2026, ICE and the U.S. Forest Service, assisted by the Caldwell County Sheriff's Office, set up a checkpoint at the Wilson Creek

[37] *Id.*

[38] *Id.*

recreational area in the Pisgah National Forest. Wilson Creek is a popular destination for Latino families to visit, picnic, and swim.

190. Forest Service personnel stopped cars with Latino drivers and occupants, then waved over ICE agents, who swarmed around the vehicles, demanding proof of citizenship or legal permanent resident status. Cars with white drivers were permitted to proceed into the recreational area without inspection.

191. One of the people detained in this operation, Roman Antonio Rogel Alvarenga, is an asylum seeker, father of three, and small business owner, who has been living in Charlotte for the past ten years. He has a pending asylum application and consistently attended his Immigration Court hearings, including one held just weeks before his arrest, at which the judge continued his case to a hearing in late 2028.

192. Mr. Alvarenga brought his wife, sister, elderly mother, and children (ages five, three, and one) to Wilson Creek on the day of the ICE operation. He stopped at the checkpoint and produced his driver's license to a U.S. forest ranger upon request. ICE agents then swarmed around his car, demanding proof of citizenship or legal permanent resident status. He and his wife explained that he had a work authorization and pending asylum application. The agents first asserted—falsely—that he was not allowed to be present in the country if he did not have citizenship or a green card. They then said that his asylum application had been denied, which is factually inaccurate—it remains pending, as of this filing. At no point in the encounter did they produce or otherwise indicate that they had a

warrant for Mr. Alvarenga's arrest. At no point did they ask questions about his home, work, or other ties to the community, although his immediate family, sister, and mother were present and identified themselves to the agents as his family members.

193. The ICE agents asked Mr. Alvarenga to step out of the car, he followed this instruction, and then they handcuffed him and placed him under arrest.

194. Mr. Alvarenga's wife pled with the ICE agents to take her and the children with them, if they were going to arrest her husband. The ICE agents laughed at her, told her that the government would pay her to self-deport (although they had not asked and did not otherwise have means to know her citizenship or immigration status), and said they were only arresting men.

195. Mr. Alvarenga's elderly mother begged agents not to take her son away. They physically pushed her away.

196. While Mr. Alvarenga was waiting in a holding room, after being arrested, he observed the officers laughing and celebrating, high fiving each other, and saying things like "good job" and "we got another one" after each additional person was arrested. ICE agents later transported Mr. Alvarenga to detention, where he remains today.

197. Another person detained in the Wilson Creek operation was Argenis Eduardo Torres Rosales. Mr. Rosales came to the United States from Venezuela with his family in April 2023, entering the country under humanitarian parole. He also has a pending asylum application and a valid employment authorization card.

198. Officers first approached him while he was sitting in his car, in a line of vehicles waiting to pass the check-point and enter the Wilson Creek recreational area. A sheriff's deputy asked for his license and registration, which he provided, and then the deputy handed the documents over to agents who were, on information and belief, ICE agents. The ICE agents then walked up to the car and told Mr. Rosales that he did not have legal status and was being detained.

199. The agents did not ask Mr. Rosales any questions before detaining him. They did not ask about his immigration status, nor did they ask about his home, work, family, or other ties to the community. In fact, he has strong ties to the community, including a U.S. citizen aunt who lives in the Charlotte area.

***An Asylum-Seeker Working as a Rideshare Driver***

200. Darwin Alberto Gomez Corrales is a 33-year-old Venezuelan man, who arrived in the United States in 2022, was given Temporary Protected Status, and has a pending asylum petition. Since then, he has lived in Charlotte with his partner and children. At the time of his arrest, he had a work permit and drivers license and worked as a rideshare driver to support his family.

201. On July 13, 2026, he dropped off a passenger at a store and went inside himself to purchase something sweet for his daughter. While driving away from the store, he pulled up behind a car on the main road that was not moving. He honked gently at the car, and then five ICE officers got out of the car and approached him. They asked him no questions, claimed to have a warrant for his arrest, but refused to show it to him and would not even confirm that they knew

his name. They demanded he provide his driver's license and threatened to smash his car window if he did not comply. As he was calling his wife, they smashed his car window, covering him in broken glass, handcuffed him, and transported him to an office for processing.

202. Mr. Gomez Corrales is claustrophobic and had a panic attack while being transported. He told the officers he could not breathe and asked them to open a window or give him some space, but they just laughed at him. He fainted twice while being transported. One officer punched him in the ribs and left bruises; other officers told him to shut up and said "here, you have no rights."

203. Once he arrived at the office, he asked again to see a warrant, and the officers refused. The officers also did not appear to know his name until they processed him and found his identification. At no point did they ask questions about his home, work, or other ties to the community. He was fingerprinted and processed, then taken to a detention center in Georgia.

## IMPACT ON NORTH CAROLINA COMMUNITIES AND BUSINESSES

### *A Laundromat Owner*

204. DHS agents have appeared to target businesses and workplaces, seeking out Latino people generally, rather than particular people for whom they had warrants.

205. David Rebolloso is a U.S. citizen who served 20 years in the U.S. Air Force. His father was born in Mexico, and his mother, who was part Sioux, was

born in Texas. They married in Mexico and then moved to the Rio Grande Valley in Brownsville, Texas, where Mr. Rebolloso was born and raised.

206. After decades working in the medical field and living in Apex, Mr. Rebolloso retired and moved to Charlotte. Approximately nine years ago, he opened a laundromat in the El Mariachi shopping center on North Tryon Street in Charlotte. The laundromat and the shopping center have many Latino patrons. Other nearby businesses include El Mariachi Supermercado y Restaurante, Panadería Odalys, Paletería Mich Tocumbo, and Emely's.

207. On November 16, 2025, as he was heading to work, Mr. Rebolloso's wife and stepdaughter called him from the laundromat. They were crying and quite frantic. They told him that Border Patrol and ICE agents were terrorizing people in and around the parking lot of the El Mariachi shopping center, as well as up and down North Tryon Street.

208. After he arrived at the laundromat, Mr. Rebolloso learned that his customers had been so frightened that day by federal immigration agents that some left behind their clothes in the washers and dryers and did not return to pick them up. Even though Mr. Rebolloso offered to provide pick-up and drop-off services for his customers, many were too afraid to open their doors.

209. The activities of DHS agents have impacted Mr. Rebolloso's business. His customers usually spend one to two hours doing their laundry. But because people were so leery of the federal immigration agents, far fewer people—including customers who are U.S. citizens—frequented his laundromat following the

activities of November 16, 2025.[39] Mr. Rebolloso estimated he had lost more than 50% of his profits during the first month following the November 2025 activity.[40] His staff, who are all U.S. citizens, also expressed fear about being arrested just because they are Latino.

210. On November 16, 2025, and in the following days, Mr. Rebolloso saw people who looked to be Latino being stopped, chased, and arrested by federal agents in Charlotte. Although Mr. Rebolloso is a U.S. citizen, he is afraid of being stopped and possibly arrested by DHS agents based on the color of his skin.

***A Bakery Owner***

211. Manuel "Manolo" Betancur was born and raised in Colombia, where he served in the Colombian Navy. He later came to the United States and became a U.S. citizen. An entrepreneur for over 30 years, Mr. Betancur owns and operates a number of small businesses in Charlotte, including Manolo's Bakery on Central Avenue. Manolo's Bakery is well known for its bread, pastries, coffee, and desserts prepared in Latin traditions. Based on its physical location in Charlotte and the food it prepares and sells, a significant portion of its customers are originally from Central and South America.

---

[39] *See* Desiree Mathurin, *Charlotte's Latino Shops Weather Border Patrol Raids: Rattled Customers, Empty Lots*, Charlotte Observer (Nov. 20, 2025), https://perma.cc/UBM3-KFHX.

[40] *See* Julian Berger, *Immigrant-Owned Businesses in Charlotte Struggle One Month after Border Patrol Crackdown*, WUNC News (Dec. 16, 2025), https://perma.cc/5QCP-VR85.

212. Mr. Betancur is an active member of the National Small Business Association's Leadership Council and has received numerous awards and commendations for his work and civic leadership.

213. On Saturday, November 15, 2025, as he started walking to his bakery around 9:00 a.m., Mr. Betancur saw multiple SUVs with dark windows driving aggressively on the street. The cars were driving very fast, darting in and out of traffic. On multiple instances, he saw cars stop, and what appeared to be federal immigration agents jumping out. The people coming out of the vehicles were all wearing green uniforms with some lettering on the front; many appeared to be wearing masks. These agents ran up to people walking on the sidewalk, grabbed them, quickly put them in handcuffs, and drove off with them in their vehicles. The people being grabbed all appeared to be Latino or non-white. He saw at least three instances of this happening that morning.

214. Based on what he witnessed, Mr. Betancur called his staff at Manolo's Bakery and told them to shut the doors. He was afraid that federal immigration agents might enter the bakery and place his Latino customers and staff in danger. Based on those concerns and in an effort to protect his customers and staff, Mr. Betancur kept Manolo's Bakery closed for a week. During that time, Mr. Betancur became aware of U.S. citizens being detained by immigration agents even though the people being detained had identification on them. As a result, he started carrying his passport with him because he was afraid of being stopped and possibly arrested based on the color of his skin.

215. Only hours after reopening the bakery on November 24, 2025, Mr. Betancur observed more federal immigration activity just feet away from the bakery, renewing his fears.[41]

216. The consequences of shutting down Manolo's Bakery due to the activities of federal immigration agents were significant. Mr. Betancur estimated that he lost between approximately $50,000-$64,000, as well as his biggest wholesale customer, due to being closed.

217. Manolo's Bakery normally has around 20 people on staff, some of whom are U.S. citizens and some who are non-citizens who are lawfully present in the country. As a result of the November raids, Manolo's Bakery lost multiple employees because they did not feel safe coming to work, even though they were citizens or lawfully present; they were too afraid that federal immigration agents would still arrest them.

218. Months after the start of "Operation Charlotte's Web," Mr. Betancur still gets scared whenever he sees an SUV nearby, especially one with dark windows.

## DHS'S SIMILAR PRACTICES IN OTHER JURISDICTIONS

219. The warrantless arrest policy in North Carolina aligns with DHS's practices in other places where it has surged enforcement. In those places, courts have found consistent and systematic efforts by DHS to subject individuals to

[41] *See* Eli Brand, *Manolo's Bakery Reopens amid Immigration Concerns*, WSOC-TV (Nov. 24, 2025), https://perma.cc/YJ9X-P89W.

warrantless arrests made without probable cause of escape risk, which courts in those jurisdictions have held unlawful under § 1357(a)(2). *See Castañon Nava v. Dep't of Homeland Sec.*, 805 F. Supp. 3d 823, 858, 861 (N.D. Ill. 2025); *Ramirez Ovando v. Noem*, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *15 (D. Colo. Nov. 25, 2025); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417-BAH, 2025 WL 3465518, at *26-27 (D.D.C. Dec. 2, 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 735 (E.D. Cal. 2025); *M-J-M-A & Victor Cruz Gamez v. Hermosillo*, No. 6:25-CV-02011-MTK, 2026 WL 303612, at *1 (D. Or. Feb. 4, 2026).

220. In each of these cases, district courts preliminarily enjoined DHS's practice of arresting individuals without a warrant and without probable cause to believe they present an escape risk.

221. This nationwide pattern of unlawful conduct also reverses established DHS practice, which itself was prompted by litigation. In *Castañon Nava v. Dep't of Homeland Security*, plaintiffs sued DHS in May 2018 to challenge unlawful warrantless arrests in the Chicago area. 435 F. Supp. 3d 880, 885 (N.D. Ill. 2020). The plaintiffs alleged that ICE agents arrested and detained each individual plaintiff without making an individualized determination that the person was likely to escape before a warrant could be obtained, in violation of 8 U.S.C. § 1357(a)(2). That litigation resulted in a settlement, approved on February 8, 2022, in which DHS agreed to promulgate and follow a "Broadcast Statement of Policy"—a policy that simply required agents to do what 8 U.S.C. § 1357(a)(2) requires—to

ensure that warrantless arrests are only made when an agent makes an individualized assessment of probable cause.

222. The Broadcast Statement of Policy requires DHS officers to consider the totality of the circumstances in evaluating a person's "likelihood of escape," including community ties and prior attempts to evade authorities. *Castañon Nava*, No. 1:18-cv-03757 (Feb. 7, 2022), Dkt. No. 155-1 (Broadcast Statement of Policy), at ¶ 1. The policy also requires that, following a warrantless arrest, DHS officers document its facts and circumstances "as soon as practicable," including "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." *Id.* at ¶ 2.

223. DHS has systematically disregarded this policy in North Carolina and other places where it has increased enforcement. And it has attempted to cancel the policy altogether. In June 2025, DHS announced that it would no longer follow the Broadcast Policy. But the policy remains in effect, as the district court in *Nava* confirmed in a February 17, 2026 order. *See* Order, *Castañon Nava*, No. 1:18-cv-03757 (Feb. 16, 2026), Dkt. No. 301.

224. Along similar lines, ICE's prior longstanding policy and practice, for at least fifteen years, required ICE agents to complete a "Field Operations Worksheet" (FOW) by providing details about their target and then submit the completed form to a supervisor for specific approval prior to conducting any operation to arrest an immigrant in the United States.

225. Without explanation or even announcement, DHS recently changed its policy to stop requiring completion of the FOW, and to stop requiring subsequent specific supervisory approval prior to conducting operations to arrest a noncitizen in the United States. Under ICE's policy and practice before the recent change, the FOW was used in almost every arrest made by the Enforcement and Removal Operations division of ICE, the only exceptions being instances in which ICE was called to assist local law enforcement agencies.

226. As other courts have concluded, DHS has been systematically ignoring the Broadcast Policy and the requirements of § 1357(a)(2) since the start of 2025.

227. As in North Carolina, DHS has increased operations in Los Angeles, California; Portland, Oregon; Washington, D.C.; Minneapolis, MN; and across the state of Colorado. During these operations, DHS agents—driving unmarked vehicles, wearing camouflage or tactical-style uniforms, wearing masks to hide their faces, and carrying military-style weapons—have conducted raids and made hundreds of arrests. Agents have routinely arrested groups of people who appeared Latino or were speaking Spanish, apparently without knowing who they were ahead of time or checking identification or immigration status before detaining them. They have targeted businesses and workplaces, apparently targeting Latino people generally, rather than particular people for whom they had warrants. They have routinely used excessive force in these arrests, including smashing car windows and forcibly pulling people from their cars. DHS agents shot and killed two U.S. citizens on the streets of Minneapolis: a 37-year-old mother during a

traffic encounter, and a 37-year-old intensive care nurse for the Department of Veterans Affairs.

228. These incidents are an inevitable outgrowth of drastically lowered standards and weakened screening processes for new DHS recruits. Just weeks ago, an official overseeing recruitment of thousands of new ICE agents lodged a formal whistleblower report relating an "unprecedented lowering of standards" for hiring ICE agents, including widespread improper vetting, incomplete background checks, and other "systemic breakdowns" in hiring protocols that were crafted to protect the public.[42]

229. Nor are DHS agents receiving training that might curb or prevent unlawful behavior—in fact, such training is being slashed. As a former ICE attorney recently informed Congress, ICE has pared away "classes that teach the Constitution, our legal system, firearms training, the use of force, lawful arrests, proper detention and the limits of officers' authority," to the point that "ICE is teaching cadets to violate the Constitution."[43]

**DHS'S ADMISSION OF UNLAWFUL ARREST POLICIES**

230. DHS's disregard for the warrantless arrest statute is also clear from its public statements about its arrest practices.

---

[42] Alexandra Berzon, et al., *ICE Skipped Basic Checks in Rush for Recruits, Whistle-Blower Says*, N.Y. Times (Sept. 3, 2026), https://perma.cc/6UU3-H2EE.

[43] *See* Nicholas Nehamas & Hamad Aleasiz, *Training for New ICE Agents Is 'Deficient' and 'Broken,' Whistle-Blower Says*, N.Y. Times (Feb. 23, 2026), https://perma.cc/M7RQ-SHYH.

231. DHS has repeatedly acknowledged in public statements that agents use the lower "reasonable suspicion" standard—not "probable cause"—to make arrests. In response to a lawsuit filed in the District of Columbia regarding warrantless arrests in September 2025, a DHS spokeswoman said, "DHS law enforcement uses 'reasonable suspicion' to make arrests."[44]

232. The list of similar statements from DHS is long. For example, DHS made similar statements in an October 6, 2025, press release[45] and a November 19, 2025, news article.[46] On January 16, 2026, the official DHS account on X (formerly Twitter) published posts stating "[l]aw enforcement uses 'reasonable suspicion' to make arrests."[47]

233. DHS has likewise acknowledged in public statements that agents conduct immigration enforcement arrests without assessing escape risk, as required by law. In an October 1, 2025, press release, DHS stated, "If and when we

---

[44] *See* Teo Armus & Jenny Gathright, *Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.,* Washington Post (Sept. 25, 2025), https://perma.cc/22QL-NS88.

[45] *See DHS Debunks Governor Pritzker's Harmful Lies About Operation Midway Blitz in Chicago, Federal Law Enforcement*, Homeland Security (Nov. 19, 2025), https://perma.cc/NBY6-YTH4 ("Under the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement used 'reasonable suspicion' to make arrests.").

[46] *See* Mauricio Casillas, *Lawsuit Could Limit How ICE Conducts Arrests in DC*, NBC4 Washington (Nov. 19, 2025), https://perma.cc/NXV4-Q592 ("Under the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement uses 'reasonable suspicion' to make arrests.").

[47] *See* Homeland Security [@DHSgov], *False. A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity. Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution. The Supreme Court has already ruled that such actions are in line with the Constitution*, X (Jan. 16, 2026), https://perma.cc/3GQQ-BXN6.

do encounter individuals subject to arrest, our law enforcement is trained to ask a series of well-determined questions to determine status and removability," with no mention of any assessment of escape risk.[48]

234. DHS recently underscored its disregard for the requirement to perform an individualized assessment of escape risk in a Memorandum issued on January 28, 2026, by Defendant Lyons (the "Lyons Memo"). The Lyons Memo—issued to all ICE personnel—announced that the Administration would be applying a new interpretation of § 1357(a)(2)'s "likely to escape" requirement. The Lyons Memo authorizes officers to make warrantless arrests whenever they determine a person "is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained."[49]

235. The factors that the Lyons Memo counsels ICE officers to consider include a series of innocuous circumstances, like presence in a vehicle. Indeed, the Lyons Memo seems to sweep in virtually anyone stopped in a traffic stop or even traveling on a sidewalk: "age and health" (which suggests that anyone not visibly disabled, elderly, or a small child is an escape risk) and "ability to promptly depart the scene" (which encompasses anyone who can walk or has access to a bike or vehicle) are permissible risk factors.

---

[48] *See DHS Debunks New York Times False Reporting: DHS Does NOT Deport U.S. Citizens*, Homeland Security (Nov. 18, 2025), https://perma.cc/2PVQ-W5Z7.

[49] *See* Memorandum from Todd M. Lyons to All ICE Personnel (Jan. 28, 2026), https://perma.cc/W98Q-DVYD; Hamed Aleaziz & Charlie Savage, *ICE Expands Power of Agents to Arrest People Without Warrants*, N.Y. Times (Jan. 30, 2026), https://perma.cc/5J82-ZYN5.

236. Following the issuance of the Lyons Memo, DHS has made clear that it continues to engage in warrantless arrests without probable cause. DHS's spokesperson told multiple media outlets that the Lyons Memo is "nothing new" and argued that "authorities under 1357 and, of course, reasonable suspicion are protected by the U.S. Constitution."[50]

237. The Lyons Memo is another confirmation of ICE's policy and practice in North Carolina of making warrantless arrests without the probable cause required by law, and an attempt to render meaningless the "likely to escape" requirement, gutting the protections Congress has enacted.

## CLASS ACTION ALLEGATIONS

238. Plaintiffs Willy Aceituno, Yoshi Cuenca Villamar, Ruben Arguera Lopez, Edwin Godinez, and Yair Alexander Napoles bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

239. Mr. Aceituno, Mr. Cuenca, Mr. Arguera Lopez, Mr. Godinez, and Mr. Napoles seek to represent the following classes and subclasses:

**Suspicionless Stops Class:** All persons who, since November 1, 2025, have been or will be subject to an investigatory stop for immigration

---

[50] *See* Ashley Oliver, *ICE Reveals Legal Theory Behind Warrantless Immigration Arrests*, Fox News (Feb. 3, 2026), https://perma.cc/ANN9-E5KU; Anthony Iafrate, *Nothing But Green Lights: ICE Memo Expands Agents' Warrantless Arrest Powers*, Daily Caller (Jan. 31, 2026), https://perma.cc/HY3E-AFLU.

purposes by DHS in North Carolina without reasonable suspicion that the person is in the United States in violation of civil immigration laws.

**Warrantless Arrests Class**: All persons who, since November 1, 2025, have been or will be subject to an arrest by DHS in North Carolina for immigration purposes without a warrant and without a pre-arrest, individualized assessment of probable cause both that the person is in the United States in violation of civil immigration laws and poses an escape risk.

- **Removability Subclass**: All persons who, since November 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in North Carolina without probable cause that the person is in the United States in violation of civil immigration laws.
- **Escape Risk Subclass**: All persons who, since November 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in North Carolina without probable cause that the person is likely to escape before a warrant can be obtained.

240. Plaintiffs reserve the right to amend or modify the class and subclass definitions as appropriate.

241. The proposed classes and subclasses satisfy the prerequisites of Rule 23(a) and 23(b)(2).

242. They easily satisfy the numerosity requirement of Rule 23(a)(1). Although the number of individuals who have been or will be subject to unlawful stops and arrests by Defendants under these policies is not known with precision, class members number in the hundreds. Between November, 2025 and August 6, 2026 (the last date for which data is available), federal agents have arrested over 6,400 people in North Carolina.[51] The frequent detentions of U.S. citizens and other lawfully present individuals who are later released on the same day are unlikely to be counted among these official arrest figures, even though they often involve handcuffing, physical assault, property confiscation, or forced transportation, or otherwise meet the legal criteria for arrest. The vast majority of these stops and arrests have been carried out without a warrant. Defendants are indiscriminately stopping and arresting people throughout the state without reasonable suspicion or probable cause, as illustrated by the numerous stories of Plaintiffs and witnesses in this case.

243. The proposed classes and subclasses satisfy the commonality requirement of Rule 23(a)(2) as they share common issues of fact or law, including but not limited to whether Defendants' policies and practices violate 8 U.S.C. § 1357(a)(2).

244. The proposed classes and subclasses also satisfy the typicality requirement of Rule 23(a)(3). The claims of the proposed class representatives are

[51] Deportation Data Project, Administrative Arrests Dataset, https://deportationdata.org/index.html (accessed Sept. 25, 2026) (filtered to "apprehension state" = "North Carolina" and by date), https://perma.cc/2BZ3-CQZC.

typical of the classes because they were stopped without reasonable suspicion, arrested without a warrant and without probable cause of removability or escape risk.

245. Plaintiffs are adequate class representatives, as required by Rule 23(a)(4), as they have no conflict of interest with the putative class members, will fairly and adequately protect the interests of the class, and understand and accept their responsibilities as class representatives. They have also retained qualified counsel with adequate resources and significant experience to prosecute their claims.

246. The proposed classes and subclasses satisfy the requirements of Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, as they have policies and practices to which everyone in the class and subclasses is subject. Final injunctive or declaratory relief therefore is appropriate to the class and subclasses as a whole.

247. Counsel for Plaintiffs have extensive experience litigating class actions and cases involving civil and constitutional rights generally and are therefore qualified to be certified as class counsel pursuant to Rule 23(g).

## CLAIMS FOR RELIEF

### Count I

### Investigative Stops without Reasonable Suspicion

### Violation of the Fourth Amendment and 5 U.S.C. §§ 704, 706(2)(B)

248. On behalf of the Suspicionless Stops Class, Plaintiffs Aceituno, Cuenca, Arguera Lopez, Godinez, Napoles, and Vazquez Orea incorporate by reference the allegations of the preceding paragraphs.

249. Under the Fourth Amendment to the U.S. Constitution:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

250. Law enforcement officers may briefly stop individuals to "make[] reasonable inquiries" based on "unusual conduct which leads [the officer] reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). But officers cannot make stops based on ascribing suspicion generally to individuals of a certain ethnicity.

251. Defendants have adopted and implemented a policy and practice of conducting stops of individuals in North Carolina—including Plaintiffs—based largely or entirely on the perceived race or ethnicity of the individual and without reasonable suspicion that the individual is present in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens.

252. In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights to be free from unreasonable seizure, specifically stops without reasonable suspicion that the individual is present in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens and unreasonable termination of their freedom of movement.

253. Plaintiffs and class members reasonably fear further violation of the Fourth Amendment as they go about their normal daily lives in North Carolina.

254. This Court has inherent equitable authority to enjoin violations of the Constitution by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

255. This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2)(B).

256. Individual Plaintiffs and Suspicionless Stops Class members have no plain, adequate, or complete remedy at law to address the wrongs described herein. The relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

## Count II

### Warrantless Arrests without Individualized Removability Determinations

### Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), and 5 U.S.C. §§ 704, 706(2)(C)

257. On behalf of the Warrantless Arrests Class and the Removability Subclass, Plaintiffs Aceituno, Cuenca, Arguera Lopez, Godinez, Napoles, and Vazquez Orea incorporate by reference the allegations of the preceding paragraphs.

258. Defendants arrested Plaintiffs without warrants. Before each arrest, Defendants failed to make the required individualized finding that the person arrested was in violation of the immigration laws.

259. Defendants made each of these arrests without a warrant and without "reason to believe" that Plaintiffs were "in the United States in violation of any [immigration] law or regulation" in violation of 8 U.S.C. § 1357(a)(2).

260. These arrests were part of Defendants' policy, pattern, and/or practice of making warrantless arrests without probable cause of removability.

261. DHS's ongoing and increasing presence and enforcement activity in North Carolina, as well as its public statements that it intends to continue the Charlotte's Web campaign, demonstrate that Defendants' illegal arrest tactics are ongoing.

262. Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized status determination is final agency action that is ultra vires and in excess of statutory jurisdiction, authority, or limitations under 8 U.S.C. § 1357(a)(2). *See* 5 U.S.C. §§ 704, 706(2)(C).

263. This Court has inherent equitable authority to enjoin violations of the federal law by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

264. This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

265. Individual Plaintiffs, Warrantless Arrest Class members, and Removability Subclass members have no plain, adequate, or complete remedy at law to address the wrongs described herein. The relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

**Count III**

**Warrantless Arrests without Individualized Escape Risk Determinations**

**Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii) and 5 U.S.C. §§ 704, 706(2)(C)**

266. On behalf of the Warrantless Arrests Class and the Escape Risk Subclass, Plaintiffs Aceituno, Cuenca, Arguera Lopez, Godinez, Napoles, and Vazquez Orea incorporate by reference the allegations of the preceding paragraphs.

267. Defendants arrested Plaintiffs without warrants. Before each arrest, Defendants failed to make the required individualized finding that the person arrested posed a flight risk.

268. Defendants made each of these arrests without a warrant and without "reason to believe" that Plaintiffs and members of the Escape Risk Subclass were

"likely to escape before a warrant can be obtained for [their] arrest" in violation of 8 U.S.C. § 1357(a)(2).

269. These arrests were part of Defendants' policy, pattern, and/or practice of using warrantless arrests.

270. DHS's ongoing and increasing presence and enforcement activity in North Carolina, as well as its public statements that it intends to continue the Charlotte's Web campaign, demonstrate that Defendants' illegal arrest tactics are ongoing.

271. Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized fight risk determination is final agency action that is ultra vires and in excess of statutory jurisdiction, authority, or limitations under 8 U.S.C. § 1357(a)(2). *See* 5 U.S.C. §§ 704, 706(2)(C).

272. This Court has inherent equitable authority to enjoin violations of the federal law by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

273. This Court also has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

274. Individual Plaintiffs, Warrantless Arrest Class members, and Escape Risk Subclass members have no plain, adequate, or complete remedy at law to address the wrongs described herein. The relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1. Certify the Suspicionless Stops Class, Warrantless Arrests Class, Removability Subclass, and Escape Risk Subclass as described above, and appoint Mr. Aceituno, Mr. Cuenca, Mr. Arguera Lopez, Mr. Godinez, and Mr. Napoles as class representatives;

2. Appoint the undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

3. Declare that Defendants' policy and practice of conducting stops of individuals in North Carolina without reasonable suspicion that the individual is present in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens violates the Fourth Amendment to the U.S. Constitution.

4. Declare unlawful Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the person being arrested is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

5. Declare unlawful Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the person being arrested is likely to escape before a warrant can be obtained as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

6. Vacate and set aside Defendants' policy and practice of conducting stops of individuals in North Carolina without reasonable suspicion that the individual is present in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens.

7. Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the person being arrested is in the United States in violation of law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens in violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii);

8. Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without a valid pre-arrest, individualized determination of probable cause that the person being arrested is likely to escape before a warrant can be obtained in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

9. Issue permanent injunctive relief preventing Defendants from engaging in the conduct described above;

10. Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge, at a time and in a manner agreed upon with Plaintiffs, all records collected and maintained about Plaintiffs and class members from their unlawful arrests, including any derivative information;

11. Award Plaintiffs their costs and attorney's fees; and

12. Issue any and all other such relief as the Court deems appropriate.

Dated: October 1, 2026

Respectfully submitted,

/s/ *Corina Scott*

Corina Scott
NC Bar No. 64573
Kristi Graunke
NC Bar No. 51216
Jaclyn Maffetore
NC Bar No. 50849
**ACLU of North Carolina Legal Foundation**
P.O. Box 28004
Raleigh, NC 27611
cscott@acluofnc.org
kgraunke@acluofnc.org
jmaffetore@acluofnc.org
T: (919) 627-3309

Johanna M. Hickman*
DC Bar No. 981770
Adnan Perwez*
DC Bar No. 90027532
Steven Y. Bressler*
DC Bar No. 482492
Brian Netter*
DC Bar No. 979362
**Democracy Forward Foundation**
P.O. Box 34553
Washington, DC 20043
hhickman@democracyforward.org
aperwez@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org
T: (202) 448-9090

Lucia Goin*
Kathryn Huddleston*
**ACLU Foundation**
**Immigrants' Rights Project**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
lgoin@aclu.org
khuddleston@aclu.org

Oscar Sarabia Roman*
Noelle Smith*
**ACLU Foundation**
**Immigrants' Rights Project**
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
osarabia@aclu.org
nsmith@aclu.org

Jacob H. Sussman
NC Bar No. 31821
**Southern Coalition for Social Justice**
P.O. Box 51280
Durham, NC 27717
jsussman@scsj.org
T: (919) 323-3380 (ext. 129)

* Admitted *pro hac vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 1, 2026, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will effect service on all counsel of record.

Respectfully submitted this the 1st day of October, 2026.

*/s/ Corina Scott*
Corina Scott
cscott@acluofnc.org

*Counsel for Plaintiffs*