**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| WILLY WENDER ACEITUNO, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>*Defendants*. | Civil Action No. 26-146<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION** |

Plaintiffs Willy Wender Aceituno, Yoshi Cuenca Villamar, Ruben Arguera Lopez, Edwin Godinez, Yair Alexander Napoles, and Fernando Vazquez Orea, on behalf of themselves and a putative class, respectfully request preliminary injunctive relief or, alternatively, a stay of agency action of Defendants' policies and practices of making warrantless civil arrests in North Carolina without a pre-arrest individualized determination of (1) probable cause that the person arrested is present in the United States in violation of federal law regulating the admission, exclusion, expulsion, or removal of noncitizens; and (2) probable cause that the person being arrested is likely to escape before a warrant can be obtained. Such relief will prevent the U.S. Department of Homeland Security (DHS) from violating the statutory restrictions Congress placed on its authority, without disturbing DHS's lawful operations.

Defendants have been engaged in a campaign of unlawful immigration arrests throughout North Carolina since at least November 2025. In recent months, the severity and scale of their unlawful enforcement efforts have increased, necessitating the preliminary relief sought here. DHS agents, typically masked and heavily armed, have arrested North Carolinians whom they perceive to be Latino, without a warrant and without making the individualized probable cause assessments

required by federal law. DHS agents flood neighborhoods with high concentrations of Latino residents, circling public areas and shopping centers in unmarked SUVs, detaining people whom they happen to find, with no objective and lawful reason to believe either these individuals are unlawfully in the United States or likely to escape before a warrant could be obtained.

The indiscriminate nature of DHS's unlawful arrest practices means that even U.S. citizens or individuals with valid immigration status—like the six Plaintiffs in this case—risk being detained and arrested again without the procedures mandated to safeguard their rights to live, work, and travel freely with dignity. Plaintiffs and putative class members are frightened to leave their homes, go to work, pick up food, exercise outside, and run basic errands. *See, e.g.*, Ex.1, Declaration of Willy Wender Aceituno ("Aceituno Decl.") ¶ 45; Ex. 2, Declaration of Yoshi Cuenca Villamar ("Cuenca Decl.") ¶¶ 31, 35; Ex. 3, Declaration of Ruben Arguera Lopez ("Arguera Lopez Decl.") ¶¶ 28, 31; Ex. 4, Declaration of Yair Alexander Napoles ("Napoles Decl.") ¶¶ 30-31; Ex. 5, Declaration of Edwin Godinez ("Godinez Decl.") ¶¶ 25-27, 30; Ex. 6, Declaration of Fernando Vazquez Orea ("Vazquez Decl.") ¶¶ 21-22. Defendants' policies also cause Plaintiffs to alter their lives and movements in order to attempt to mitigate the significant risk of re-arrest. Plaintiffs minimize their time in public places, alter their routes to or from work based on reported Immigration and Customs Enforcement (ICE) sightings in their communities, avoid Latino-owned and -patronized businesses, and avoid main roads and highways to avoid encountering and being re-arrested by DHS agents. *See, e.g.*, Ex. 1, Aceituno Decl. ¶¶ 45-47; Ex. 2, Cuenca Decl. ¶¶ 23-27, 31-32; Ex. 5, Godinez Decl. ¶¶ 25-26, 30; Ex. 4, Napoles Decl. ¶¶ 28, 30-31; Ex. 3, Arguera Lopez Decl. ¶¶ 22-25, 27-28; Ex. 6, Vazquez Decl. ¶¶ 21-22.

Defendants' policies and practices of making warrantless arrests without individualized probable cause and escape risk determinations violate the explicit text of the Immigration and

Nationality Act (INA) and its implementing regulations. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)-(ii). As a result, these agency policies violate the Administrative Procedure Act's (APA) requirements because they are contrary to law, arbitrary and capricious, and in excess of statutory authority.

Similar DHS warrantless arrest policies and practices have been enjoined by federal courts across the country. *See M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1158 (D. Or. 2026); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 15 (D.D.C. 2025); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1242 (D. Colo. 2025). In line with this persuasive authority, this Court should grant preliminary relief prohibiting DHS's warrantless arrest policies and practices on a class-wide basis.

## BACKGROUND

Federal law prohibits immigration officers from making warrantless arrests, except in narrow, enumerated circumstances. Before making a warrantless arrest, immigration agents must have "reason to believe" *both* that: (1) the person to be arrested is in the United States in violation of immigration laws, *and* (2) the person is likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)-(ii); *M-J-M-A-*, 822 F. Supp. 3d at 1158 ("The law on this issue is clear and undisputed."). "Courts have held that the phrase 'reason to believe' in § 1357 is equivalent to constitutionally required probable cause." *United States v. Segura-Gomez,* No. 17-CR-65-FL-1, 2018 WL 6582823, at *6 (E.D.N.C. May 25, 2018), *R&R adopted*, No. 17-CR-65-FL-1, 2018 WL 6259222 (E.D.N.C. Nov. 30, 2018) (collecting cases).

The record demonstrates that Defendants are targeting communities based on demographics and arresting people without warrants, without conducting any inquiry as to whether individuals are removable or whether they are likely to escape before a warrant can be obtained.

### A. Defendants' warrantless arrest policies are unlawful.

The White House and DHS have imposed quotas requiring officers to make thousands of immigration-related arrests per day—with consequences for not hitting arrest targets.[1] To meet that goal, the Administration has directed agents to make warrantless arrests of anyone they encounter and *suspect* of being in the country unlawfully—which violates Section 1357(a)(2). Through designated spokespeople and on official platforms, DHS has issued public statements confirming that it authorizes its agents to use a lower, "reasonable suspicion" standard to make arrests, not "probable cause."[2] In January, for example, DHS wrote: "Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution"—a statement that conflicts with the Fourth Amendment and § 1357(a)(2)'s text.[3] Most recently, *after* Defendants began implementing their policy in North Carolina, then-Acting Director of ICE Todd Lyons issued a memorandum (the "Lyons Memo") that confirms Defendants do not comply with the § 1357(a)(2) likelihood of escape requirement. The Lyons Memo acknowledges that Defendants cannot conduct a warrantless arrest absent probable cause of escape

---

[1] Ex. 7, Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://perma.cc/Z4YZ-PNEN; Ex. 8, David J. Bier, *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, Cato Institute (June 20, 2025), https://perma.cc/J7NB-2YQU (White House set arrest quota at 3,000 per day); Ex. 9, Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, New York Times (July 1, 2026), https://perma.cc/65ND-QU84 (2,000 arrests per day is the "new standard for enforcement").

[2] *See* Ex. 10, Teo Armus & Jenny Gathright, *Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.*, Washington Post (Sept. 25, 2025), https://perma.cc/22QL-NS88; Ex. 11, *DHS Debunks Governor Pritzker's Harmful Lies About Operation Midway Blitz in Chicago*, *Federal Law Enforcement*, U.S. Dep't of Homeland Sec. (Nov. 19, 2025), https://perma.cc/NBY6-YTH4 ("Under the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement used 'reasonable suspicion' to make arrests."); Ex. 12, Mauricio Casillas, *Lawsuit Could Limit How ICE Conducts Arrests in DC*, NBC4 Washington (Nov. 19, 2025), https://perma.cc/NXV4-Q592 ("Under the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement uses 'reasonable suspicion' to make arrests.").

[3] Ex. 13, Homeland Security [@DHSgov], X (Jan.16, 2026) https://perma.cc/3GQQ-BXN6 ("False. A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity. Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution. The Supreme Court has already ruled that such actions are in line with the Constitution").

risk but then enumerates a series of "[p]ossible factors" relevant to escape risk, including, among other things, presence in a car, the individual's age, or their health[4]—factors that would encompass virtually anyone detained in a traffic stop or on the street. A DHS spokesperson told multiple news outlets that the Lyons Memo was "nothing new" and reiterated the "reasonable suspicion" standard.[5] DHS has yet to rescind the Lyons Memo, confirming that DHS agents continue to disregard the probable-cause requirement and arrest individuals without obtaining any evidence supporting either prong of § 1357(a)(2), much less probable cause.

DHS's formal directives have resulted in a drastic increase in the scale of enforcement. The agency has made more than 6,300 documented federal immigration arrests in North Carolina from January 2025 to March 2026, nearly double that of the prior two years combined.[6] Between January and July 2026, ICE arrested 4,949 people in North Carolina, more than double the number arrested during the same time period in 2025.[7] Arrests, both nationally and in North Carolina, reached record highs in July 2026.[8] Siembra NC, a nonprofit organization that runs a community hotline to monitor ICE enforcement activity, consistently receives at least two hotline calls and two social media reports *per week* describing North Carolinians being arrested without a warrant

---

[4] *See* Ex. 42, Memorandum from Todd M. Lyons to All ICE Personnel (Jan. 28, 2026), https://perma.cc/W98Q-DVYD.

[5] *See* Ex. 14, Ashley Oliver, *ICE Reveals Legal Theory Behind Warrantless Immigration Arrests, Fox News* (Feb. 3, 2026), https://perma.cc/ANN9-E5KU; Ex. 15, Anthony Iafrate, *Nothing But Green Lights: ICE Memo Expands Agents' Warrantless Arrest Powers*, Daily Caller (Jan. 31, 2026), https://perma.cc/HY3E-AFLU.

[6] Ex. 16, Jacob Biba and Lex Clay Alfonso, *New ICE Data Shows More than 6,300 Arrests in NC since Trump Took Office, Nearly Double the Prior Two Years*, WFAE 90.7 (Apr. 28, 2026), https://perma.cc/7VHF-8ACU.

[7] Ex. 17, Deportation Data Project, Administrative Arrests Dataset, https://deportationdata.org/index.html (accessed Sept. 25, 2026) (filtered to "apprehension state" = "North Carolina" and by date), https://perma.cc/7KJG-GFA4.

[8] Ex. 21, Albert Sun & Allison McCann, *ICE Arrests Soar as People With No Criminal Record Are Increasingly Targeted*, New York Times (Aug. 27, 2026), https://perma.cc/2BR3-HSD8.

and without the probable cause required by the law. Ex. 18, Decl. of Andreina Malki, Siembra NC ("Siembra Decl.") ¶ 26.

DHS's implementation of its unlawful policies and practices of arresting absent probable cause in North Carolina began no later than November 2025, when DHS launched what it dubbed "Operation Charlotte's Web."[9] Ex. 18, Siembra Decl. ¶¶ 5-8. As part of the Operation, DHS sent hundreds of agents into the state and deployed indiscriminate, street-level sweeps to boost the numbers of people arrested in order to meet the arbitrary quotas set by the administration.[10] Masked agents driving unmarked vehicles and carrying military-style weapons carried out hundreds of arrests in Charlotte and other areas across the state.[11] Focusing on neighborhoods with high concentrations of Latino residents, agents circled public areas and shopping centers and used violent arrest tactics, including smashing car windows, dragging people from vehicles, forcibly grabbing people off the sidewalk, and seizing workers from workplaces. Ex. 1, Aceituno Decl. ¶¶ 11-12; Ex. 3, Arguera Lopez Decl. ¶ 11; Ex. 28, Declaration of Manolo Betancur ("Betancur Decl.") ¶ 8; Ex. 19, Declaration of Becca O'Neill, Carolina Migrant Network ("CMN Decl.") ¶¶ 6-7; Ex. 20, Declaration of David Rebolloso ("Rebolloso Decl.") ¶¶ 9-16.

Carolina Migrant Network (CMN), a 501(c)(3) organization in Charlotte, North Carolina that provides free legal representation to individuals in immigration proceedings, received over 1,400 calls to its community hotline in November 2025, representing a more than 2000% increase

---

[9] Ex. 22, *DHS Launches Operation Charlotte's Web to Target Criminal Illegal Aliens Terrorizing Americans in Charlotte, North Carolina,* U.S. Dep't of Homeland Security (Nov. 15, 2025), https://perma.cc/6PNF-GUDQ.

[10] *See supra* n.1; Ex. 45, Maya Yang, *Protests in Charlotte as aggressive immigration arrests continue*, The Guardian (Nov. 17, 2025), https://perma.cc/8EAE-58ZU.

[11] *Id.*

from the previous month. Ex. 19, CMN Decl. ¶¶ 1, 3-4. Hundreds of these calls pertained to individuals being arrested in the streets by DHS agents without a warrant. *Id.* ¶ 7.

**B. Defendants' recent escalation of arrests.**

Despite widespread outcry in response to Defendants' tactics during the Charlotte's Web surge,[12] Defendants' illegal tactics continued and then escalated again. Local law enforcement officials predicted that federal immigration enforcement would continue to increase in 2026,[13] and this forecast has materialized. DHS is expanding its capacity within the state to process and house individuals who are detained. The GEO Group, which operates private prisons and detention centers across the United States, is in the process of re-opening the decommissioned Rivers Facility in Winton, North Carolina, which will add around 1,400 immigration detention beds within the state by the end of 2026.[14] ICE has proposed new administrative offices in Cary and Charlotte.[15] Public sources show that arrests have "continue[d] at [a] fast pace,"[16] and "intensified"[17] since November.

---

[12] *See, e.g.*, Ex. 23, Danielle Battaglia, *Thom Tillis accuses Kristi Noem of violating the law, says she 'failed at FEMA'*, The News and Observer (March 3, 2026), https://perma.cc/9W3E-DGGM (North Carolina Senator in statements before Congress noted, "Quality matters. Not quantity . . . . And what we've seen is a disaster under your leadership, Miss Noem. What we've seen is innocent people getting detained that turn out are American citizens.").

[13] Ex. 37, Hank Lee, Myles Harris, *Mecklenburg County Sheriff Says Border Patrol Return to Charlotte is Likely, Cites Federal Agenda*, WCNC Charlotte (Dec. 17, 2025), https://perma.cc/S7QJ-F79V.

[14] Ex. 31, Eduardo Medina and Hamed Aleaziz, *ICE Detention Center in North Carolina to Be Among Largest on East Coast,* New York Times (July 24, 2026), https://perma.cc/6APC-3R2W.

[15] Ex. 33, Jacob Biba, *Where in North Carolina is ICE Looking to Expand*? NC Local (Mar. 10, 2026), https://perma.cc/QZ7J-VNUS.

[16] Ex. 25, Caitlin McGlade, *North Carolinian ICE Arrests Continue at Fast Pace after Border Patrol Surge*, The Charlotte Observer (Apr. 20, 2026), https://perma.cc/6M47-B5T3.

[17] Ex. 24, Patricia Ortiz, *ICE Increases Arrests in North Carolina after CBP Operation in Charlotte*, Enlace Latino NC (May 5, 2026), https://perma.cc/9PUJ-BGBY.

In the past few months, there has been a drastic increase in street-level arrests throughout the state. Ex. 1, Aceituno Decl. ¶¶ 37-39; Ex. 2, Cuenca Decl. ¶¶ 23-25, 31, 33; Ex. 4, Napoles Decl. ¶¶ 25, 27, 29; Ex. 5, Godinez Decl. ¶¶ 22-24, 30, 32; Ex. 3, Arguera Lopez Decl. ¶¶ 18-21, 26-27, 29; Ex. 6, Vazquez Decl. ¶¶ 19-20, 29; Ex. 19, CMN Decl. ¶¶ 14-17; Ex. 18, Siembra Decl. ¶¶ 23-27. These incidents include the detention of drivers and passengers, as well as arrests occurring during routine, daily activities such as commuting to work or attending appointments. Ex. 18, Siembra Decl. ¶¶ 23-24, 27. CMN has also seen "a concerning uptick" of reported arrests and requests for legal intake during the summer of 2026 arising from individuals caught up in traffic stops, in sweeps of Black and Latino neighborhoods, and from those faithfully attending their ICE check-ins, without any reason to believe the individual arrested was an escape risk. Ex. 19, CMN Decl. ¶¶ 12-16.

A recent incident illustrates these broader policies. On July 26, 2026, ICE conducted a raid at Wilson Creek in the Pisgah National Forest, which attracts families (particularly Latino families) looking for a place to swim and gather during the summer. Ex. 30, Declaration of Sandra Salazar ("Salazar Decl.") ¶ 4. At least 13 people were arrested, including Mr. Rogel Alvarenga and Mr. Torres Rosales, who have deep ties to their families and communities in North Carolina. The agents did not produce warrants, did not ask questions related to escape risk, and appeared to not know who either of the men were before stopping their cars. *See* Ex. 26, Declaration of Roman Antonio Rogel Alvarenga ("Alvarenga Decl.") ¶¶ 6-8; Ex. 27, Declaration of Argenis Eduardo Torres Rosales ("Rosales Decl.") ¶¶ 7-11. In fact, Mr. Rogel Alvarenga watched as ICE agents stopped every car with a Latino driver but allowed several cars that did not have Latino drivers to proceed to the creek without any investigation, stop, or arrest. Ex. 26, Alvarenga Decl. ¶ 5.

Other putative class members throughout the state have been arrested without a warrant and without the probable cause required by law. For instance, on July 13, 2026, DHS agents targeted a Latino Uber driver in a parking lot. Agents smashed his car window, forcibly removed him from the vehicle, and arrested him without showing him a warrant and without asking any questions bearing on escape risk. Ex. 32, Declaration of Darwin Alberto Gomez Corrales ("Corrales Decl.") ¶¶ 5-9. The increase in ICE arrests in North Carolina mirrors national trends: In July 2026, ICE arrested nearly 50,000 people nationally—the highest monthly total since the beginning of Trump's second administration.[18]

**C. Plaintiffs and putative class members face ongoing harm as a result of Defendants' unlawful policies.**

Plaintiffs are all North Carolinians who have been arrested pursuant to Defendants' unlawful policies and practices. DHS agents did not present a warrant before arresting any of the Plaintiffs or conduct an individualized and particularized assessment of either removability or likelihood of escape. *See* Ex. 1, Aceituno Decl. ¶¶ 18-20; Ex. 2, Cuenca Decl. ¶¶ 9-13; Ex. 3, Arguera Lopez Decl. ¶¶ 4-5, 10, 13; Ex. 5, Godinez Decl. ¶¶ 16-17; Ex. 4, Napoles Decl. ¶¶ 17-18; Ex. 6, Vazquez Decl. ¶¶ 7-10.[19] DHS agents smashed the window of Plaintiff Willy Wender Aceituno's truck, dragged him from his vehicle, forced him to the ground, handcuffed him, and threw him in a van—all without checking the identification in his wallet or asking any questions about his status in the United States or his community ties. Ex. 1, Aceituno Decl. ¶¶ 11-21. Masked DHS agents tackled Plaintiff Yoshi Cuenca Villamar from behind without identifying themselves or asking any

---

[18] Ex. 34, Rebecca Santana, *ICE arrests jumped to nearly 50,000 in July, the highest monthly total of Trump's second term,* AP News, (Aug. 25, 2026), https://perma.cc/NBH9-Q85Q.

[19] Pursuant to the instruction of the Clerk of Court, Plaintiffs' counsel is contemporaneously mailing a USB drive to the Clerk of Court and to opposing counsel containing the original, unaltered video files referenced in the declarations of Plaintiffs Aceituno, Cuenca, Godinez, Napoles, and Vazquez.

questions about his status or community ties and then handcuffed him, despite protests from his brothers on site that he is a U.S. citizen. Ex. 2, Cuenca Decl. ¶¶ 2-6, 8-12. Plaintiff Ruben Arguera Lopez was ordered out of his car, placed in handcuffs, and arrested by DHS agents, even after informing them that he has a valid U-visa. Ex. 3, Arguera Lopez Decl. ¶¶ 3-8, 10. Plaintiffs and stepbrothers Edwin Godinez and Yair Alexander Napoles, both U.S. citizens, were arrested at a red light by DHS agents, who did not question them about removability or community ties and attempted to force them out of their car and seize their phones, despite them presenting their IDs at the start of the encounter. Ex. 5, Godinez Decl. ¶¶ 4-17; Ex. 4, Napoles Decl. ¶¶ 4-18. Plaintiff Fernando Vazquez Orea, also a U.S. citizen, was arrested at a jobsite and confined in an SUV by DHS agents, even though agents possessed his identification; here too, agents did not ask any questions about removability or community ties. Ex. 6, Vazquez Decl. ¶¶ 4-10. Plaintiffs were all engaged in unavoidable, routine tasks when Defendants arrested them. *See* Ex. 1, Aceituno Decl. ¶¶ 2, 7 (arrested in the parking lot of a restaurant while picking up food on the way to work); Ex. 2, Cuenca Decl. ¶¶ 2-3, (arrested while working in a landscaping client's yard); Ex. 3, Arguera Lopez Decl. ¶ 2 (arrested while driving to work); Ex. 5, Godinez Decl. ¶¶ 3, 27 & Ex. 4, Napoles Decl. ¶ 3 (arrested while driving on a main road); Ex. 6, Vazquez Decl. ¶¶ 3-4 (arrested while working at a construction site for a preschool).

Defendants' escalation of enforcement tactics in recent months significantly increases the risk that Plaintiffs will be subjected to re-arrest, causing Plaintiffs to alter their lives in new and painful ways. *See infra* § B. North Carolinians, including Plaintiffs and their loved ones, avoid leaving their homes because of the risk that they will be subjected to racial profiling and warrantless arrests. Ex. 1, Aceituno Decl. ¶¶ 36-47; Ex. 2, Cuenca Decl. ¶¶ 21-23, 35; Ex. 3, Arguera Lopez Decl. ¶¶ 26-31; Ex. 5, Godinez Decl. ¶¶ 21, 25-27, 29, 32; Ex. 4, Napoles Decl. ¶¶

23, 26-31; Ex. 6, Vazquez Decl. ¶¶ 17-19, 21-22, 26; Ex. 20, Rebolloso Decl. ¶¶ 14-17; Ex. 28, Betancur Decl. ¶¶ 16-18. Eight of Plaintiff Aceituno's co-workers—all Latino construction workers—have been arrested without warrants by DHS agents in the past month, which has caused Mr. Aceituno to be extremely anxious and fearful when he leaves his house or drives his work truck because he is at substantial risk of being arrested again despite being a U.S. citizen. Ex. 1, Aceituno Decl. ¶¶ 38-40. In mid-July, Plaintiff Cuenca reported to the home of a client for his lawn services company to find two unmarked vehicles containing ICE agents boxing in a construction van across the street. Ex. 2, Cuenca Decl. ¶ 24. He packed his truck and left the job site as quickly as possible for fear of being re-arrested based on sheer proximity, and watched three or four people get arrested as he left. *Id.* ¶¶ 25-26. Plaintiffs Godinez, Napoles, Vazquez, and Arguera Lopez similarly describe an inability to move around freely in public as a result of trying to avoid re-arrest. *See, e.g.*, Ex. 5, Godinez Decl. ¶¶ 25-26, 30, 32; Ex. 4, Napoles Decl. ¶¶ 28-31; Ex. 6, Vazquez Decl. ¶¶ 21-22; Ex. 3, Arguera Lopez ¶¶ 27-28, 31. Despite their best efforts to try to avoid encounters with ICE, they have no choice but to live, work, and drive in areas with a concentrated ICE presence. Ex. 4, Napoles Decl. ¶¶ 24-29; Ex. 5, Godinez Decl. ¶¶ 25-30; Ex. 3, Arguera Lopez Decl. ¶¶ 18-26; Ex. 6, Vazquez Decl. ¶¶ 19, 23-25, 28.

The significant risk of re-arrest causes Plaintiffs to live in fear and continues to significantly impact their ability to go about their day-to-day lives. *See, e.g.*, Ex. 1, Aceituno Decl. ¶¶ 45-47 (cannot move around freely in public because of risk of re-arrest while getting groceries, picking up food, and driving his work truck); Ex. 2, Cuenca Decl. ¶ 31 (stopped doing yardwork at two clients' houses because ICE agents regularly patrol that area); Ex. 3, Arguera Lopez Decl. ¶¶ 28, 31 (no longer goes for runs or walks outside and is scared to leave the house); Ex. 4, Napoles Decl. ¶¶ 30-31 (no longer spends recreational time outside and stopped fishing, one of his favorite

hobbies, because risk of re-arrest is too high); Ex. 5, Godinez Decl. ¶¶ 25-26, 30 (checks local groups for information about ICE sightings before going out in public, resulting in 6-7 hours of monitoring ICE activity per week—time he used to spend going to the gym or hanging out with friends); Ex. 6, Vazquez Decl. ¶ 22 (no longer goes to one of his favorite Latino-owned restaurants because ICE targets it).

DHS agents continue to target communities and locations where Plaintiffs and putative class members live, work, shop, and drive. Ex. 2, Cuenca Decl. ¶¶ 24-30, 33; Ex. 5, Godinez Decl. ¶¶ 22-28; Ex. 4, Napoles Decl. ¶¶ 24-30; Ex. 3, Arguera Lopez Decl. ¶¶ 21-29; Ex. 18, Siembra Decl. ¶¶ 13, 24 (explaining that ICE regularly carries out warrantless arrests without probable cause in predominantly Latino neighborhoods, including the East Charlotte and South Charlotte areas). ICE regularly targets individuals in the early morning hours in predominantly Latino neighborhoods, including those driving trucks with construction materials and those driving vans used to transport multiple construction workers and materials. Ex. 18, Siembra Decl. ¶¶ 15-16, 19, 26-27.[20] Local businesses, particularly in Latino neighborhoods, have lost customers and revenue. Ex. 28, Betancur Decl. ¶¶ 13-14. The harm inflicted by Defendants extends beyond Plaintiffs. Members of the putative class similarly face an unacceptable risk of illegal warrantless arrest given ICE's ongoing stops and arrests, including ICE's ongoing tactic of pulling over vehicles or forcing them off the road and then subsequently arresting those inside without warrants and without probable cause of removability and escape risk. Ex. 18, Siembra Decl. ¶¶ 7, 15-17, 19-20, 26-27.

[20] The overwhelming majority of construction workers in North Carolina (73%) are U.S.-born citizens, and more are naturalized citizens or have immigration status. Ex. 29, Nat'l Ass'n of Home Builders, *Geographic Concentration of Immigrants in Construction*, https://perma.cc/FY5Y-QBB9 (last visited Sept. 25, 2026). Similarly, the overwhelming majority (78.4%) of landscaping industry employees in North Carolina are U.S.-born citizens, and more are naturalized citizens or have immigration status. Ex. 35, American Immigration Council, *The Contributions of New Americans in North Carolina*, at 7 (Aug. 2016), https://perma.cc/7GTG-LDUU. The mere fact of working in construction or landscaping provides no basis for probable cause of removability.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[21] The same standard applies to a motion to stay agency action under the APA, 5 U.S.C. § 705. *See HonorBridge v. Carlton*, No. 25-CV-50, 2025 WL 2271423, at *4 (E.D.N.C. Mar. 31, 2025); *Cook Cnty., Ill. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## ARGUMENT

Plaintiffs satisfy each of the four *Winter* factors and are therefore entitled to preliminary relief preventing Defendants' agents from continuing their policy and practice of conducting warrantless arrests without the statutorily required probable cause. Plaintiffs seek relief on behalf of themselves as well as the proposed Warrantless Arrests Class, as defined in their Amended Complaint, (Am. Compl. ¶ 240). Accordingly, Plaintiffs ask that this Court issue preliminary relief on a class-wide basis.[22] Finally, Plaintiffs request that this Court waive bond or issue only a nominal bond to secure its injunction.

[21] The standards by which a court examines evidence are relaxed at the preliminary injunction stage. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Lockhart v. Home-Grown Indus. of Ga Inc.*, No. 3:07-CV-297, 2007 WL 2688551 at *4 n. 7 (W.D.N.C. Sept. 10, 2007) ("At the preliminary injunction stage . . . the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence[.]").

[22] Plaintiffs are concurrently filing a Motion for Class Certification, seeking certification of both the Warrantless Arrests Class and the Suspicionless Stops Class, but the Suspicionless Stops Class is not at issue in this Motion. If the Court reserves judgment on Plaintiffs' Motion for Class Certification, Plaintiffs seek provisional certification of the Warrantless Arrests Class to allow for class-wide preliminary relief.

## I. Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on the merits of their claims that Defendants' policies and practices of making warrantless arrests without probable cause of removability and escape risk, as required by federal law, violates 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i)-(ii), and 5 U.S.C. § 706(2)(A), (C).

The Fourth Amendment requires probable cause for arrest. *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019). In the immigration context, the INA authorizes immigration officers to make an arrest only where "he has reason to believe that the alien so arrested is in the United States in violation of [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).[23] "Courts have held that the phrase 'reason to believe' in § 1357 is equivalent to constitutionally required probable cause." *Segura-Gomez*, 2018 WL 6582823 at *6 (collecting cases); *see also Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971) (explaining § 1357(a)(2) "must be read in light of constitutional standards").

Probable cause is an objective standard that asks "whether the facts known to the officer could make a prudent officer believe that the suspect's conduct satisfies the elements" of an offense. *Thurston v. Frye*, 99 F.4th 665, 674 (4th Cir. 2024). "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause *particularized with respect to that person*." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (emphasis added). It requires more than "mere suspicion," *Brinegar v. United States*, 338 U.S. 160, 177 (1949), or that an individual is near another person "independently suspected of criminal activity," *Ybarra*, 444 U.S. at 91. "Probable cause is determined by a 'totality-of the circumstances' approach." *Smith v.*

[23] The Court should address both requirements, as each provides a distinct basis for relief. Under 8 U.S.C. § 1357(a)(2), "an immigration officer can know for *certain* that someone is present in violation of immigration laws, and *still* does not have authority to arrest them without a warrant or an individualized probable cause determination that the individual is likely to escape before a warrant can be obtained." *M-J-M-A-*, 822 F. Supp. 3d at 1172 (citation modified).

*Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (citation modified). Courts use an objective test to consider what a "reasonably prudent officer" would do with the available information regarding the suspect's conduct and the contours of the offense the suspect is believed to have committed through that conduct. *Hupp*, 931 F.3d at 318.

Defendants' arrests of Plaintiffs and putative class members, their own statements, and their conduct in other jurisdictions all demonstrate a policy and practice of disregarding these plain legal requirements when making immigration arrests in North Carolina.

### A. Defendants have a policy and practice of making warrantless arrests in North Carolina without probable cause of removability.

Defendants are implementing a policy and practice of arresting North Carolinians without the required probable cause that they are noncitizens subject to removal, requiring immediate relief from this Court. Pursuant to this policy, Defendants arrested each Plaintiff without probable cause of removability. *Cf. Johnson v. Baltimore City, Maryland*, 163 F.4th 808, 822 (4th Cir. 2026) (explaining that a policy can be established by pointing to a "persistent and widespread practice," "the duration and frequency of which indicate" that the relevant policymakers "had actual or constructive knowledge of the conduct," and "failed to correct it due to their deliberate indifference"). All six Plaintiffs are lawfully present in the United States: Five are U.S. citizens, and one has a valid U-Visa. *See* Ex. 1, Aceituno Decl. ¶ 1; Ex. 2, Cuenca Decl. ¶ 1; Ex. 3, Arguera Lopez Decl. ¶ 1; Ex. 4, Napoles Decl. ¶ 2; Ex. 5, Godinez Decl. ¶ 1; Ex. 6, Vazquez Decl. ¶ 1. The agents provided no indication that they knew Plaintiffs' identities before arresting them, did not provide reasons for each Plaintiff's initial stop, and did not produce warrants justifying Plaintiffs' eventual arrests. *See, e.g.*, Ex. 1, Aceituno Decl. ¶¶ 3, 6, 19; Ex. 2, Cuenca Decl. ¶¶ 3, 9-11; Ex. 3, Arguera Lopez Decl. ¶¶ 2, 13; Ex. 4, Napoles Decl. ¶¶ 3, 17; Ex. 5, Godinez Decl. ¶¶ 3, 16; Ex. 6, Vazquez Decl. ¶¶ 4-8. Nor did the agents' encounters with Plaintiffs—which occurred while

Plaintiffs were engaged in ordinary, law-abiding activities—"objective[ly]" provide any "particularized and individualized information" that Plaintiffs are unlawfully present in the United States. *Calloway v. Lokey*, 948 F.3d 194, 202 (4th Cir. 2020) (citation modified). Mr. Aceituno was picking up food from a restaurant, Ex. 1, Aceituno Decl. ¶ 2, Mr. Cuenca and Mr. Vazquez were working on clients' properties, Ex. 2, Cuenca Decl. ¶ 2; Ex. 6, Vazquez Decl. ¶ 3, and the other three Plaintiffs were in vehicles, Ex. 3, Arguera Lopez Decl. ¶ 2 (driving his own properly-registered vehicle and obeying traffic laws when arrested); Ex. 5, Godinez Decl. ¶ 3 (driving his own properly-registered vehicle and obeying traffic laws when arrested); Ex. 4, Napoles Decl. ¶ 3 (riding as Mr. Godinez's passenger). In fact, the only initial questions that agents asked Plaintiffs suggest that all six Plaintiffs were targeted for arrest solely because of their race or perceived ethnicity. *See* Ex. 1, Aceituno Decl. ¶ 3 (on initial approach, asking for his "last name" and "whether [he] was a citizen"); Ex. 2, Cuenca Decl. ¶ 10 (asking Mr. Cuenca whether he "speak[s] English"); Ex. 3, Arguera Lopez Decl. ¶ 4 (after detaining Mr. Arguera Lopez, initially asking him "where [he] was from," and "how [he] came to this country"); Ex. 5, Godinez Decl. ¶ 5 (after stopping Mr. Godinez and Mr. Napoles and receiving their identifications, asking "how [they] got into the country," despite both having been born in the U.S.); Ex. 6, Vazquez Decl. ¶ 5 (agents asked him "where [he] was from") .

Moreover, nothing that occurred during the questioning of Plaintiffs provided any information suggesting they were removable. Instead, all six Plaintiffs—and, in some cases, bystanders, too—affirmatively *told* officers they are citizens or have a valid visa. *See* Ex. 1, Aceituno Decl. ¶¶ 17, 23 (informed agents that he was a citizen and insisted they check his wallet while being restrained in broken glass and held in a vehicle); Ex. 2, Cuenca Decl. ¶¶ 3, 6, 8 (Mr. Cuenca's brother informed agents he is a U.S. citizen while he was thrown to the ground and

handcuffed); Ex. 3, Arguera Lopez Decl. ¶¶ 6-8, 10 (informed agents after threat of arrest that he held a valid U-visa, and again after being handcuffed); Ex. 4, Napoles Decl. ¶ 5 & Ex. 5, Godinez Decl. ¶ 5 (brothers informed agents at the beginning of encounter that they are U.S. citizens and provided their IDs but were nonetheless arrested); Ex. 6, Vazquez Decl. ¶¶ 8-9 (encouraged agents to run his REAL ID to prove his citizenship, but was nonetheless arrested). Each Plaintiff was carrying identification that readily identified him as having U.S. citizenship or lawful immigration status at the time of his arrest. *See* Ex. 1, Aceituno Decl. ¶¶ 13-14, 17, 24; Ex. 2, Cuenca Decl. ¶¶ 15, 18; Ex. 3, Arguera Lopez Decl. ¶ 12; Ex. 4, Napoles Decl. ¶¶ 5, 17; Ex. 5, Godinez Decl. ¶¶ 5, 16; Ex. 6, Vazquez Decl. ¶¶ 8-9. Mr. Aceituno had his identification checked twice: one group of agents questioned him, checked his identification, and confirmed his citizenship before a *second* group of federal agents blocked his car in and arrested him minutes later. *See* Ex. 1, Aceituno Decl. ¶¶ 2-8, 15. A bystander tried telling the second group of officers that Mr. Aceituno had already been ID'd by other officers just minutes before, and yelled: "why do you guys keep stopping the same guy?" Ex. 1, Aceituno Decl. ¶ 16.

Defendants themselves have admitted that they maintain a policy of conducting warrantless immigration arrests without the requisite probable cause, establishing "actual or constructive knowledge" of their unlawful conduct. *Johnson*, 163 F.4th at 822 (citation modified); *see Escobar Molina*, 811 F. Supp. 3d at 33 (existence of a policy is supported "by defendants' own public statements acknowledging the use of a standard lower than probable cause to make warrantless immigration arrests"). Defendants have publicly admitted that they authorize agents to use a lower, "reasonable suspicion" standard for effecting arrests. *See supra* nn. 2-3; *Escobar Molina*, 811 F. Supp. 3d at 44-45 (collecting statements). DHS has issued public statements confirming that it authorizes its agents to use a lower, "reasonable suspicion" standard to make arrests, not "probable

cause." *Id.* In January, for example, DHS wrote: "Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution"—admitting that DHS knowingly violates the Fourth Amendment and § 1357(a)(2). *See supra* n.3. Defendants have taken no steps to retract or amend these numerous statements, either in this litigation or in the public sphere, confirming that this policy remains ongoing. *See, e.g.*, Mot. to Dismiss, ECF No. 24, at 23-24; *cf. Howard v. City of Durham*, 68 F.4th 934, 953 (4th Cir. 2023) (explaining that policymakers' "failure . . . to correct or terminate the improper custom and usage" can establish municipal liability (citation modified)).

This conduct by DHS in North Carolina is consistent with its unlawful policies and practices in states throughout the country. In *Vasquez Perdomo v. Mullin*, No. 25-cv-5605 (C.D. Cal.), a case challenging, *inter alia*, DHS's illegal warrantless arrest policy in the Central District of California, recent discovery confirmed that DHS routinely detains people about whom they have no individualized knowledge.[24] The information revealed in discovery also confirms that DHS agents routinely do not target individuals because they believe them to be removable and an escape risk; rather, agents seek to determine the person's status or inquire about factors bearing on escape risk only after an arrest has already been effectuated.[25] Documents and footage have demonstrated that, rather than conducting targeted operations as they claim, agents arrest Latino individuals they encounter without establishing probable cause of either removability or flight

[24] *See Vasquez Perdomo v. Mullin,* No. 2:25-cv-05605 (C.D. Cal.), ECF No. 632, at 2-7, 22, available at https://perma.cc/YM5C-S6MA.

[25] *See id.*; Ex. 40, *Government's Own Records Reveal Racial Profiling in Federal Immigration Stops*, ACLU S. Cal. (July 28, 2026), https://perma.cc/6TML-NMWG.

risk.[26] The similar policy and practice that DHS is implementing in North Carolina does not pass legal muster, and warrants preliminary relief.

### B. Defendants have a policy and practice of making warrantless arrests in North Carolina without probable cause that the person is likely to escape.

Defendants' policy and practice of arresting without probable cause that individuals pose an escape risk also violates the second prong of 8 U.S.C. § 1357(a)(2). This is an independent statutory requirement.[27] *See United States v. Harrison*, 168 F.3d 483, *4 (4th Cir. 1999) (unpublished table decision); *see also Vasquez Perdomo v. Mullin*, 2026 WL 2751388, *19-20 (explaining that there are "two prerequisites for a warrantless arrest," and Section 1357 "clearly require[s] two determinations."). Here again, courts examine the objective facts within the knowledge of the arresting agents and consider whether that knowledge amounted to probable cause to believe that the subject's escape is likely before a warrant can be obtained. *See id.* at *18-20. Courts in this Circuit have concluded that agents lacked probable cause of a likelihood of escape where agents could easily obtain his home address from his vehicle registration, *see Gomez v. Guadian*, No. CV 26-3078, 2026 WL 2546049, *4 (D. Md. Aug. 28, 2026), where the subject had attended regular, scheduled ICE check-ins, *see Lopez v. Noem*, No. CV 25-3662, 2025 WL 3496195, *6 (D. Md. Dec. 5, 2025), and where agents knew the subject was attending a court hearing relating to custody of his child, *see Segura-Gomez*, 2018 WL 6582823, *7-8.

[26] *See id.*; *see also* Ex. 41, Jazmine Ulloa et al., *New Evidence Shows Agents Using Slurs, Bolstering Profiling Claims*, New York Times (updated Aug. 19, 2026), https://perma.cc/Y34E-ZHU2.

[27] ICE has acknowledged that it must satisfy both probable cause requirements of §1357(a)(2). Pursuant to a settlement agreement in *Castañon Nava*, No. 18-cv-3757, ICE stated that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be obtained" and identified factors that may be relevant to the escape risk determination, including "the ICE Officer's ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond." *See* Settlement Agreement and Release at 17-19, *Castañon Nava*, No. 18-cv-3757 (N.D. Ill. Feb. 7, 2022), ECF No. 155-1, available at https://perma.cc/9Q86-43BR.

Defendants arrested each of the Plaintiffs without probable cause to believe they were likely to escape before a warrant could be obtained. DHS agents did not know Plaintiffs' identities before stopping them, and they learned no information suggesting a likelihood of escape prior to arresting Plaintiffs. *See* Ex. 1, Aceituno Decl. ¶¶ 19-20 (agents did not know his name or run his ID prior to arrest and agents asked no questions about individual circumstances); Ex. 2, Cuenca Decl. ¶¶ 9-12 (agents did not know his name, ask for ID, or ask any questions prior to arrest other than "do you speak English?"); Ex. 4, Napoles Decl. ¶ 18 (agents did not ask any questions about individual circumstances); Ex. 5, Godinez Decl. ¶ 17 (agents ignored affirmative offer of information that he was coming from his parents' house and lived in Salisbury and asked no other questions about individual circumstances); Ex. 6, Vazquez Decl. ¶¶ 8, 10 (agents refused to run ID prior to arrest even though they had the ID in their possession and agents asked no questions about individual circumstances); Ex. 3, Arguera Lopez Decl. ¶¶ 5-12 (agents asked some questions about individual circumstances, but after Mr. Arguera Lopez exercised his right to remain silent, agents arrested him prior to running his ID or inspecting his documents). All six Plaintiffs complied with the agents' instructions, and none attempted to flee the scene of the arrest. *See* Ex. 1, Aceituno Decl. ¶ 18; Ex. 2, Cuenca Decl. ¶ 13; Ex. 3, Arguera Lopez Decl. ¶ 11; Ex. 4, Napoles Decl. ¶¶ 12, 15; Ex. 5, Godinez Decl. ¶¶ 13-14; Ex. 6, Vazquez Decl. ¶ 6. Three of the Plaintiffs were arrested in their vehicles, so a simple vehicle registration check would have revealed their local home addresses. *See* Ex. 1, Aceituno Decl. ¶¶ 2, 8; Ex. 3, Arguera Lopez Decl. ¶ 2; Ex. 5, Godinez Decl. ¶ 3. Mr. Godinez and Mr. Napoles are stepbrothers and were arrested together, indicating local family ties. Ex. 5, Godinez Decl. ¶¶ 2-3; Ex. 4, Napoles Decl. ¶ 3. Two Plaintiffs were arrested while on their local job sites, demonstrating local employment. Ex. 2, Cuenca Decl. ¶¶ 1-2; Ex. 6, Vazquez Decl. ¶¶ 3-4.

If agents had asked Plaintiffs questions regarding their circumstances or community ties, they would have learned that each Plaintiff has longstanding ties to his community, entirely nullifying any risk of an escape before the issuance of a warrant. *See* Ex. 1, Aceituno Decl. ¶¶ 1-2 (Mr. Aceituno has lived in North Carolina for 25 years, has a U.S. citizen wife and daughter, owns a home, and has a vehicle registered in his name); Ex. 2, Cuenca Decl. ¶ 1 (Mr. Cuenca owns a landscaping business, and has lived in North Carolina his entire life alongside U.S. citizen siblings); Ex. 3, Arguera Lopez Decl. ¶¶ 1-2 (Mr. Arguera Lopez has lived in North Carolina for 15 years, works as a cook at a local restaurant in Charlotte, and has a vehicle registered in his name); Ex. 5, Godinez Decl. ¶¶ 1-3 (Mr. Godinez has lived in North Carolina for over 25 years, owns a home, has three brothers who live in North Carolina, works as a carpenter, and has a vehicle registered in his name); Ex. 4, Napoles Decl. ¶¶ 1-2 (Mr. Napoles lives near his U.S. citizen relatives, rents an apartment in Salisbury, and works in construction); Ex. 6, Vazquez Decl. ¶¶ 1-3 (Mr. Vazquez has lived in North Carolina for his entire life, graduated from a North Carolina high school last year, volunteers with his Church, and works as a landscaper).

The arrests of putative class members are similar. One putative class member, for example, was arrested right outside of his vehicle in the presence of his wife, small children, sister, and elderly mother, despite producing his driver's license and regularly attending Immigration Court hearings over many years. *See* Ex. 26, Alvarenga Decl. ¶¶ 2, 4, 8. Another putative class member was arrested at the same checkpoint after producing his license and registration and without agents asking any questions about his home, work, family, or other ties to the community. *See* Ex. 27, Rosales Decl. ¶¶ 4-11. DHS's conduct in North Carolina is consistent with its conduct around the country, including in jurisdictions where courts have found that DHS likely has a pattern and practice of making immigration arrests without probable cause to believe the arrested individuals

present an escape risk. *See Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 843-47 (N.D. Ill. 2025); *Ramirez Ovando*, 810 F. Supp. 3d at 1231-35; *Escobar Molina*, 811 F. Supp. 3d at 49; *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 734-36 (E.D. Cal. 2025), *remanded on other grounds, United Farm Workers v. Mullin*, No. 25-4047, 2026 WL 2754794, at *1 (9th Cir. Aug. 24, 2026); *M-J-M-A-*, 822 F. Supp. 3d at 1182.

Defendants' agencies have confirmed on multiple occasions that they are employing a standard that is less than the statutorily required probable cause with respect to the likelihood of escape. DHS has made repeated, official public statements confirming that it authorizes its agents to use a lower, "reasonable suspicion" standard to make arrests, not "probable cause." The Lyons Memo confirms that the same violations occur with respect to the escape risk prong of § 1357(a)(2); it provides a "flawed definition of escape risk," improperly instructing officers to focus on whether the individual is likely to leave the location of the stop, rather than whether they could be located again at a clearly identifiable location, and it ignores factors like community ties that should weigh against a finding that a person is unlikely to be located again. *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 832 F. Supp. 3d 22, 50 (D.D.C. 2026). Defendants have pointed to the Lyons Memo in this litigation, ECF 24, at 22, to assert that probable cause is, in fact, the operative policy and practice at issue. But the Lyons Memo was issued as a post-hoc explanation, after litigation was filed around the country challenging DHS enforcement tactics. As Defendants themselves have noted, it has changed nothing about the actual policy and practice being carried out here in North Carolina.[28] Defendants are making immigration arrests in North Carolina without an individualized determination of probable cause that the person arrested is likely to escape, and thus preliminary relief is warranted here.

---

[28] *See* Ex. 14, Oliver, *supra* note 5, https://perma.cc/ANN9-E5KU.

### C. Defendants' policies and practices violate the Administrative Procedure Act.

As Plaintiffs explained in their Memorandum in opposition to Defendants' Motion to Dismiss, *see* ECF No. 28 at 21-25, and as at least three other courts have held, Defendants' policies and practices are final agency actions that are arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act. *See, e.g., M-J-M-A-,* 822 F. Supp. 3d at 1182; *Escobar Molina*, 811 F. Supp. 3d at 43, 50; *Ramirez Ovando*, 810 F. Supp. 3d at 1235.

## II. Plaintiffs and putative class members continue to suffer irreparable harm.

Plaintiffs' evidence demonstrates that "irreparable injury is *likely* in the absence of an injunction" *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). The recent escalation of Defendants' tactics risks Plaintiffs' re-arrests. "[T]he erroneous deprivation of . . . liberty, 'for even minimal periods of time, unquestionably constitutes irreparable injury'" *S.D.B.B. v. Johnson*, No. 1:25-cv-882, 2025 WL 2845170, at *10 (M.D.N.C. Oct. 7, 2025) (quoting *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022)). The threats to Plaintiffs' liberty are ongoing: they face constant risk of re-arrest, and their freedom of movement within their home state is severely limited as a result of agents acting unlawfully.

In light of the significant escalation in enforcement within the state, Plaintiffs and putative class members face a substantial risk of re-arrest while engaging in routine and unavoidable daily tasks.[29] *See, e.g.*, Ex. 1, Aceituno Decl. ¶¶ 37-39, 45 (describing arrests occurring "just 1 or 2 minutes from my house," and explaining that he "can't go to work driving [his] truck or go pick up food from a food truck without risking being arrested again"); Ex. 2, Cuenca Decl. ¶¶ 22-26 (stating he works outside "a lot," which "exposes [him] to another arrest" and detailing an arrest

[29] Ex. 38, Jon Dowding, *ICE arrests in North Carolina top 5,000 in 2026 so far; leading to fear, anxiety, experts say*, ABC11 Raleigh-Durham (Sept. 20, 2026), https://perma.cc/82S6-7YB6.

at a nearby job site); Ex. 3, Arguera Lopez Decl. ¶¶ 18-20 (explaining that there have been "a lot of arrests in [his] neighborhood"); Ex. 5, Godinez Decl. ¶¶ 21-29, 32 (expressing concern regarding being in "construction sites, driving on main roads, or spending any time in Home Depot or Lowe's parking lots"); Ex. 4, Napoles Decl. ¶¶ 27-29 (describing being "especially fearful at work" because he "work[s] outside"); Ex. 6, Vazquez Decl. ¶¶ 23-25 (stating that the "nature of [his] work, being in construction and being outside, puts [him] at risk of re-arrest"). As a result, Plaintiffs have been forced to undertake efforts to try to avoid encountering DHS agents. *See, e.g.*, Ex. 1, Aceituno Decl. ¶¶ 45-47 (explaining that he avoids "Hispanic food trucks, Hispanic gas stations, and Hispanic grocery stores in [his] neighborhood" because "ICE targets them"); Ex. 2, Cuenca Decl. ¶¶ 21-25, 31 (stating that he "stopped taking work at two [clients'] houses" located in an area where "a lot of Latino men work" and the risk of re-arrest is "very high"); Ex. 3, Arguera Lopez Decl. ¶¶ 14-15, 22-25, 28 (attempting to take alternate paths to work to avoid encountering ICE agents); Ex. 5, Godinez Decl. ¶¶ 25-30 ("try[ing] to take back roads, rather than main streets or highways, to try and avoid ICE"); Ex. 4, Napoles Decl. ¶¶ 25-31 (avoiding "markets and any events where Latino people may be gathering"); Ex. 6, Vazquez Decl. ¶ 22 (avoiding his "favorite spots" because "ICE is targeting local Hispanic businesses" in his "neighborhood and area").

Plaintiffs' avoidance strategies are a direct response to Defendants' unlawful arrest policies. Defendants' policies have severely burdened Plaintiffs' and class members' federal and state constitutional rights to intrastate travel, depriving them of the freedom of movement enjoyed by other North Carolinians—described by the state supreme court as "a right of function . . . to carry out daily life activities." *Standley v. Town of Woodfin*, 362 N.C. 328, 331 (2008); *see also Johnson v. City of Cincinnati,* 310 F.3d 484, 498 (6th Cir. 2002) ("[T]he Constitution protects a right to travel locally through public spaces and roadways."); *Lutz v. City of York*, 899 F.2d 255,

268 (3d Cir. 1990). Despite Plaintiffs' efforts, they still face a significant risk of re-arrest in future encounters with DHS agents given DHS's pervasive presence in areas that Plaintiffs must frequent daily.

As long as Defendants' warrantless arrest policy continues unabated in North Carolina, Plaintiffs and putative class members remain squarely in the path of the government's unlawful policies and practices and are at substantial risk of being unlawfully arrested again. Plaintiffs' ongoing efforts to mitigate their risk of re-arrest disrupts their lives and routines and constitutes ongoing irreparable harm. *See* Ex. 1, Aceituno Decl. ¶¶ 40-49; Ex. 2, Cuenca Decl. ¶¶ 23-32; Ex. 3, Arguera Lopez Decl. ¶¶ 15-17, 22-25, 28, 31-32; Ex. 5, Godinez Decl. ¶¶ 25-26, 29-30, 32; Ex. 4, Napoles Decl. ¶¶ 25-26, 28, 30-31; Ex. 6, Vazquez Decl. ¶¶ 21-25. DHS agents continue to target communities and locations where Plaintiffs live, work, shop, and drive, carrying out warrantless arrests without probable cause targeting (among others) individuals driving work trucks in the early morning hours in predominantly Latino neighborhoods. *See, e.g.,* Ex. 18, Siembra Decl. ¶¶ 26-27. Plaintiffs Aceituno, Cuenca, and Napoles are all required to drive work trucks as part of their jobs. *See* Ex. 1, Aceituno Decl. ¶ 40; Ex. 2, Cuenca Decl. ¶ 33; Ex. 4, Napoles Decl. ¶ 27.

The experiences of Plaintiffs and information from community members and immigrants' rights nonprofits demonstrate that this conduct has escalated in recent months and is continuing to escalate, with a "concerning uptick" in warrantless arrests resulting from sweeps of Latino neighborhoods, the detention of drivers in work trucks or for rideshare services, individuals attending routine appointments, and even families swimming in a popular watering hole. *See, e.g.*, Ex. 1, Aceituno Decl. ¶¶ 37-40; Ex. 2, Cuenca Decl. ¶¶ 23-25; Ex. 3, Arguera Lopez Decl. ¶¶ 18-21; Ex. 5, Godinez Decl. ¶¶ 21-22, 29; Ex. 4, Napoles Decl. ¶¶ 24-27, 29; Ex. 19, CMN Decl. ¶¶ 6, 12-17;

Ex. 18, Siembra Decl. ¶¶ 23-27; Ex. 27, Rosales Decl. ¶¶ 4-12; Ex. 26, Alvarenga Decl. ¶¶ 4-10; Ex. 30, Salazar Decl. ¶¶ 3-11; Ex. 32, Corrales Decl. ¶¶ 5-13. Members of the putative class similarly face a substantial risk of illegal warrantless arrest as DHS's implementation of their unlawful warrantless arrest policy continues. *See* Ex. 18, Siembra Decl. ¶¶ 7-9, 15-17, 19-20, 23-24 (numerous individuals pulled over or forced off the road by unmarked ICE vehicles and subjected to DHS's unlawful policy). Courts have found that implementation of similar warrantless arrest policies in other jurisdictions constitutes irreparable harm to support a stay or preliminary injunction. *See M-J-M-A-*, 822 F. Supp. 3d at 1183; *Ramirez Ovando*, 810 F. Supp. 3d at 1237-39; *Escobar Molina*, 811 F. Supp. 3d at 50-52.

DHS's increasing investment in both administrative and detention facilities in North Carolina also underscores the ongoing, large-scale immigration enforcement operations in the state. More in-state infrastructure demonstrates DHS's intent to continue and escalate enforcement operations in North Carolina, resulting in more arrests. Other jurisdictions with newly-opened detention centers have experienced a corresponding increase in arrests to fill the newly empty beds available.[30] Because Plaintiffs and putative class members remain subject to Defendants' unlawful policy when they step out of their houses, they will continue to suffer irreparable harm absent a stay or injunction. *See M-J-M-A-*, 822 F. Supp. 3d at 1183 (irreparable harm was likely to result from warrantless arrest policy where DHS has not "scaled back their practices or brought them into compliance with the law"); *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (highlighting the "irreparable harms imposed on anyone subject to immigration detention").

[30] Ex. 36, *If You Build It, ICE Will Fill It: The Link Between Detention Capacity and ICE Arrests*, Detention Watch Network, at 3 (2022), https://perma.cc/UPT9-4US8 ("[R]esearch demonstrates that immigrants in counties with more detention space are significantly more likely to be arrested and detained by ICE. Further, the likelihood of ICE arrest increases as detention capacity increases" and that "[t]he likelihood of arrest continues to increase in lockstep with bed capacity").

### III. The balance of equities and public interest weigh strongly in favor of preliminary relief.

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In evaluating the balance of equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Plaintiffs' requested injunction seeks to ensure that DHS policies and practices are consistent with the law and respect for their constitutional rights. *See Leaders of Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("It is well-established that the public interest favors protecting constitutional rights."); *see also Escobar Molina*, 811 F. Supp. 3d at 52-53 (the balance of equities and public interest favor Plaintiffs where "requested injunction would allow all aspects of immigration enforcement to continue, within the express bounds of the INA").

As described in Section II, the injuries to Plaintiffs and putative class members are significant, and the public's interest is undoubtedly served by requiring Defendants to comply with federal law and their own regulations. Moreover, the relief sought by Plaintiffs is narrowly tailored to address the unlawful conduct at issue. Plaintiffs request that the Court order Defendants and their agents to refrain from making warrantless immigration arrests without the probable cause findings required by § 1357(a)(2), and to provide documentation to Plaintiffs' counsel on a regular schedule. These reasonable and minimally intrusive requirements are necessary to ensure that Defendants' conduct conforms to the requirements set forth in § 1357(a)(2).

On the other side of the scale, Defendants have no colorable interest in continuing their policies and practices of making immigration arrests without probable cause in express violation of § 1357(a)(2). *See Ramirez Ovando*, 810 F.Supp.3d at 1239-40 ("Neither the government nor the public can claim any legitimate interest in the systemic violation of § 1357(a)(2)'s prohibition

against warrantless arrests except upon individualized probable cause[.]"); *see also Mendoza Palacios v. Mullin*, 829 F. Supp. 3d 67, 83 (D. Md. 2026) (government's interest in removal of noncitizens was outweighed by public interest in curtailing "governmental actions restricting their liberty interests"); *Roe v. Dep't of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020) ("[T]he public undoubtedly has an interest in seeing its governmental institutions follow the law[.]") (citation modified). The harm to Plaintiffs, putative class members, and North Carolina communities in this case is great. The harm to DHS, on the other hand, is non-existent: Plaintiffs ask only that DHS stop violating its statutory obligations. The public interest and equities strongly favor Plaintiffs.

### IV. Provisional class certification is warranted.

Should the Court reserve judgment on Plaintiffs' concurrently-filed motion for class certification at this time, it should provisionally certify the class in order to ensure class-wide preliminary injunctive relief to North Carolinians who are adversely impacted by Defendants' policies and practices of warrantless arrests.[31] For the reasons more fully stated in Plaintiffs' motion for class certification, the Proposed Warrantless Arrests Class and Subclasses satisfy the requirements of both Rule 23(a) and 23(b)(2). The Proposed Class would be amenable to uniform, class-wide remedies, such as declaring Defendants' policies and practices unlawful and enjoining them moving forward. Courts have provisionally certified similar plaintiff classes asserting similar claims for the purpose of awarding effective injunctive relief. *See M-J-M-A-*, 822 F. Supp. 3d at

[31] Should this Court find that Defendants' policies and practices of warrantless arrests constitute final agency action and that Plaintiffs are likely to succeed on their APA claim such that a stay of the agency action is appropriate, as detailed *supra* § I.C, certification of the classes, provisionally or otherwise, is unnecessary at this juncture to afford Plaintiffs the requested relief. *See, e.g. Asylum Seeker Advoc. Project v. U.S. Citizenship & Immigr. Servs.,* 808 F. Supp. 3d 708, 722 (D. Md. 2025) (noting that § 705 of the APA governing stays of agency action provides broad relief beyond the parties and is unaffected by *Trump v. CASA, Inc*, 606 U.S. 831 (2025)); *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 176-77 (D. Md. 2025) (same) (collecting cases).

1175-77, 1184 (provisionally certifying unassessed escape risk subclass to afford class-wide relief against Defendants' warrantless arrest policy); *Escobar Molina*, 811 F. Supp. 3d at 57-61 (same).

### V. The Court should enjoin Defendants' policies and practices and order documentation requirements.

This Court should enjoin Defendants from taking any steps to implement, further, or act pursuant to Defendants' ongoing policies and practices of conducting warrantless immigration arrests without probable cause that each person arrested (1) is in the United States in violation of federal immigration law, and (2) poses a likelihood of escape before a warrant may be issued.

Given the need for a workable injunction that can be effectively implemented to prevent ongoing harm to Plaintiffs and putative class members, this Court should order relief that includes documentation requirements. Documentation of Defendants' stops and arrests will ensure that Plaintiffs receive meaningful interim relief that allows for a mechanism to address substantial and widespread noncompliance that harms class members. These kinds of documentation requirements are common in preliminary injunction orders in similar class-action cases challenging unlawful stop and arrest policies and practices. *See, e.g., Vasquez Perdomo*, 2026 WL 2751388, at *27 (requiring DHS to document arrests as part of preliminary injunction because "[w]ithout this, Defendants cannot show that any arrest was proper"); *Melendres v. Arpaio*, 784 F.3d 1254, 1266 (9th Cir. 2015) (affirming injunction requiring the development of a system that collected traffic stop data, including audio and video recordings); *Escobar Molina*, 811 F. Supp. 3d at 63 (similar); *Ramirez Ovando*, 810 F. Supp. 3d at 1241 (similar); *Floyd v. City of New York*, 959 F. Supp. 2d 668, 681-83, 689 (S.D.N.Y. 2013) (preliminary injunction order required NYPD to begin documenting the bases for stops in narrative form). As courts have recognized, this kind of injunction is "narrowly tailored to remedy the harm" of implementation of policies and practices of

warrantless arrests lacking probable cause on a class-wide basis. *Ramirez Ovando*, 810 F. Supp. 3d at 1240 (citation omitted).

### VI. The Court should waive bond or impose only a nominal bond.

Federal Rule of Civil Procedure 65(c) provides that "'a court may issue a preliminary injunction . . . only if the movant gives security,'" but "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 331-32 (4th Cir. 2013) (citation omitted), *abrogated on other grounds*, *Stinnie v. Holcomb*, 37 F.4th 977, 982 (4th Cir. 2022). In cases brought by plaintiffs alleging practices of wrongdoing by government actors and agencies, courts have commonly exercised their discretion to waive the security requirement or require only a nominal bond. *See, e.g.*, *CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 702 (D. Md. 2025) ("In public interest cases like this one, when the risk of harm to the government is non-existent or remote, a nominal bond may be appropriate."); *Planned Parenthood S. Atl. v. Stein*, 680 F. Supp. 3d 595, 600 (M.D.N.C. 2023) (waiving bond because "defendants face little to no harm" by being prohibited from engaging in unlawful conduct). A nominal bond or waiver of bond is therefore appropriate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction, or, in the alternative, a stay under 5 U.S.C. § 705, prohibiting Defendants from conducting warrantless immigration arrests without determining probable cause of removability and escape risk. Plaintiffs further request that this Court order documentation requirements, provisionally certify the Warrantless Arrests class and subclasses to effectuate class-wide relief, and either waive or impose only a nominal bond.

Dated: October 1, 2026

Respectfully submitted,

*/s/ Corina Scott*

Corina Scott
NC Bar No. 64573
Kristi Graunke
NC Bar No. 51216
Jaclyn Maffetore
NC Bar No. 50849
**ACLU of North Carolina Legal Foundation**
P.O. Box 28004
Raleigh, NC 27611
cscott@acluofnc.org
kgraunke@acluofnc.org
jmaffetore@acluofnc.org
T: (919) 627-3309

Johanna M. Hickman*
DC Bar No. 981770
Adnan Perwez*
DC Bar No. 90027532
Steven Y. Bressler*
DC Bar No. 482492
Brian Netter*
DC Bar No. 979362
**Democracy Forward Foundation**
P.O. Box 34553
Washington, DC 20043
hhickman@democracyforward.org
aperwez@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org
T: (202) 448-9090

*Counsel for Plaintiffs*

Lucia Goin*
Kathryn Huddleston*
**ACLU Foundation**
**Immigrants' Rights Project**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
lgoin@aclu.org
khuddleston@aclu.org

Oscar Sarabia Roman*
Noelle Smith*
**ACLU Foundation**
**Immigrants' Rights Project**
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
osarabia@aclu.org
nsmith@aclu.org

Jacob H. Sussman
NC Bar No. 31821
**Southern Coalition for Social Justice**
P.O. Box 51280
Durham, NC 27717
jsussman@scsj.org
T: (919) 323-3380 (ext. 129)

* Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on October 1, 2026, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will effect service on all counsel of record.

Respectfully submitted this the 1st day of October, 2026.

*/s/ Corina Scott*
Corina Scott
cscott@acluofnc.org

*Counsel for Plaintiffs*