**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| WILLY WENDER ACEITUNO, *et al.*, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants.* | Civil Action No. 26-146<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

## INTRODUCTION

Defendants are engaged in a dragnet campaign of unlawful immigration stops and arrests throughout the state of North Carolina. Pursuant to illegal policies and practices promulgated by the U.S. Department of Homeland Security (DHS), masked federal immigration agents have flooded neighborhoods with high concentrations of Latino residents, circling public areas and shopping centers in unmarked SUVs, and detaining people—usually Latino—whom they happen to find, without any reason to believe they are unlawfully in the United States or that they pose an escape risk. Unsurprisingly, this approach has led to the illegal stops and arrests of numerous U.S. citizens and residents with immigration status, including the six class representatives in this case. Plaintiffs and putative class members are suffering irreparable harm, including loss of liberty and a pervasive risk that they may be unlawfully stopped and arrested at any time, as a result of DHS's policies and practices of carrying out suspicionless stops and warrantless arrests that do not conform with the Fourth Amendment and 8 U.S.C. § 1357(a)(2).

With this Motion, Plaintiffs seek to challenge Defendants' widespread policies and practices of conducting these illegal stops and arrests in North Carolina. To protect their own rights

and the rights of others who are similarly situated, Plaintiffs seek to certify the following Classes and Subclasses ("the Proposed Classes"):

**Suspicionless Stops Class:** All persons who, since November 1, 2025, have been or will be subject to an investigatory stop for immigration purposes by DHS in North Carolina without reasonable suspicion that the person is in the United States in violation of civil immigration laws.

**Warrantless Arrests Class**: All persons who, since November 1, 2025, have been or will be subject to an arrest by DHS in North Carolina for immigration purposes without a warrant and without a pre-arrest, individualized assessment of probable cause both that the person is in the United States in violation of civil immigration laws and poses an escape risk.

- **Removability Subclass**: All persons who, since November 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in North Carolina without probable cause that the person is in the United States in violation of civil immigration laws.

- **Escape Risk Subclass**: All persons who, since November 1, 2025, have been or will be subject to a warrantless arrest for immigration purposes by DHS in North Carolina without probable cause that the person is likely to escape before a warrant can be obtained.

Plaintiffs satisfy all the requirements for class certification under Fed. R. Civ. P. 23(a) and (b)(2). Members of the Proposed Classes are numerous—so numerous that joinder is impracticable. Hundreds, if not thousands, of residents have been stopped and arrested because of Defendants' ongoing, warrantless immigration enforcement activity. Class members are subject to the same pattern of conduct and suffer the same injury, namely suspicionless stops in violation of the Fourth Amendment and warrantless arrests in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i)-(ii). Resolution of their claims will require answering common legal and factual questions, including: 1) whether DHS has followed policies and practices of encouraging or allowing agents to stop people to question them about immigration status without reasonable suspicion that they are removable; and 2) whether DHS has followed policies and practices of encouraging or allowing agents to arrest individuals without probable cause to believe they are

removable or pose an escape risk. Plaintiffs' claims are also typical of the Proposed Classes' claims because they all arise from the same illegal policies and practices. Additionally, Plaintiffs are adequate class representatives, because they have no conflicts with other class members and are represented by experienced class counsel. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants' policies and practices of conducting suspicionless stops and warrantless arrests in North Carolina without making the requisite probable cause determinations apply generally across the class and enjoining such a policy would provide relief to each class member. Courts routinely certify classes in systemic civil rights challenges to law enforcement policies and practices. Indeed, Congress created Rule 23(b)(2) "to facilitate civil rights class actions." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 n.24 (4th Cir. 2006).

For these reasons, Plaintiffs respectfully request that the Court grant class certification under Rule 23(b)(2),[1] appoint the Plaintiffs as Class Representatives as set forth below, and appoint the undersigned as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

## BACKGROUND

Stops and arrests carried out by federal immigration agents are subject to important constitutional and statutory limits, which Defendants have broadly disregarded in North Carolina. "Except at the border and its functional equivalents," detentive stops must be supported by "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that [the persons stopped are noncitizens] who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Defendants must have a

[1] Plaintiffs request, in the alternative, provisional certification of the Warrantless Arrests Class and its Subclasses so the Court may issue the class-wide preliminary relief Plaintiffs seek in the concurrently filed Motion for Preliminary Injunction and/or Stay of Agency Action, ECF No. 36.

"particularized and objective basis for suspecting *the particular person stopped* of [a violation of law]." *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009) (cleaned up) (emphasis added).

Additionally, a federal statute prohibits immigration officers from making warrantless arrests, except in narrow circumstances. As one district court recently observed, "[t]he law on this issue is clear and undisputed." *M-J-M-A- v. Hermosillo,* 822 F. Supp. 3d 1147, 1158 (D. Or. 2026). Before making a warrantless arrest, immigration agents must have "reason to believe" that: (1) the person to be arrested is in the United States in violation of immigration laws, *and* (2) the person is likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)-(ii). "Courts have held that the phrase 'reason to believe' in § 1357 is equivalent to constitutionally required probable cause." *United States v. Segura-Gomez,* No. 4:17-CR-65-FL-1, 2018 WL 6582823, at *6 (E.D.N.C. May 25, 2018), *R&R adopted*, No. 17-CR-65-FL-1, 2018 WL 6259222 (E.D.N.C. Nov. 30, 2018) (collecting cases).

Over the past year, following executive directives, DHS agents in North Carolina have trampled these legal requirements. Their tactics in North Carolina mirror those used in other states: federal immigration agents have smashed car windows, snatched people off the street and shoved them into unmarked vehicles, and dragged workers out of their workplaces. Declaration of Willy Wender Aceituno, ECF No. 36-1[2] ("Aceituno Decl.") ¶ 11; Declaration of Darwin Alberto Gomez Corrales, ECF No. 36-32 ("Gomez Corrales Decl.") ¶ 9; Declaration of Yoshi Cuenca Villamar, ECF No. 36-2 ("Cuenca Decl.") ¶¶ 3-14; Declaration of Manuel Betancur, ECF No. 36-28 ("Betancur Decl.") ¶ 8; Declaration of David Rebolloso, ECF No. 36-20 ("Rebolloso Decl.") ¶ 9; Declaration of Fernando Vazquez Orea, ECF No. 36-6 ("Vazquez Decl.") ¶¶ 4-9. In November

[2] Exhibits cited by ECF number are attached to the concurrently filed Motion for Preliminary Injunction and/or Stay of Agency Action, ECF No. 36.

2025, DHS launched what it calls "Operation Charlotte's Web," sending hundreds of CBP agents to North Carolina.[3] Since at least November 2025, DHS agents have made hundreds of suspicionless stops and warrantless arrests for purported immigration purposes, without the reasonable suspicion and probable cause required by law. *See infra* Argument, Part I.A.

Plaintiffs are all North Carolinians who have previously been stopped by DHS agents without reasonable articulable suspicion and arrested without probable cause that they are removable from this country and pose an escape risk. The experiences of the Plaintiffs and putative class members illustrate three clear policies that DHS is carrying out on a wide scale in North Carolina.[4] First, Defendants stop and question individuals in North Carolina—mostly Latino individuals—without the reasonable suspicion required by law. Second, Defendants arrest individuals without a warrant and without probable cause of removability. Third, Defendants arrest individuals without a warrant and without probable cause of escape risk—a violation that multiple courts have enjoined class-wide in districts around the country. *See M-J-M-A-,* 822 F. Supp. 3d at 1184; *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 65 (D.D.C. 2025); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1240 (D. Colo. 2025). DHS's unlawful policies and practices have affected citizens (like Plaintiffs Willy Wender Aceituno, Yoshi Cuenca Villamar, Edwin Godinez, Yair Napoles, and Fernando Vazquez Orea) and non-citizens (like Plaintiff Ruben Arguera Lopez, a U-visa holder) alike. As a result of Defendants' ongoing enforcement of these

---

[3] *See* ECF No. 36-22, *DHS Launches Operation Charlotte's Web to Target Criminal Illegal Aliens Terrorizing Americans in Charlotte, North Carolina,* U.S. Dep't of Homeland Security (Nov. 15, 2025), https://perma.cc/6PNF-GUDQ.

[4] Plaintiffs move for preliminary relief only on Counts II and III in the Amended Complaint (the warrantless arrest claims). *See* ECF No. 36. However, Plaintiffs request that the Court certify both the Suspicionless Stops Class and Warrantless Arrest Class (and Subclasses) in this Motion.

unlawful policies and practices, Plaintiffs remain at substantial risk of being unlawfully stopped and arrested again.

***Willy Wender Aceituno***: On November 15, 2025, four DHS agents approached Plaintiff Aceituno while he was awaiting a food order from a Honduran restaurant in a shopping center parking lot and asked for his last name and citizenship status. Aceituno Decl. ¶¶ 2-3. Mr. Aceituno asked whether he had to answer yes or no. *Id.* ¶ 3. Agents did not respond to that question and instead kept telling Mr. Aceituno to give them his documents. *Id.* ¶¶ 3, 5. Mr. Aceituno provided the agents with his REAL ID. *Id.* ¶ 5. The agents then demanded a different document demonstrating citizenship. *Id.* After approximately 15 minutes, the agents scanned Mr. Aceituno's license, confirmed that he was a U.S. citizen, and let him enter the restaurant to retrieve his food. *Id.* ¶ 6. After picking up his food, Mr. Aceituno then left the restaurant and was intercepted—a second time—by a different group of CBP agents. *Id.* ¶ 7. He was inside his truck, which is registered in his name, and was about to drive away, when CBP agents suddenly used their vehicles to block him. *Id.* ¶ 8. Mr. Aceituno told the agents that he had already identified himself, but an agent nonetheless yelled "open the door." *Id.* ¶¶ 9, 11. Armed, masked DHS agents then smashed his truck window, dragged him from his vehicle, forced him to the ground, and handcuffed him. *Id.* ¶¶ 11-15. Mr. Aceituno repeatedly told the agents that he is a U.S. citizen and begged them to check his ID, which was in his back pocket. *Id.* ¶ 17. The agents also ignored a bystander who was shouting that other agents had already checked Mr. Aceituno's ID several minutes before. *Id.* ¶ 16. None of the agents presented a warrant or asked any questions about Mr. Aceituno's family, community ties, employment history, or how long he had lived in Charlotte. *Id.* ¶¶ 19-20. DHS agents forced Mr. Aceituno into an unmarked vehicle and drove away. *Id.* ¶¶ 21-22. After approximately ten minutes of driving, agents finally ran Mr. Aceituno's information, verified his

citizenship, and then dropped him off on the side of the road, stranding him. *Id.* ¶¶ 23-25. He was forced to walk back to his truck while bloody. *Id.* ¶ 26. He subsequently filed a police report and then went to the hospital to be evaluated for the injuries he suffered. *Id.* ¶¶ 28, 29.

***Yoshi Cuenca Villamar***: On that same day, armed, masked DHS agents arrested Plaintiff Cuenca, a U.S. citizen, while he was performing yard clean-up work at a private residence in Charlotte. Cuenca Decl. ¶¶ 2-9. DHS agents grabbed him from behind without identifying themselves, pushed him to the ground, and immediately handcuffed him. *Id.* ¶¶ 2-6. Mr. Cuenca's brothers, who were also on the scene, repeatedly told the agents that Mr. Cuenca is a U.S. citizen. *Id.* ¶¶ 5-6. The only question agents asked Mr. Cuenca was whether he spoke English. *Id.* ¶ 10. They did not ask for his ID before putting him in their unmarked vehicle. *Id.* ¶ 9. No warrant was presented, and there was nothing to indicate the agents even knew Mr. Cuenca's name before snatching him off the street. *Id.* ¶ 11. After 20 to 30 minutes of driving around, the agents took a picture of his license and confirmed he was a citizen. *Id.* ¶¶ 17-18. The agents then dropped him off on the side of the road and threw his wallet at him before departing. *Id.* ¶ 18. Mr. Cuenca had to walk to a nearby business to call his brothers and ask them to come pick him up. *Id.* ¶ 19.

***Ruben Arguera Lopez***: On November 17, 2025, Plaintiff Arguera Lopez, who has a valid work permit and U-visa, was driving to his job in Charlotte when three SUVs began following him. Declaration of Ruben Arguera Lopez, ECF No. 36-3 ("Arguera Lopez Decl.") ¶ 2. One of the SUVs pulled in front of his car, boxing him in and forcing him to stop his car. *Id.* Five DHS agents approached the car and began asking various questions about where Mr. Arguera Lopez was from and how he came to this country. *Id.* ¶¶ 3-4. Mr. Arguera Lopez exercised his right to remain silent. *Id.* ¶ 4. Around 10 minutes into the encounter, agents told Mr. Arguera Lopez they would take him with them if he did not answer their questions. *Id.* ¶ 6. He responded and told them that he has a

U-Visa. *Id.* ¶ 7. Nonetheless, the agents ordered Mr. Arguera Lopez to get out of the car, put him in handcuffs, and tried to put him into their SUV. *Id.* ¶¶ 7-11. At no point did they tell Mr. Arguera Lopez why he was being arrested. *Id.* ¶ 13. Mr. Arguera Lopez asked the agents to let him go and reiterated that he has legal status. *Id.* ¶ 11. After approximately an hour of questioning, the agents finally asked Mr. Arguera Lopez where his work permit was and pulled it out of his wallet. *Id.* ¶ 12. None of the agents identified themselves, presented a warrant, or indicated that they knew Mr. Arguera Lopez before stopping him. *Id.* ¶ 13.

***Fernando Vazquez Orea***: On November 18, 2025, Plaintiff Vazquez Orea—a U.S. citizen—was approached by CBP agents at a construction site where he works in Cary. Vazquez Decl. ¶ 3-4. The agents asked in English and Spanish where he was from. *Id.* ¶ 5. He declined to answer their questions at first, as is his right, and he tried to step away from the area, but the agents cornered him. *Id.* ¶¶ 5-6. They then placed Mr. Vazquez Orea in handcuffs, searched him, pulled out his wallet, and saw his North Carolina Real ID (which demonstrates legal immigration status or citizenship). *Id.* ¶¶ 6, 8. Nevertheless, rather than release him, they loaded him into a vehicle and drove away. *Id.* ¶ 9. The agents did not present a warrant or give any reason for putting him in handcuffs and detaining him. *Id.* ¶¶ 6-7. They also did not ask him any questions about how long he's lived in North Carolina, his employment history, or anything else about community ties. *Id.* ¶ 10. After driving about 5 minutes down the road and going through the contents of Mr. Vazquez Orea's wallet, the agents abruptly pulled the vehicle over, let him out, and threw his wallet, IDs, and other cards at him. *Id.* ¶¶ 11-12. Agents stranded Mr. Vazquez Orea in a wooded area on the side of the road. He had to run about a half a mile back to his job site. *Id.* ¶¶ 12, 14.

***Edwin Godinez and Yair Napoles***: On January 5, 2026, DHS agents in an unmarked vehicle turned on police-style lights behind Plaintiffs Godinez and Napoles, both U.S. citizens, as

they sat at a red light in Salisbury, North Carolina. Declaration of Edwin Godinez, ECF No. 36-5, ("Godinez Decl.") ¶ 3; Declaration of Yair Alexander Napoles, ECF No. 36-4 ("Napoles Decl.") ¶ 3. After the two stepbrothers pulled over and presented their IDs, additional agents arrived and escalated the stop. Godinez Decl. ¶¶ 5-8; Napoles Decl. ¶¶ 5-8. Agents told them they were detained, reached into the car, attempted to seize their phones, and forcibly opened the doors. Godinez Decl. ¶¶ 8-12; Napoles Decl. ¶¶ 8-14. They pinned Mr. Godinez against his seat, knocked out his earrings, punched him in the abdomen, and tried to drag both Mr. Godinez and Mr. Napoles from the vehicle while threatening to handcuff them. *Id.* After roughly 10 to 15 minutes of force and intimidation—without presenting a warrant, identifying themselves, or explaining the reason for the arrest—the agent returned their IDs and allowed them to leave. Godinez Decl. ¶ 16; Napoles Decl. ¶ 17. At no point did the agents ask them any questions about their ties to the community. Godinez Decl. ¶ 17; Napoles Decl. ¶ 18.

As the Plaintiffs' experiences illustrate, the agents provided no indication that they knew Plaintiffs' identities before stopping them, did not provide reasons for each Plaintiff's initial stop, did not produce warrants for Plaintiffs' eventual arrests, and obtained no information during the stops establishing probable cause of removability or escape risk. *See, e.g.*, Aceituno Decl. ¶¶ 3, 19-20; Cuenca Decl. ¶¶ 3, 11-12; Arguera Lopez Decl. ¶ 13; Napoles Decl. ¶¶ 3, 17-18; Godinez Decl. ¶¶ 16-17; Vazquez Decl. ¶¶ 4-7, 10. The agents' encounters with Plaintiffs—which occurred while Plaintiffs were engaged in ordinary, law-abiding activities—did not provide any "particularized and objective basis" to suspect that Plaintiffs are unlawfully present in the United States or pose an escape risk. *Navarette v. California*, 572 U.S. 393, 396 (2014). Mr. Aceituno was picking up a meal from a restaurant, Aceituno Decl. ¶ 2, Mr. Cuenca and Mr. Vazquez Orea were working on clients' properties, Cuenca Decl. ¶ 2; Vazquez Decl. ¶ 3, and the other three Plaintiffs

were in vehicles, Arguera Lopez Decl. ¶ 2 (driving his own properly-registered vehicle and obeying traffic laws when arrested); Godinez Decl. ¶ 3 (driving his own properly-registered vehicle and obeying traffic laws when arrested); Napoles Decl. ¶ 3 (riding as Mr. Godinez's passenger). In fact, the only initial questions that agents asked Plaintiffs suggest that all six Plaintiffs were targeted for arrest solely because of their race or perceived ethnicity. Aceituno Decl. ¶ 3; Cuenca Decl. ¶ 10; Arguera Lopez Decl. ¶ 4; Godinez Decl. ¶ 5; Napoles Decl. ¶ 5; Vazquez Decl. ¶ 5.

Defendants' illegal practices have not abated, and in recent months, have escalated. Between December 2025 and July 2026, there have been approximately 1,500 non-custodial civil immigration arrests by ICE in North Carolina—arrests that occurred within the community rather than transfers from criminal custody or other custodial settings.[5] Siembra NC, a nonprofit organization that runs a community hotline to monitor ICE enforcement activity, consistently receives at least two hotline calls and two social media reports *per week* describing North Carolinians being arrested without a warrant and without the probable cause required by the law. *See* Declaration of Andreina Malki, Siembra NC, ECF No. 36-18 ("Siembra Decl.") ¶ 26.

Over the summer of 2026, DHS once again surged immigration enforcement in North Carolina, sowing fear and alarm among the state's Latino and immigrant communities.[6] The indiscriminate nature of DHS's unlawful stop and arrest practices means that even U.S. citizens or

---

[5] *See* ECF No. 36-17, Deportation Data Project, Administrative Arrests Dataset, https://deportationdata.org/index.html (accessed Sept. 25, 2026) (filtered to "apprehension state" = "North Carolina" and to "apprehension method" = "Non-custodial arrests"), https://perma.cc/A53J-QBJA.

[6] *See* ECF No. 36-38, Jon Dowding, *ICE arrests in North Carolina top 5,000 in 2026 this year; leading to fear, anxiety, experts say*, ABC11 Raleigh-Durham (Sept. 20, 2026), https://perma.cc/82S6-7YB6; ECF No. 36-39, Marge Farrington, *Joint Operation by ICE, Sheriff's Deputies, and Forest Service Rangers Leads to 13 Arrests at Wilson Creek* (Aug. 13, 2026), https://perma.cc/748D-ZBF8.

individuals with lawful status—like the six Plaintiffs in this case—risk being stopped, arrested, and detained again without the procedures required to safeguard their rights to live, work, and travel freely with dignity. Plaintiffs and putative class members are frightened to leave their homes, go to work, pick up food, exercise outside, and run basic errands. *See, e.g.*, Aceituno Decl. ¶ 45-47; Cuenca Decl. ¶¶ 30-31, 35; Arguera Lopez Decl. ¶¶ 28, 31; Napoles Decl. ¶¶ 29-31; Godinez Decl. ¶¶ 25-28, 30, 32; Vazquez Decl. ¶ 21-25. For example, eight of Plaintiff Aceituno's co-workers—all Latino construction workers—were stopped and arrested without warrants by DHS agents in the past month or so, which has caused Mr. Aceituno to be extremely anxious and fearful when he leaves his house or drives his work truck because he is at substantial risk of being stopped and arrested again despite being a U.S. citizen. Aceituno Decl. ¶¶ 38-40. Plaintiffs and other putative class members similarly describe minimizing time in public places, altering their routes to or from work based on reported ICE sightings in their communities, and avoiding main roads and highways to try to avoid encountering and being arrested by DHS agents. *See, e.g.*, Aceituno Decl. ¶¶ 45-47; Cuenca Decl. ¶¶ 30-32, 35; Godinez Decl. ¶¶ 25-26, 30, 32; Napoles Decl. ¶¶ 26, 28, 30-31; Arguera Lopez Decl. ¶¶ 21, 23-25, 28, 31; Vazquez Decl. ¶¶ 18, 21-22.

These ongoing and escalating operations perpetuate harm to Plaintiffs and putative class members and expose them to an intolerable risk of unlawful stops and arrests. *See, e.g.*, Aceituno Decl. ¶¶ 36-42, 45 (describing arrests occurring "just 1 or 2 minutes from my house," and explaining that he "can't go to work driving [his] truck or go pick up food from a food truck without risking being arrested again"); Cuenca Decl. ¶ 22 (stating he works outside "a lot," which "exposes [him] to another arrest); Arguera Lopez Decl. ¶ 18-21, 26 (explaining that "ICE agents frequently pull over Latino men driving in [his] neighborhood and arrest them," which puts him at a high risk of re-arrest because he has to "drive through [his] neighborhood frequently to get to

work or even [] run basic errands"); Godinez Decl. ¶ 21-30, 32 (expressing concern regarding being in "construction sites, driving on main roads, or spending any time in Home Depot or Lowe's parking lots"); Napoles Decl. ¶¶ 24, 27-29 (explaining that the recent escalation causes him to be "especially fearful [of re-arrest] at work" because he "work[s] outside"); Vazquez Decl. ¶¶ 23-25 (stating that the "nature of [his] work, being in landscaping and being outside, puts [him] at risk of re-arrest").

Class members, witnesses, and community organizations describe ongoing operations that mirror Plaintiffs' experiences. *See* Declaration of Argenis Eduardo Torres Rosales, ECF No. 36-27 ("Rosales Decl.") ¶¶ 8-12; Declaration of Roman Antonio Rogel Alvarenga, ECF No. 36-26 ("Alvarenga Decl.") ¶¶ 4-9; Gomez Corrales Decl. ¶¶ 5-10; Betancur Decl. ¶ 8; Rebolloso Decl. ¶¶ 9, 15-16; Siembra Decl. ¶¶ 15, 16, 19, 20, 22-24, 26; Declaration of Becca O'Neill, Carolina Migrant Network, ECF No. 36-19 ("CMN Decl.") ¶¶ 12-17. In many of these cases, both the detained individuals and their family members reported that they did not understand why the arrest had occurred, and no warrant was presented before the individuals were detained. *Id.*

For instance, on July 13, 2026, DHS agents targeted a Latino Uber driver in a parking lot. Gomez Corrales Decl. ¶¶ 5-10. Agents smashed his car window, forcibly removed him from the vehicle, and arrested him without showing him a warrant and without asking any questions bearing on escape risk. *Id.* ¶¶ 8-9. And on July 26, 2026, ICE conducted a raid at Wilson Creek, a swimming area in the Pisgah National Forest, which attracts families (particularly Latino families) during the summer. Declaration of Sandra Salazar, ECF No. 36-30 ("Salazar Decl.") ¶¶ 3-5. At least 13 people were arrested, including Mr. Rogel Alvarenga and Mr. Torres Rosales, who have pending applications for immigration relief and deep ties to their families and communities in North Carolina. Mr. Rogel Alvarenga witnessed ICE agents only stopping cars with Latino drivers, while

letting cars with white drivers pass through the checkpoint without stopping. Alvarenga Decl. ¶ 5. While arresting Mr. Rogel Alvarenga and Mr. Torres Rosales, the agents did not produce warrants, did not ask questions related to escape risk, and appeared to not know who either of the men were before stopping their cars. Alvarenga Decl. ¶¶ 4-9; Rosales Decl. ¶¶ 7-11.

Defendants' public statements confirm their agency-wide policy of disregarding 8 U.S.C. § 1357(a)(2)'s probable cause requirements. As detailed in the accompanying Motion for a Preliminary Injunction, Defendants have repeatedly made public statements highlighting their policy of making warrantless immigration arrests based on reasonable suspicion alone, rather than the legally required probable cause. For example, a September 25, 2025, post from DHS's official X account stated that "[u]nder the [F]ourth [A]mendment of the U.S. Constitution, DHS law enforcement uses 'reasonable suspicion' to make arrests,"[7] contradicting the Supreme Court's clear, longstanding requirement that a "valid" arrest requires "probable cause." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964).

This conduct shows a widespread disregard for the clear legal limits that constrain DHS's power. Class-wide injunctive relief is necessary to protect the targets of Defendants' widespread campaign of illegal stops and arrests. As detailed below, the Proposed Classes satisfy the requirements for certification under Rules 23(a) and 23(b)(2).

## LEGAL STANDARD

Under Fed. R. Civ. P. 23, "[a]t an early practicable time after a person sues . . . as a class representative, the court must determine by order whether to certify the action as a class action."

[7] *See* ECF No. 36-13, Homeland Security [@DHSgov], X (Jan.16, 2026) https://perma.cc/3GQQ-BXN6 ("False. A person's immigration status makes them a target for enforcement, not their skin color, race or ethnicity. Law enforcement uses 'reasonable suspicion' to make arrests, as protected under the Fourth Amendment to the U.S. Constitution. The Supreme Court has already ruled that such actions are in line with the Constitution").

Fed. R. Civ. P. 23(c)(1)(A). To obtain class certification, Plaintiffs must satisfy all of Rule 23(a)'s requirements and one prong of Rule 23(b). Certification is appropriate under Rule 23(a) if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(1)-(4). Rule 23(b)(2) requires that Defendants "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." As the Fourth Circuit has recognized, "Rule 23 provides wide discretion to district courts, in part, to promote the systemic class action virtues of efficiency and flexibility." *Brown v. Nucor Corp.*, 785 F.3d 895, 921-22 (4th Cir. 2015).

Upon certifying a class, the Court must also appoint class counsel. Fed. R. Civ. P. 23(g). To do so, the Court considers: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). The Court "may [also] consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

## ARGUMENT

Class certification is necessary and appropriate to constrain DHS's abuse of authority and protect North Carolinians from being subjected to suspicionless stops and warrantless arrests. Courts around the country have certified similar classes challenging DHS's unlawful arrest practices, recognizing that class treatment is the most judicially efficient way to resolve claims that

might otherwise go unaddressed or lead to varying adjudications. *See M-J-M-A-,* 822 F. Supp. 3d at 1184 (certifying an "Unassessed Escape Risk Class," comprised of all persons who have been or will be arrested in the District of Oregon for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk); *see also Escobar Molina*, 811 F. Supp. 3d at 65; *Ramirez Ovando*, 810 F. Supp. 3d at 1240. Plaintiffs satisfy all the requirements for class certification under Federal Rules of Civil Procedure 23(a) and (b)(2).

**I. The Proposed Classes Satisfy the Requirements of Rule 23(a).**

A. The Proposed Classes Are So Numerous that Joinder Is Impracticable.

Rule 23 requires that a proposed class be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "Though no specified number is needed to maintain a class action, as a general guideline, a class that encompasses fewer than 20 members will likely not be certified while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone[.]" *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (cleaned up). "Plaintiffs need not establish the precise number of class members at the certification stage to satisfy the numerosity requirement so long as they provide a reasonable estimate of the number of class members." *D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 574 (D. Md. 2026) (citation modified).

Here, the Proposed Subclasses are sufficiently numerous because the evidence indicates that over the past year, hundreds, if not thousands, of North Carolinians have been subjected to suspicionless stops and warrantless arrests without probable cause that they are non-citizens subject to removal from the United States or likely to escape before a warrant can be obtained. Arrest data confirms the large scope of the class. DHS reported 425 arrests in a one-week period

in November 2025 alone.[8] And these are just the arrests that were logged and reported—DHS omits the detentions of those who are discovered to be U.S. citizens and subsequently released. *See Vasquez Perdomo v. Noem*, No. 25-cv-5605 (C.D. Cal.), Dkt. No. 632-40 at 167:10–169:9 (explaining that ICE does not track "investigative detentions, that do not lead to an arrest," or stops "where a person turns out to be a U.S. citizen or lawfully present"). Between December 2025 and July 2026, there have been approximately 1,500 non-custodial civil immigration arrests by ICE in North Carolina—arrests that occurred within the community and exclude transfers from criminal custody or other custodial settings.[9]

The harm is not only ongoing but escalating. Siembra NC receives at least two hotline calls and two social media reports *per week* describing North Carolinians being arrested without a warrant and without the probable cause required by the law. Siembra Decl. ¶ 26. In the past two months, ICE has surged enforcement in North Carolina, and there has been a drastic increase in street-level stops and arrests throughout the state. Aceituno Decl. ¶¶ 37-39; Cuenca Decl. ¶¶ 23-25, 33; Napoles Decl. ¶¶ 24-25, 28-29; Godinez Decl. ¶¶ 22-25, 30-32; Arguera Lopez Decl. ¶¶ 18-21, 29; CMN Decl. ¶ 14; Siembra Decl. ¶¶ 23-27. These incidents include the detention of drivers and passengers in work vehicles, as well as arrests occurring during routine, daily activities such as commuting to work or attending appointments. *See, e.g.*, Siembra Decl. ¶¶ 15, 16, 19, 20, 22-23 (describing various street-level arrests over the past 6 months); CMN Decl. ¶¶ 12-17 (describing "a concerning uptick" of reported arrests and requests for legal intake during the summer of 2026 from individuals caught up in traffic stops, in sweeps of Latino neighborhoods, or for faithfully

---

[8] *See* ECF No. 36-43, Brandon Kingdollar, *ICE Agents Once Again Operating in North Carolina, Activists Say, Including Arrests in Durham*, NC Newsline (Dec. 5, 2025), https://perma.cc/R2Z7-XBLT.

[9] *See supra* n.5.

attending their ICE check-ins, and without any reason to believe the individual arrested was an escape risk).

Importantly, "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'" *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:15 (5th Ed. 2018)). And when "a class's membership changes continually over time, that factor weighs in favor of concluding that joinder of all members is impracticable." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022). The Proposed Classes include numerous future members who are currently unknown, but will be subject to DHS's suspicionless stops and warrantless arrest policies and practices in North Carolina. Such difficulty in "immediately identifying all class members" only makes certification more desirable, as joinder is more impracticable. *Haywood v. Barnes*, 109 F.R.D. 568, 576 (E.D.N.C. 1986). Notably, DHS maintains an ongoing quota targeting 2,000 arrests per day,[10] and nationally, DHS has accelerated arrests over the course of the summer: in July 2026 alone, ICE arrested nearly 50,000 individuals across the country, making it the month with the highest number of arrests during this administration.[11] In North Carolina, ICE is increasing its detention capacity so that it can arrest more people. The GEO Group, which operates private prisons and detention centers across the United States, is in the process of re-opening the decommissioned Rivers Facility in Winton, North Carolina, which will add around 1,400 immigration detention beds within the state by the end of

---

[10] *See* ECF No. 36-9, Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, New York Times (July 1, 2026), https://perma.cc/65ND-QU84 (2,000 arrests per day is the "new standard for enforcement").

[11] *See* ECF No. 36-34, Rebecca Santana, *ICE arrests jumped to nearly 50,000 in July, the highest monthly total of Trump's second term*, AP News (Aug. 25, 2026), https://perma.cc/NBH9-Q85Q.

2026.[12] ICE's expanding presence in North Carolina, along with arrest quotas set at the highest levels of government, promise to ensnare hundreds more North Carolinians given DHS officers' ongoing street-level enforcement practices and demonstrated disregard for constitutional and statutory requirements in making stops and arrests. Joinder of all of these as-yet unknown North Carolinians is, by definition, impracticable.

Accordingly, Plaintiffs have produced sufficient evidence that the Proposed Classes are significantly larger than the 40-member number that triggers a presumption of impracticability. *In re Zetia*, 7 F.4th at 234. The hundreds (if not thousands) of members of the Proposed Classes, as well as the fact that they are dispersed throughout North Carolina, make joinder impracticable and satisfy the numerosity requirement for class certification under Rule 23(a)(1).

B. The Proposed Classes Meet the Commonality Requirement.

Plaintiffs must also show that "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). This means that class-wide "claims must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[E]ven a single common question will do." *Id.* at 359 (internal quotations omitted).

Courts in this Circuit and courts in other circuits have found commonality met where plaintiffs challenge specific governmental policies or practices, because the existence and legality of those policies and practices can be determined on a class-wide basis. *See, e.g.*, *CASA, Inc. v. Trump*, 793 F. Supp. 3d 703, 720 (D. Md. 2025) (certifying birthright citizenship class because

---

[12] *See* ECF No. 36-31, Eduardo Medina and Hamed Aleaziz, *ICE Detention Center in North Carolina to Be Among Largest on East Coast,* New York Times (July 24, 2026), https://perma.cc/6APC-3R2W.

"whether the Executive Order is constitutional and whether it violates the INA, [would] resolve 'in one stroke' the issue that is central to the validity of the class claims") (quoting *Wal-Mart*, 564 U.S. at 350); *M-J-M-A-,* 822 F. Supp. 3d at 1176, 1177 (provisionally certifying an "Unassessed Escape Risk Subclass" in a similar warrantless arrest lawsuit because "[m]ultiple, identical questions of law [] are [] common to the subclass"); *Buffkin v. Hooks*, No. 1:18-CV-502, 2019 WL 1282785, at *12 (M.D.N.C. Mar. 20, 2019) (certifying statewide class challenging prison policy on hepatitis C treatment). Importantly, courts routinely find commonality when plaintiffs have "suffered the same injury." *Wal-Mart*, 564 U.S. at 350 (internal quotations omitted).

Here, the class representatives and class members suffer the same injury: unlawful stops and arrests. This injury stems from DHS's policies and practices of directing its agents to stop North Carolinians without reasonable suspicion of removability and arrest North Carolinians without a warrant and without the requisite probable cause, which provides the "glue" holding class members' claims together. *See id.* at 352. The claims of the Proposed Classes hinge on legal and factual questions that can be resolved on a class-wide basis, including:

- Whether DHS has a policy and practice of initiating immigration stops without the reasonable suspicion required by law;
- Whether DHS has a policy and practice of making immigration arrests without probable cause that the arrestee is removable,
- Whether DHS has a policy and practice of making immigration arrests without probable cause that the arrestee is likely to escape before a warrant may be obtained, and
- Whether these policies and practices violate the Fourth Amendment, 8 U.S.C. § 1357(a)(2), and 8 C.F.R. § 287.8(c)(2)(i)-(ii).

When the Court determines whether these policies and practices exist and violate federal law, it will resolve "in one stroke" the issue that is central to the validity of the class claims. *See Wal-Mart*, 564 U.S. at 350.

These issues are amenable to class-wide resolution regardless of any factual variation between class members because all class members are subject to the same core policies and legal violations. "[T]he legality of the challenged policy and practice" of making warrantless arrests without meeting statutory prerequisites "is not a question that requires wading into fact-specific and individualized determinations about each class member's arrest." *Escobar Molina*, 811 F. Supp. 3d at 58 (cleaned up) (provisionally certifying class in challenge to DHS's warrantless arrests); *see also Wilson v. Eagle Nat'l Bank*, No. JRR-20-1344, 2023 WL 2478933, at *11 (D. Md. Mar. 13, 2023) ("Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law.") (citation and quotation marks omitted).[13]

Ultimately, the injuries of all class members stem from Defendants' policies and practices of conducting suspicionless stops and unlawful arrests. Plaintiffs' and class members' claims depend largely, if not entirely, on the existence and legality of those policies and practices. Thus, the "common answers" to these questions will "drive the resolution of the litigation" as to the classes for which Plaintiffs seek certification. *Wal-Mart*, 564 U.S. at 350 (internal citation omitted). Accordingly, the Proposed Classes satisfy the commonality requirement of Rule 23(a)(2).

C. <u>Plaintiffs' Claims are Typical of Class Members' Claims.</u>

Federal Rule of Civil Procedure 23(a) also requires "the claims or defenses of the representative parties" to be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Rule 23's typicality requirement "tends to merge with the commonality and adequacy-of-representation requirements." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006); *see*

[13] *M-J-M-A-* and *Ramirez Ovando* also found commonality despite immaterial differences in individual plaintiffs' circumstances. *See, e.g.*, *M-J-M-A-,* 822 F. Supp. 3d at 1176; *Ramirez Ovando*, 810 F. Supp. 3d at 1228–29, 1234. This Court should follow suit.

*also 1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 523 (4th Cir. 2022) (courts "need not tarry for long" on typicality analysis after considering commonality) (citation omitted). There is typicality if the class representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *Deiter*, 436 F.3d at 466 (citation and quotation marks omitted).

Here, typicality is satisfied for largely the same reasons as commonality. Each proposed class member has suffered the same principal injury (suspicionless stops and unlawful warrantless arrests), based on the same government policy (indiscriminate suspicionless stops and warrantless arrests without individualized assessments of removability and escape risk), which is unlawful as to the entire class because it violates constitutional, statutory, and regulatory constraints. *See Kidd v. Mayorkas*, 343 F.R.D. 428, 439 (C.D. Cal. 2023) (finding typicality because plaintiffs did not "seek a declaration or injunction directed at any individual ICE encounter" but "challenge[d] ICE's policies or practices on a systemwide basis" and "all members of the proposed classes would benefit from a declaration that a particular ICE policy or practice is unconstitutional (or an injunction prohibiting ICE from maintaining a policy or practice)"). The class thus shares an identical interest in restraining Defendants' illegal policies and practices. Any factual differences that might exist here between Plaintiffs and class members do not defeat typicality. *See Deiter*, 436 F.3d at 467 (explaining that the class representative's and class members' claims do not have to be "perfectly identical or perfectly aligned"). Accordingly, Plaintiffs have satisfied the typicality requirement of Rule 23(a)(3).

D. Plaintiffs and Plaintiffs' Counsel Will Adequately Protect the Interests of the Proposed Classes.

Finally, Plaintiffs and Plaintiffs' counsel "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy analysis "serves to uncover conflicts of interest

between named parties and the class they seek to represent," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997), and focuses on whether there are any "fundamental" conflicts, *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179-80 (4th Cir. 2010). "A conflict is not fundamental when . . . all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'" *Id.* at 180 (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 431 (4th Cir. 2003)).

The proposed class representatives do not have any conflicts of interest with the unnamed class members. Rather, they share common objectives with the members of the Proposed Classes because they are all subject to Defendants' unlawful policies and practices of making suspicionless stops and warrantless immigration arrests in North Carolina without the necessary individualized reasonable suspicion and probable cause determinations. Plaintiffs are motivated to pursue this action on behalf of themselves and others who suffer harm from being subjected to these unlawful policies and practices. Aceituno Decl. ¶¶ 50-51; Cuenca Decl. ¶¶ 34, 36; Arguera Lopez Decl. ¶¶ 30, 33; Godinez Decl. ¶¶ 31, 33; Napoles Decl. ¶ 32; Vazquez Decl. ¶ 30. They seek the same remedies to order DHS to abide by the legal limits on its policing powers. No Plaintiff seeks any relief that is in any way at odds with the relief sought by the Proposed Classes. As a result, Plaintiffs and the putative class "share common objectives" and "have the same interest in establishing the liability" of Defendants. *Ward*, 595 F.3d at 180 (quoting *Gunnells*, 348 F.3d at 431); *see also Escobar Molina*, 811 F. Supp. 3d at 60 (finding adequacy satisfied in similar challenge to Defendants' warrantless arrest policy and practice where plaintiffs and putative class members were all subjected to the challenged policy and practice and attested that they understood "the responsibility of being a class representative" and were "willing to protect the class's interests").

Plaintiffs' attorneys are also qualified to represent the Proposed Classes. Under Rule 23(a)(4), courts also examine whether counsel are "qualified, experienced, and generally able to conduct the litigation." 1 Newberg & Rubenstein on Class Actions § 3:72 (6th ed. 2026) (internal citations and quotations omitted). Under Rule 23(g)(1), relevant considerations include "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class[.]"

Plaintiffs have retained qualified counsel with significant experience in complex immigration-related cases, civil rights litigation, and class action litigation to represent the class's interests. *See* Ex. 1, Declaration of Kristi L. Graunke (ACLU of North Carolina); Ex. 2, Declaration of Kathryn Huddleston (ACLU Foundation Immigrants' Rights Project); Ex. 3, Declaration of Jacob H. Sussman (Southern Coalition for Social Justice); Ex. 4, Declaration of Steven Y. Bressler (Democracy Forward Foundation). Counsel have devoted substantial time and resources to developing the claims in this action and will continue to do so, and counsel are well-versed in the intricacies of immigration law, federal law governing immigration enforcement, civil rights law, and law governing class action proceedings. As such, Plaintiffs and Plaintiffs' counsel will fairly and adequately represent the Proposed Classes' interests, as required by Rule 23(a)(4). Additionally, under Rule 23(g), the Court should appoint the American Civil Liberties Union of North Carolina, the American Civil Liberties Union, the Southern Coalition for Social Justice, and Democracy Forward as counsel for the class in this case.

## II. The Proposed Classes Satisfy the Requirements of Rule 23(b).

In addition to satisfying the requirements of Rule 23(a), a putative class must also fall within one of the three subparts of Rule 23(b). Plaintiffs here seek class certification under

Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (quotations omitted).

Actions which seek to enjoin unlawful government conduct, like this one, are particularly appropriate for 23(b)(2) certification. Indeed, the Supreme Court has recognized that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of class actions permissible under Rule 23(b)(2). *Amchem Prods.*, 521 U.S. at 614. And the Fourth Circuit has acknowledged that Congress created this rule "to facilitate civil rights class actions." *Thorn*, 445 F.3d at 330 n.24.

Importantly, Rule 23(b)(2) "is almost automatically satisfied in actions primarily seeking injunctive relief." *CASA, Inc. v. Trump*, 793 F. Supp. 3d 703, 717 (D. Md. 2025) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)). And the Supreme Court recently noted the importance of class actions in providing consistent relief against broadly applicable statutes and policies. *See Trump v. CASA, Inc.*, 606 U.S. 831, 849 (2025); *id.* at 869 (Kavanaugh, J., concurring) (discussing Rule 23(b)(2) as an avenue to challenge unlawful government action). As relevant here, "courts have regularly certified classes challenging immigration-related policies." *Escobar Molina*, 811 F. Supp. 3d at 61 (collecting cases).

This is a quintessential case for Rule 23(b)(2) treatment. Defendants have acted on grounds that apply generally to the Proposed Classes by engaging in the same unlawful policies and practices against them—conducting stops without reasonable suspicion and warrantless arrests

without probable cause. The class members' injuries can be remedied through a single injunction, without differentiating between class members. Both a declaratory judgment that the policies and practices are unlawful, and an injunction that enjoins DHS from carrying out detentive stops without reasonable suspicion and warrantless arrests without probable cause would be "indivisible," meaning it would provide complete relief to all class members. *Wal-Mart*, 564 U.S. at 360. That is sufficient for this civil rights action and aligns with numerous other district court decisions certifying similar classes under Rule 23(b)(2) in cases involving the same types of claims. *See, e.g., M-J-M-A-,* 822 F. Supp. 3d at 1184; *Escobar Molina*, 811 F. Supp. 3d at 65; *Ramirez Ovando*, 810 F. Supp. 3d at 1240.

Additionally, class certification is especially warranted here because many members of the Proposed Classes are located throughout North Carolina or may be in detention centers and are unlikely to have sufficient financial resources to hire attorneys to assert their rights on an individualized basis. It is far more efficient for this Court to grant injunctive and declaratory relief protecting all class members than to review numerous individual cases asserting the same claims. *See J.D.*, 925 F.3d at 1323. Thus, Rule 23(b)(2) is satisfied.

## **CONCLUSION**

Plaintiffs respectfully request that the Court grant the Motion for Class Certification and certify the proposed Suspicionless Stops Class and Warrantless Arrests Class under Federal Rules of Civil Procedure 23(a) and 23(b)(2). Additionally, Plaintiffs request that the Court appoint Plaintiffs Willy Wender Aceituno, Yoshi Cuenca Villamar, Ruben Arguera Lopez, Edwin Godinez, Yair Napoles, and Fernando Vazquez Orea as class representatives, and appoint the undersigned and their firms as class counsel pursuant to Rule 23(g).

Dated: October 1, 2026

Respectfully submitted,

/s/ *Corina Scott*

Corina Scott
NC Bar No. 64573
Kristi Graunke
NC Bar No. 51216
Jaclyn Maffetore
NC Bar No. 50849
**ACLU of North Carolina Legal Foundation**
P.O. Box 28004
Raleigh, NC 27611
cscott@acluofnc.org
kgraunke@acluofnc.org
jmaffetore@acluofnc.org
T: (919) 627-3309

Johanna M. Hickman*
DC Bar No. 981770
Adnan Perwez*
DC Bar No. 90027532
Steven Y. Bressler*
DC Bar No. 482492
Brian Netter*
DC Bar No. 979362
**Democracy Forward Foundation**
P.O. Box 34553
Washington, DC 20043
hhickman@democracyforward.org
aperwez@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org
T: (202) 448-9090

Lucia Goin*
Kathryn Huddleston*
**ACLU Foundation**
**Immigrants' Rights Project**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
lgoin@aclu.org
khuddleston@aclu.org

Oscar Sarabia Roman*
Noelle Smith*
**ACLU Foundation**
**Immigrants' Rights Project**
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
osarabia@aclu.org
nsmith@aclu.org

Jacob H. Sussman
NC Bar No. 31821
**Southern Coalition for Social Justice**
P.O. Box 51280
Durham, NC 27717
jsussman@scsj.org
T: (919) 323-3380 (ext. 129)

* Admitted *pro hac vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 1, 2026, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will effect service on all counsel of record.

Respectfully submitted this the 1st day of October, 2026.

*/s/ Corina Scott*
Corina Scott
cscott@acluofnc.org

*Counsel for Plaintiffs*