IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WILLY WENDER ACEITUNO, *et al.*, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants.* | Civil Action No. 26-146-SCR-MTO |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Defendants maintain a widespread policy and practice of violating federal law by conducting immigration arrests without probable cause. The voluminous evidence submitted in support of Plaintiffs' motion for a preliminary injunction shows that Defendants' ongoing policy and practice has resulted in the illegal warrantless arrests of Plaintiffs (five U.S. citizens, one visa-holder), as well as scores of other Latino North Carolinians. *See generally* ECF No. 36-1–36-46, 40. This evidence is reinforced by a growing body of caselaw showing that Defendants' unlawful enforcement policy in North Carolina is no aberration. Across the nation, federal judges have found that Defendants have a policy and practice of authorizing and encouraging their agents to engage in unlawful warrantless arrests. *See, e.g., M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1178–82 (D. Or. 2026); *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 33 (D.D.C. 2025) (*Escobar Molina I*); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1234–35 (D. Colo. 2025); *UFW v. Noem*, 785 F. Supp. 3d 672, 735 (E.D. Cal. 2025).

Despite 34 pages of briefing,[1] Defendants have not mustered a single declaration, nor any other evidence, to counter Plaintiffs' factual showing. Instead, they claim—with no supporting evidence—that Plaintiffs' experiences were one-offs and thus they lack standing to seek injunctive relief. To make this argument, Defendants dodge the record: in recent months, immigration arrests have significantly increased in North Carolina. *See* Pls. Br. (ECF No. 37) at 5, 7–12. Many of these arrests have occurred on streets and in other public areas, with Defendants' agents targeting individuals because they appear Latino. *Id.* at 6–12, 16, 24–26. Defendants have already subjected each Plaintiff to arrest under their ongoing policy and practice (*id.* at 9–10), and Defendants have detained Plaintiff Aceituno *twice* (*id.* at 17).

Plaintiffs have standing to seek an injunction. There is a significant risk that they will again be unlawfully arrested because Defendants' policy and practice is ongoing, and because Plaintiffs—who frequent Latino neighborhoods and are themselves Latino—are members of the group Defendants target for unlawful arrests. Plaintiffs also suffer ongoing injuries: Defendants' unlawful policy and practice causes Plaintiffs to alter their lives and their movements, infringing on their liberty on an ongoing basis. Defendants attempt to downplay the harm to Plaintiffs, but Defendants' illegal tactics do more than instill fear—they hamper Plaintiffs' and putative class members' abilities to go about their daily lives, and constitute an ongoing civil rights violation.

Defendants' other arguments fail. Plaintiffs demonstrate final agency action that is reviewable under the Administrative Procedure Act (APA). And 8 U.S.C. § 1252(f)(1) does not bar

[1] Defendants' brief significantly exceeds LCvR 7.1(d)'s 25-page limit. Several weeks ago, Plaintiffs' counsel consented to Defendants requesting a five-page extension (a limit of 30 pages total). Defendants never moved the Court for a page extension, yet filed a brief that exceeds the Court's page limit by nine pages. This is the second time that Defendants have exceeded mandatory page limits without authorization. *See* ECF No. 24 (26-page brief in support of motion to dismiss).

the relief sought by Plaintiffs because that statutory provision, by its own terms, does not apply to the warrantless arrest statute (8 U.S.C. § 1357(a)(2)).

This Court should reject Defendants' claims of executive usurpation. The proposed injunction is appropriately tailored and consistent with those entered by other courts. The ongoing violation of Plaintiffs' and putative class members' rights constitutes irreparable harm, and the equities weigh strongly in favor of protecting individuals' rights against the deeply harmful and often violent law enforcement overreach documented by Plaintiffs.

## ARGUMENT

### I. Plaintiffs have standing, and an unrebutted factual record shows a likelihood of success on the merits.

Defendants admit their agents are bound by 8 U.S.C. § 1357(a)(2)'s mandate that two discrete categories of probable cause—removability and escape risk— must exist before their agents may execute a warrantless immigration arrest. Defs. Br. (ECF No. 48) at 1–2, 24–25. But other than generally asserting that they follow the law, Defendants do not challenge the detailed factual record amassed by Plaintiffs, which demonstrates an ongoing, widespread disregard of the requirements set forth in § 1357(a)(2). Instead, Defendants contest standing, claiming that Plaintiffs cannot demonstrate "they are at a substantial risk of imminently being arrested again without probable cause[.]" Defs. Br. at 15.

Defendants challenge only the injury-in-fact requirement of standing doctrine. *See id.* at 10–20. To obtain prospective injunctive relief, a party must demonstrate (1) substantial risk of future harm, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), *or* (2) ongoing harm, *Jonathan R. ex rel. Dixon v. Morrisey*, 178 F.4th 139, 164 (4th Cir. 2026). Plaintiffs show both.

### A. Plaintiffs have standing because they face a substantial risk of future injury.

Defendants' policy poses a "substantial risk" of inflicting future injuries on Plaintiffs. *See Susan B. Anthony*, 573 U.S. at 158. Plaintiffs establish the concreteness and imminence of this risk in three ways: *First*, Defendants maintain an ongoing, widespread policy and practice of conducting warrantless arrests without probable cause of removability or escape risk. *Second*, Defendants have already arrested each Plaintiff pursuant to that policy and practice—and indeed have already detained one of them twice—underscoring the risk that Plaintiffs will again be subjected to that policy. *Third*, Plaintiffs are members of the population being targeted under this policy and intend to continue engaging in the type of unavoidable, routine conduct that makes them vulnerable to arrests. Taken together, these factors show that the likelihood of another arrest is "real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

1. *Defendants' widespread, ongoing policy and practice subject Plaintiffs to substantial risk of future unlawful arrests.*

Defendants maintain a policy and practice of exceeding the limited warrantless arrest authority conferred by 8 U.S.C. § 1357(a)(2). "[W]here a policy that produced a plaintiff's prior injuries remains in effect, [t]he prospect of future injury becomes significantly less speculative." *Outdoor Amusement Bus. Ass'n v. DHS*, 983 F.3d 671, 681 (4th Cir. 2020) (internal quotation omitted). The arrests detailed in Plaintiffs' declarations and other evidence establish that Defendants' agents routinely arrest Latino North Carolinians without probable cause that they are removable and that they pose an escape risk. *See* Pls. Br. 6–12.

Plaintiffs' experiences are direct evidence of this unlawful policy in action. Each Plaintiff is a U.S. citizen or lawfully in the United States. Ex. 1 (ECF No. 36-1), Aceituno Decl. ¶ 1; Ex. 2 (ECF No. 36-2) Cuenca Decl. ¶ 1; Ex. 3 (ECF No. 36-3), Arguera López Decl. ¶ 1; Ex. 4 (ECF No. 36-4), Napoles Decl. ¶ 2; Ex. 5 (ECF No. 36-5), Godinez Decl. ¶ 1; Ex. 6 (ECF No. 36-6),

Vazquez Decl ¶ 1. Officers arrested each Plaintiff without stating any reason and did so despite indications of Plaintiffs' citizenship or lawful status. Ex. 1 ¶¶ 17, 19, 23; Ex. 2 ¶¶ 3, 6, 8, 11; Ex. 3 ¶¶ 7–8, 10–13; Ex. 4 ¶¶ 5, 17; Ex. 5 ¶¶ 5, 16; Ex. 6 ¶¶ 7–9, 11, 17. Officers failed to gather information supporting probable cause of escape risk prior to Plaintiffs' arrests. Ex. 1 ¶¶ 19–20; Ex. 2 ¶¶ 9–12; Ex. 3 ¶¶ 5–12; Ex. 4 ¶ 18; Ex. 5 ¶ 17; Ex. 6 ¶¶ 5–6, 8, 10. And each Plaintiff was arrested while conducting unavoidable daily activities—working, picking up food, or driving. Ex. 1 ¶¶ 2, 7; Ex. 2 ¶¶ 2–3; Ex. 3 ¶ 2; Ex. 4 ¶ 3; Ex. 5 ¶¶ 3; Ex. 6 ¶¶ 3–4. Plaintiffs also report ongoing, street-level ICE enforcement activities in the areas they frequent. Ex. 1 ¶¶ 37–39, 42, 45–47; Ex. 2 ¶¶ 23–26, 30–33; Ex. 3 ¶¶ 18–26, 29; Ex. 4 ¶¶ 24–25, 27–28; Ex. 5 ¶¶ 22–28, 30–32; Ex. 6 ¶¶ 19–20, 22–24, 26. The evidence establishes that members of the putative class have been subjected to similar treatment. *See* Pls. Br. 25–26.

The information compiled by Plaintiffs is consistent with a growing national body of court decisions and evidence demonstrating that Defendants are systematically authorizing and encouraging arrests without probable cause. *See M-J-M-A-*, 822 F. Supp. 3d at 1178–82; *Escobar Molina I*, 811 F. Supp. 3d at 33; *Ramirez Ovando*, 810 F. Supp. 3d at 1234–35.[2] Defendants' own statements and published guidance confirm that Plaintiffs' arrests occurred pursuant to an unlawful policy. *See Escobar Molina I*, 811 F. Supp. 3d at 33 (existence of unlawful policy supported "by defendants' own public statements acknowledging the use of a standard lower than probable cause to make warrantless immigration arrests"). Defendants' high-level officials have repeatedly and publicly admitted that they authorize agents to use a less rigorous "reasonable suspicion" standard for effecting arrests. *See id.* at 43–46 (collecting statements); Pls. Br. at 4–5, 17–19.

[2] Since Plaintiffs filed this action, two additional similar cases have been filed. *See Guzman v. U.S. Dep't of Homeland Security*, 1:26-cv-03579-BAH (D. Md. 2026); *Centreville Immigration Forum v. U.S. Dep't of Homeland Security*, 1:26-cv-03777 (E.D. Va. 2026).

The Lyons Memo, touted by Defendants as proof they are following the law, instead confirms that Defendants' agents are authorized to violate section 1357(a)(2)'s mandate that arresting officers have probable cause of escape risk. The Memo authorizes agents to conduct arrests in circumstances where the facts fall well short of probable cause, instructing them to consider benign, widely applicable characteristics as evidence of escape risk, while enabling them to ignore information that would undermine probable cause. Pls. Br. at 4-5, 22; *see also Escobar Molina v. DHS*, 832 F.Supp.3d 22, 39–45, 50 (D.D.C. 2026) (*Escobar Molina II*) (discussing the Memo's flawed definition of escape risk and its failure to instruct officers to consider an individual's community ties in assessing risk).

Defendants' consistent, stated disregard for the legal requirements of § 1357(a)(2) means that Plaintiffs are likely to face implementation of Defendants' unlawful policy and practice again. *See Escobar Molina I*, 811 F. Supp. 3d at 33 ("systemic policy and practice of making warrantless arrests without individualized determinations of flight risk" "render[s] the likelihood of another arrest real and immediate" (internal quotations omitted)); *see also Kenny v. Wilson*, 885 F.3d 280, 289–90 (4th Cir. 2018) (plaintiffs had standing where officials refused to disavow challenged conduct); *N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 404 (M.D.N.C. 2017) (alleged practice of permitting and enabling systemic voter challenges subjected plaintiffs to imminent risk of purge from voter rolls, a cognizable injury).

DHS maintains a strong, "continued interest" in these enforcement efforts, contributing to Plaintiffs' substantial risk of re-arrest. *See Bryant v. Woodall*, 1 F.4th 280, 288 (4th Cir. 2021), *as amended* (June 23, 2021) (government's "continued interest" in enforcement of the challenged law shows threat of future enforcement). DHS has been instructed to "sharply increase" arrests and

meet target quotas of "3,000 arrests per day,"[3] encouraging Defendants' agents to disregard probable cause in their attempts to drive up arrest numbers. *See Escobar Molina I*, 811 F. Supp. 3d at 35 (when an agency's target arrest numbers "remain in place or even rise, so too does the risk [of unlawful warrantless arrest]").

Defendants don't contest that enforcement activities are ongoing, nor could they. Public reporting and witness statements confirm that arrests have continued at a fast pace in and out of the Charlotte metro area, Pls. Br. at 8–12, 23–26, and Defendants are adding offices and detention capacity in North Carolina to enable even more arrests, *see id.* at 7. Defendants have demonstrated a strong interest in continuing the policies and practices that caused Plaintiffs' unlawful arrests, confirming a substantial risk of recurrence. *Bryant*, 1 F.4th at 288; *Kenny*, 885 F.3d at 289. Defendants have adopted similar unlawful policies in other parts of the country, and these policies are similarly ongoing, including in our neighboring state of Virginia — where a parallel lawsuit was filed on November 16, 2026. *See supra* n.2.

Defendants' widespread pattern of unlawful arrests in North Carolina and around the country demonstrates that Plaintiffs face a substantial risk of future injury. *See Wiley v. Mayor & City Council of Balt.*, 48 F.3d 773, 775–76 (4th Cir. 1995) (defendants' policy of requiring officers to take polygraph tests created sufficient likelihood that "some members" of a police union would "in the future, be affected by th[e] policy"); *see also, e.g., Mitchell v. City of Charlotte*, 23-cv-00006-RJC-SCR, 2024 WL 1509675, at *16 (W.D.N.C. Mar. 1, 2024), *R&R adopted*, 2024 WL 1342612 (W.D.N.C. Mar. 29, 2024) (relying on *Wiley* to partially deny dismissal of request for injunctive relief where a peaceful protestor sought to enjoin police crowd-control policies that

[3] Ted Hesson and Kristina Cooke, *ICE's Tactics Draw Criticism as it Triples Daily Arrest Targets*, Reuters (June 10, 2025), https://perma.cc/V2QM-M3N2.

might subject him to future harm); *In re Navy Chaplaincy*, 697 F.3d 1171, 1176–77 (D.C. Cir. 2012) (risk of future injury "becomes significantly less speculative where [] plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury").

2. *Plaintiffs have already been arrested because of Defendants' unlawful policy.*

Plaintiffs' "past injury"—their unlawful arrests—coupled with Defendants' ongoing unlawful practice, is evidence that future injury is likely to occur. "[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." *Susan B. Anthony*, 573 U.S. at 164. Indeed, Plaintiff Aceituno has already encountered immigration agents twice: he was detained once and detained and arrested once on the same day, by two separate groups of DHS agents. Ex. 1 ¶¶ 2–8, 15–16.[4] Plaintiffs' arrests and Mr. Aceituno's repeat detentions indicate that the risk of future injury is far from speculative. *See Outdoor Amusement*, 983 F.3d at 682 ("past injuries from [the challenged] regulations" and "credible allegations" that the plaintiffs would be again subjected to injuries established standing).

Where an ongoing policy is at issue, the Fourth Circuit does not require a person subjected to the policy to be harmed multiple times before standing is established, setting this case apart from *Hussen v. Noem*, 822 F. Supp. 3d 944 (D. Minn. 2026), on which Defendants rely. *See, e.g.*, *Kenny*, 885 F.3d at 289. The *Hussen* court found it notable that "no subsequent stop or arrest occurred" to the plaintiffs following a drawdown of heightened enforcement operations, *see* 822 F. Supp. 3d at 982, 999, whereas enforcement activities in North Carolina remain elevated following Operation Charlotte's Web last November, and have occurred throughout the state,

---

[4] *See also* George Chidi, *'I Lose My Liberty in That Moment': Charlotte Shuts Down as Citizens and Noncitizens Alike Face ICE Arrests,* The Guardian (Nov. 20, 2025), https://perma.cc/K6Z4-QWMU) (describing putative class member arrested twice over the same weekend).

across multiple counties. *See* Pls. Br. 7–9, 10–12. And, as noted above, Plaintiff Aceituno's repeated interactions with Defendants' agents also distinguish this case.

As the *Hussen* court acknowledged, its decision is an outlier. *See id.* at 1000. Most courts considering the circumstances presented here—an ongoing policy and practice of conducting race-based, unlawful arrests targeting local communities—have concluded that the individuals subjected to those practices can seek injunctive relief. *See, e.g.*, *Escobar Molina I,* 811 F. Supp. 3d at 33–37; *Ramirez Ovando*, 810 F. Supp. 3d at 1226; *M-J-M-A-*, 822 F. Supp. 3d at 1173–75.

3. *Plaintiffs belong to a discrete community targeted for arrests.*

Plaintiffs are visibly members of a population targeted for arrest, making it more likely that they will be subjected to another injury. *Kenny*, 885 F.3d at 289; *see also Escobar Molina I*, 811 F. Supp. 3d at 33 ("likelihood of imminent harm increases when plaintiffs are among [the group of individuals] targeted by a defendant's policy"). Plaintiffs' evidence shows that Defendants overwhelmingly target Latino individuals in their enforcement activities in North Carolina, focusing on areas and businesses frequented by Plaintiffs and other Latinos. Pls. Br. at 12, 15–17. This pattern is consistent with multiple courts' findings that Defendants have a practice of targeting individuals based on their Latino appearance. *See Escobar Molina I*, 811 F. Supp. 3d at 33 (finding immigration agents target individuals who "appear Latino"); *Vasquez Perdomo v. Mullin*, No. 2:25-CV-05605-MEMF-SP, 2026 WL 3267125, at *12 (C.D. Cal. Oct. 23, 2026) ("Defendants routinely make detentive stops of individuals because those individuals appear Latino or Latino and working class"); *Hussen*, 822 F. Supp. 3d at 994 ("Plaintiffs have made a clear showing that Defendants have adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws," particularly targeting "Somali and Hispanic individuals").

Where plaintiffs are members of a "discrete and identifiable community," who are "explicitly target[ed]" by defendants' pattern of conduct such that they are "in danger the moment they open their front doors," there is a sufficient likelihood of imminent re-arrest. *M-J-M-A-*, 822 F. Supp. 3d at 1174; *see also Kenny*, 885 F.3d at 289 (plaintiffs' "regular[]" attendance at schools "where they allege there may be future encounters with school resource officers or other law enforcement" creates a "credible threat" of future arrest).[5]

Plaintiffs also intend to engage in activities "arguably impacted by the challenged conduct," on the streets and in other public settings, making them easy targets. *Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019) (cleaned up). Plaintiffs will repeat the same, unavoidable conduct that led to their initial arrests—purchasing food, working (often outdoors), and driving. Ex. 1 ¶¶ 2, 7, 40, 42; Ex. 2 ¶¶ 2, 30, 33; Ex. 3 ¶¶ 2, 18, 26; Ex. 4 ¶¶ 3, 27; Ex. 5 ¶¶ 3, 27; Ex. 6 ¶¶ 3–4, 24–25. Courts have found a substantial risk of future injury where "for reasons beyond the plaintiff's control, he or she is unable to avoid repeating the conduct that led to the original injury[.]" *Church v. City of Huntsville*, 30 F.3d 1332, 1338 (11th Cir. 1994); *see also Escobar Molina I*, 811 F. Supp. 3d at 34 (finding standing where plaintiffs "cannot avoid repeating the quotidian conduct that led to their original arrests"); *Md. State Conf. of NAACP Branches v. Md. Dep't of State Police*, 72 F. Supp. 2d 560, 565 (D. Md. 1999) (plaintiffs had standing where the risk of re-injury "depend[ed] only on their status as a member of a minority group and their need to travel on I-95").

4. *Plaintiffs have standing pursuant to* Lyons *and Fourth Circuit precedent*.

Taken together, Defendants' unlawful policy and practice of violating § 1357(a)(2), Defendants' ongoing and expanding enforcement efforts, Plaintiffs' past arrests, and Defendants'

[5] Such targeting is, of course, barred by the Constitution. *Trump v. Illinois*, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring) ("[O]fficers must not make interior immigration stops or arrests based on race or ethnicity.").

policy and practice of targeting Latino residents and neighborhoods demonstrate a credible threat of future arrest under Fourth Circuit precedent. *Kenny*, 885 F.3d at 289; *Davison*, 912 F.3d at 679 (plaintiff's experience of "past enforcement" and the defendant's failure to "disavow[] future enforcement" established a credible threat of enforcement under *Kenny*).

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) supports Plaintiffs' standing. The Supreme Court indicated that there would be standing where, as here, plaintiffs allege a widespread illegal practice that targets them as they go about their daily lives. *Id.* at 105–06. Two aspects of *Lyons* make this clear. First, the Court indicated the availability of standing based on allegations—as here—that the City had sanctioned the officers' conduct on a broad basis, by "order[ing] or author[izing] police officers to act in such manner." *Id.* at 106. In *Lyons*, the plaintiff sought prospective relief based *only* on the conduct of a single police officer during a single traffic stop, with no evidence of a policy of illegal conduct. *Id.* at 98, 105–06, 110 n.9; *see Kenny,* 885 F.3d at 289–90 ("[T]he Court in *Lyons* explained that there would have been an actual controversy if Lyons had 'allege[d] that he would have another encounter with the police' and 'that the City ordered or authorized police officers to act in such manner.'" (quoting *Lyons*, 461 U.S. at 105–06)); *Escobar Molina I*, 811 F. Supp. 3d at 35. In contrast, Plaintiffs point to a record of numerous unlawful arrests, including multiple arrests of U.S. citizens, and a policy of illegal warrantless arrests pursued by Defendants' agents across the country.[6]

Second, in *Lyons*, showing a risk of future injury required that in a future encounter the plaintiff would break the law, would then resist arrest, and officers would then act contrary to what

[6] After Plaintiffs filed their motion for a preliminary injunction, ICE arrested another U.S. citizen at gunpoint in Charlotte without a warrant and without the probable cause required by law. *See* Ex. 47, Julian Berger, *ICE detains U.S. citizen at gunpoint in east Charlotte*, WFAE (Oct. 22, 2026), https://perma.cc/84SA-9Y6Q. (Exhibits 47–49 document events that occurred after Plaintiffs filed their opening brief and are therefore filed as attachments to this Reply).

the Court understood to be city policy. *See* 461 U.S. at 106. Here, Plaintiffs have shown a widespread policy and practice of arresting Latino individuals as they engage in lawful, unavoidable daily activities. Plaintiffs cannot avoid these routine activities, and unlike breaking the law and resisting arrest, these activities are lawful and part of exercising their constitutionally-protected rights to travel on public streets and in public spaces. Pls. Br. at 24–25. *Lyons* thus underscores why Plaintiffs have demonstrated that they face future injuries. *See Escobar Molina I*, 811 F. Supp. 3d at 35 (distinguishing *Lyons* where "defendants have likely adopted a policy and practice of warrantless arrests without probable cause, [] plaintiffs are likely among those targeted, and [] plaintiffs likely cannot avoid repeating the conduct that led to their original injuries").[7]

Defendants next ask this Court to import the standing analysis from a pair of factually and legally inapposite data privacy cases. *See* Defs. Br. at 12–13. In both *Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017), and *Holmes v. Elephant Ins. Co.*, 156 F.4th 413 (4th Cir. 2025), the plaintiffs' claims to standing relied on attenuated chains of contingencies. In *Beck*, the plaintiffs sued after a hospital laptop and boxes containing patient information went missing, arguing that the stolen items increased the risk of identity theft. 848 F.3d at 267. The Fourth Circuit explained that the plaintiffs' standing was too "attenuated," because any future injury would require (1) "that the thief targeted the stolen items for the personal information they contained," (2) that the thieves would "then select, from thousands of others, the personal information of the named plaintiffs," and (3) that they would then "attempt"—and eventually succeed in—using "that information to steal their identities." 848 F.3d at 275. Likewise, in *Holmes*, the plaintiffs claimed that they had been injured

[7] Defendants point to *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025), Defs. Br. at 12, an unsigned stay order that contained no reasoning, explanation, or findings about the plaintiffs' standing. And *Vasquez Perdomo* involved a different policy and a different legal challenge, meaningfully different from this case. In cases like this one, courts have rejected the *Vasquez Perdomo* order's relevance to standing. *See, e.g.*, *Escobar Molina I*, 811 F. Supp. 3d at 35–36.

after their driver's license numbers were either accessed by hackers or posted directly on the dark web. 156 F.4th at 419. The plaintiffs' theory of standing required the court to conclude that plaintiffs' hacked information was likely to be purchased from the web, that the purchased information was sufficient to enable the hackers to harm the plaintiffs, and that the information was valid and usable at the point of purchase, *see id.* at 431–32—all together, too "speculative" a "chain of possibilities" to find a sufficient risk of future injury. *Id.* at 431.

Here, the risk of injury is not attenuated or speculative. No actions by any third parties are required for injury to occur.[8] And Plaintiffs have *already* been arrested under Defendants' policy of violating § 1357(a)(2); Defendants maintain the same, ongoing policy that caused their arrests in the first instance; and, in enforcing this policy, Defendants specifically target people with Plaintiffs' immutable characteristics who are going about their daily lives. *Beck* explicitly contrasted its holding with other data breach cases where "at least one named plaintiff" alleged—as Plaintiffs do here—that they had *already* suffered harm. *See* 848 F.3d at 274.

Defendants acknowledge that other district courts found standing in cases with nearly identical allegations. Defs. Br. at 19–20 (citing *M-J-M-A-*, 822 F. Supp. 3d at 1173, and *Escobar Molina I*, 811 F. Supp. 3d at 33); *see also Ramirez Ovando*, 810 F. Supp. 3d at 1226. Unable to distinguish these cases on the facts or the law, Defendants instead contend that those courts applied "a more relaxed standard" than the Fourth Circuit. Defs. Br. at 19. But in *Holmes*, the Fourth Circuit cautioned that the predictions of injury described in *Beck* may "not extend beyond the

[8] The chains of speculative causation described by *Holmes* and *Beck* and the case to which they cite, *Clapper v. Amnesty International*, 568 U.S. 398 (2013), all relied on the roles and actions of third parties. *Holmes* and *Beck* rested on predictions regarding the actions of "intervening malicious actors," *Holmes*, 156 F.4th at 431; *Beck*, 848 F.3d at 268, and *Clapper* concerned a law that explicitly regulated third parties rather than the plaintiffs, *see* 568 U.S. at 411 (plaintiffs' theory "necessarily rest[ed] on their assertion that the Government [would] target *other individuals*") (emphasis in original).

context of data breaches and other similar informational injuries." 156 F.4th at 430 n.20. And for good reason: the "substantial risk" requirement has been assessed according to the circumstances and type of injury alleged. *See id.* (citing *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) ("The more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing.").

Indeed, outside the data breach context—and especially in civil rights cases—the Fourth Circuit has recognized plaintiffs' standing to challenge future injuries without requiring percentage-of-risk calculations.[9] *See, e.g., Kenny*, 885 F.3d at 288–89 (finding standing to seek injunctive relief for risk of re-arrest, without quantifying risk); *Bryant*, 1 F.4th at 286 (similar). Courts reviewing factually similar cases have not required an estimation of percentage of risk. *See, e.g.*, *M-J-M-A-*, 822 F. Supp. 3d at 1175 ("[A]lthough Plaintiffs [cannot] prove a certain statistical likelihood that they will be subject to the same abuse, Defendants' practice of aggressively targeting people on racial lines and conducting unlawful warrantless arrests gives rise to a sufficient likelihood of harm."). As in similar cases, this Court should conclude that plaintiffs face a substantial risk of re-injury.

---

[9] Even if this Court were to reduce Plaintiffs' risk of re-injury to a percentage, Defendants' approximation is plainly wrong. Defs. Br. at 16. First, Defendants' numerator includes only logged arrests over the course of the Charlotte's Web operation, and Defendants' operations have continued and expanded since then. *See* Pls. Br. at 5–9; *see also* Deportation Data Project, Administrative Arrests Dataset, https://deportationdata.org/index.html (accessed Nov. 22, 2026) (filtered to "apprehension state" = "North Carolina" and "time" = "by month") (graph showing dramatic increase in arrests since September 2025, and significant increase in March and July 2026). Second, their arrest numbers omit arrests where detainees are not taken into formal custody, such as wrongful arrests of U.S. citizens and visa-holders, like Plaintiffs. In addition, Defendants target Latino communities and neighborhoods, not the entire population of any one city. The risk Plaintiffs face is significantly higher than Defendants claim.

### B. Plaintiffs have standing because their injuries are ongoing.

Even if Plaintiffs did not show a substantial risk of future harm, their ongoing injuries independently demonstrate standing to sue. *See Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 188–89 (4th Cir. 2018) ("[I]mport[ing] the imminence requirement into cases involving ongoing injuries" would make "little sense" because the "Supreme Court has always described and treated the two concepts — actual, ongoing injury vs. imminent injury — as disjunctive.") (internal citation omitted); *Jonathan R.*, 178 F.4th at 163 (explaining that "past injuries with ongoing harm, as opposed to threatened future injuries" suffice for standing for injunctive relief). Plaintiffs experience ongoing, cognizable injury, because (1) they have reasonably changed their behavior as a result of Defendants' continuing policy of unlawful arrests, and (2) they suffer ongoing, justified fear and dignitary harm due to the prospect of future re-arrest.

First, Defendants' practices have caused Plaintiffs to alter their lives in concrete ways, which constitutes an ongoing injury under *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). In *Monsanto*, the plaintiff farmers had standing to challenge an agency's decision to deregulate a strain of genetically engineered alfalfa, because that decision would require them to test their crops for contamination and incur costs attempting to minimize contamination, "even if their crops [we]re not actually infected" due to the change in policy. *Id.* at 154–55.

Plaintiffs have similarly altered their lives in response to Defendants' practices because of their reasonable fear of re-arrest by Defendants' agents, who are still active in their communities and target people who look like Plaintiffs, and in order to mitigate the risk of being subject again to Defendants' unlawful policy. *See, e.g.*, Ex. 1 ¶¶ 45–47; Ex. 2 ¶¶ 24–27, 31; Ex. 3 ¶¶ 24, 28, 31; Ex. 4 ¶¶ 28, 30–31; Ex. 5 ¶¶ 25–26, 30, 32; Ex. 6 ¶ 22. The Fourth Circuit has recognized that this kind of regular, ongoing injury suffices for standing. "[A] plaintiff who reasonably avoids an

activity because of the defendant's conduct has suffered an Article III injury." *W. Va. Rivers Coal., Inc. v. Chemours Co. FC*, 178 F.4th 102, 111 (4th Cir. 2026); *see also Deal*, 911 F.3d at 188–89 (effort to seek to avoid injury through changed behavior—changing schools—formed basis for standing); *M-J-M-A-*, 822 F. Supp. 3d at 1175 ("[D]aily exposure to Defendants' immigration enforcement practices employing warrantless arrests without conducting a pre-arrest assessment of someone's likelihood of escape causes significant ongoing harm.").

Second, Plaintiffs experience ongoing dignitary and psychological harms associated with the justifiable fear that they will be subjected to future unlawful arrests under Defendants' warrantless arrests policy. *See* Ex. 1 ¶¶ 30, 36–38, 40–46, 49; Ex. 2 ¶¶ 21–22, 24–26, 35; Ex. 3 ¶¶ 14–17, 24, 27, 31; Ex. 4 ¶¶ 20–24, 26–31; Ex. 5 ¶¶ 19–23, 26–29, 31; Ex. 6 ¶¶ 15–19, 21, 23–29. In addition to causing significant emotional distress, Defendants' policies have severely burdened Plaintiffs' and class members' federal and state constitutional rights, including their rights against unreasonable seizures and racial profiling, and their right to travel, causing dignitary injury. *See* Pls. Br. at 24–25; *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019) ("Dignitary harms or 'stigmatic injuries,' while not tangible, may be sufficiently concrete to constitute injury in fact.") (cleaned up).

While Defendants are dismissive of these less tangible harms, the Fourth Circuit has repeatedly held that these ongoing injuries are sufficiently concrete to confer standing. *See Jonathan R.*, 178 F.4th at 163–64 (emotional and psychological harm caused by unconstitutionally dysfunctional foster care system was ongoing injury-in-fact); *Deal*, 911 F.3d at 188–90 (plaintiff had standing where the defendants' Establishment Clause violation caused "enduring feelings of marginalization and exclusion"); *Ben-Davies v. Blibaum & Assocs., P.A.*, 695 F. App'x 674, 676–77 (4th Cir. 2017) ("emotional distress, anger, and frustration . . . sufficiently established the

existence of an injury in fact"); *see also TransUnion v. Ramirez*, 594 U.S. 413, 436, 440 n.8 (2021) (upholding appellate court's finding of standing for plaintiff who presented evidence that he was "confused" and "distressed"); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) ("[L]oss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (cleaned up).

Defendants' ongoing unlawful behavior has caused Plaintiffs and similarly situated community members to alter their day-to-day lives to avoid unconstitutional and otherwise unlawful arrests.[10] Plaintiffs, in turn, suffer from ongoing and concrete injury to their dignity and well-being. Each of these "continuing, present adverse effects from past illegal conduct" suffice to independently establish standing. *Outdoor Amusement*, 983 F.3d at 680 (cleaned up).

### C. Plaintiffs allege final agency action under the APA.

Defendants contend that the unlawful warrantless arrest policy is not "final agency action" and thus cannot be enjoined. Defs. Br. at 20. Defendants' policy and practice of conducting warrantless immigration arrests without probable cause satisfies both prongs of final agency action: (1) it marks "the consummation of the agency's decisionmaking process," and (2) it is a policy by which "rights or obligations have been determined," or "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation modified). At least four other courts have found similar policies to be final agency action.[11] *See M-J-M-A-*, 822 F. Supp. 3d at 1182;

---

[10] Last week, approaching the one-year anniversary of Operation Charlotte's Web, a journalist documented ongoing widespread fear and anxiety among Latino Charlotteans, including individuals' continuing alteration of daily routines as they attempt to avoid encounters with immigration officers. *See* Ex. 48, Julian Berger, *One year after Operation Charlotte's Web, fear still looms over the city's immigrants*, WFAE (Nov. 13, 2026), https://perma.cc/C5VF-668U.

[11] If Court finds there is no agency action, Plaintiffs' claims are also asserted in equity. *See* ECF No. 35 (Am. Compl.) ¶¶ 259–264, 268–273. Defendants have not challenged Plaintiffs' equitable

*Escobar Molina I*, 811 F. Supp. 3d at 43; *Ramirez Ovando*, 810 F. Supp. 3d at 1235; *Castañon Nava v. DHS*, 435 F. Supp. 3d 880, 901 (N.D. Ill. 2020).

To satisfy *Bennett*'s "consummation" requirement, a policy must represent the culmination of the agency's decision-making process, rather than a "tentative" step. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The challenged agency action need not be a formal action or reduced to writing. *Venetian Casino Resort v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008). Plaintiffs have alleged a clear and consistent policy that is in no way tentative. Defendants are routinely disregarding § 1357(a)(2)'s escape risk requirement. And high-level agency officials have publicly confirmed multiple times that, under their policy, Defendants' officers do not need probable cause to arrest. *See* Pls. Br. at 4–5; *Compare Escobar Molina I*, 811 F. Supp. 3d at 43 (expressing "no doubt" "that defendants in practice have consummated a decision-making process that resulted in the implementation of a new policy of conducting warrantless civil immigration arrests based on a lower standard than probable cause"), *with Jake's Fireworks, Inc. v. CPSC*, 105 F.4th 627, 631–32 (4th Cir. 2024) (single warning letter sent by subordinate official was not final agency action).

Here, Plaintiffs allege a specific, discrete agency action—a policy of arresting people without making the two individualized assessments Congress requires. This policy is evidenced by Plaintiffs' and others' arrests, multiple statements by Defendants' senior officials, and the same pattern in other parts of the country. *See* Section I.A.1 *supra*; Pls. Br. 4–9. As a result, Defendants' reliance on *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), is misplaced. There, by contrast, the plaintiffs alleged that a series of personnel decisions together amounted to a "wholesale" decision to shutter an agency, which the court concluded was a

---

cause of action, which is independently sufficient to support preliminary relief. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

programmatic challenge not subject to APA review. *Id.* at *3. And unlike *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1263 (9th Cir. 2024), where plaintiffs alleged "a medley of [government] conduct and policies," Plaintiffs here allege a single policy, causing a single species of harm: unlawful arrests and the injuries that predictably flow from those arrests.

Defendants next advance a surprising argument: that the Court should ignore their own public, repeated statements that arrests can be made using the lower "reasonable suspicion" standard, because "reason to believe" in § 1357(a)(2) "sounds like" "reasonable suspicion." *See* Defs. Br. at 26. As the court in *Escobar Molina I* recognized, the government's "remarkable assertion" suggesting that the individuals setting and communicating DHS policy "are ignorant or incompetent, or both," does not undermine the fact that these statements by high-ranking officials evince governmental policy. 811 F. Supp. 3d at 45–46. Defendants have not retracted these numerous statements; this Court should therefore follow other courts in taking these statements at "face value" – i.e., evidence of a broader, underlying policy of ignoring § 1357(a)(2) in effectuating arrests. *See id*. at 47; *see also M-J-M-A-*., 822 F. Supp. 3d at 1181.[12]

Plaintiffs also satisfy the second *Bennett* prong because "the result of [the agency's process] is one that will directly affect the parties." *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432 (4th Cir. 2010) (quoting *Franklin*, 505 U.S. at 797). Here, Defendants' policy has *already* impacted Plaintiffs. And the policy will continue to directly impact the legal rights of Plaintiffs

[12] Defendants' other arguments are unavailing. The mere existence of written regulations and policies does not refute or supplant the unlawful final agency action shown by Plaintiffs. *See Escobar Molina I*, 811 F. Supp. 3d at 48–49 ("[O]ne directive from 2022 cannot outweigh the host of more recent evidence indicating that a lower standard than probable cause is being implemented"). And, as discussed *supra* p. 6, the Lyons Memo underscores that Defendants are systematically violating the law, particularly in interpreting the escape risk requirement.

and others subject to unlawful arrests. *See M-J-M-A-*, 822 F. Supp. 3d at 1181; *Ramirez Ovando*, 810 F. Supp. 3d at 1237.

Defendants argue that the alleged policy has no legal consequences because it does not bar individual officers from making a probable cause finding. Defs. Br. at 27. That makes no sense. The whole point is that Plaintiffs and countless others would *not* be arrested if Defendants were obeying § 1357(a)(2)'s probable cause requirements. Moreover, Defendants have bound the agency to a particular legal interpretation, authorizing agents to make warrantless arrests using a lower legal standard than the one specified by statute. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). And they are implementing that policy. These actions have immediate impact: North Carolinians encountering Defendants' agents are no longer protected by the probable-cause standard required by law. This is final agency action.

**D. Section 1252(f)(1) does not apply to Plaintiffs' claims.**

Defendants assert that Plaintiffs' motion is barred by 8 U.S.C. § 1252(f)(1), which prevents lower courts from issuing classwide relief that "enjoin[s] or restrain[s]" the operation of statutes within "part IV" of a specified subchapter of the INA. But Section 1357(a)(2)—which provides the basis for Plaintiffs' claims—is not one of the provisions contained within "part IV" of the referenced subchapter. The plain text of § 1252(f)(1) forecloses Defendants' argument. *See, e.g.*, *Texas v. DHS*, 123 F.4th 186, 209–10 (5th Cir. 2024) (rejecting government's defense because statute at issue was "not one of the statutes referenced in § 1252(f)(1)"). Defendants' argument has been rejected in other cases involving warrantless immigration arrests. *See Escobar Molina I*, 811 F. Supp. 3d at 55; *UFW*, 785 F. Supp. 3d at 705–06; *Phil. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 320 (D. Md. 2025).

Defendants nonetheless contend that the relief sought will have collateral effects on "enforcing or implementing detention and the initiation of proceedings." Defs. Br. at 28. But, given Congress's textual choice to limit the statute's application to "part IV" statutes, and the "presumption favoring interpretations of statutes that allow judicial review of administrative action," *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991), courts have been clear that downstream effects are not enough to trigger § 1252(f)(1). For instance, in *Gonzales v. DHS*, the Ninth Circuit held that § 1252(f)(1) was not triggered by an order enjoining a misuse of the adjustment-of-status statute (part V), even though the order explicitly prevented DHS's execution of removal orders (squarely within part IV). 508 F.3d 1227, 1233 (9th Cir. 2007). The Supreme Court expressly declined to disturb that rule in *Garland v. Aleman Gonzalez*. 596 U.S. 543, 553 n.4 (2022), and other courts have followed suit. *See, e.g.*, *Castañon-Nava v. DHS*, 175 F.4th 828, 838 (7th Cir. 2026).[13] Plaintiffs do not challenge or seek to enjoin any arrests carried out under § 1226 or any other provision covered by § 1252(f)(1). *See Escobar Molina I*, 811 F. Supp. 3d at 56. Defendants' argument fails as a matter of statutory text.[14]

**E. The proposed preliminary injunction is consistent with injunctions in similar cases.**

Defendants contradictorily criticize Plaintiffs' proposed injunction as both "an unqualified weapon for Plaintiffs to chill immigration agents' ability to effectively perform their duties," and an impermissible "follow the law" injunction. Defs. Br. at 29–30. It is neither. Plaintiffs seek classwide relief tailored to remedy only the specific harms shown and akin to the injunctions

---

[13] The single case on which Defendants rely, *N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025), is inapposite and is not at odds with Plaintiffs' position. In *N.S.*, the D.C. Circuit reviewed federal actions taken directly under § 1226 (a provision in part IV) and held that § 1252(f)(1) prevented review. *See id.* at 289–90.

[14] Section 1252(f)(1) also does not reach the relief sought here, vacatur of existing government policies. *See CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 596 (D. Md. 2025) (collecting cases).

entered in similar cases. *See, e.g.*, *Ramirez Ovando*, 810 F. Supp. 3d at 1240–42; *Escobar Molina I*, 811 F. Supp. 3d at 65–66; *UFW*, 785 F. Supp. 3d at 743–44; *Vasquez Perdomo,* 2026 WL 2751388, at *31. Additionally, "there is no bar on injunctions that order the defendant to cease conduct identified as violating a statute." *Escobar Molina I*, 811 F. Supp. 3d at 62 n.51 (collecting cases); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (upholding an injunction barring "any practices which were violations of [particular] statutory provisions").

An injunction instructing an agency to comply with a statute is appropriate when "the statute or regulation requires clearly specified conduct," and is only disfavored where "relevant law leaves ambiguous what conduct is actually prohibited." *Silver Star Props. REIT, Inc. v. Hartman vREIT XXI, Inc.*, No. 23-2720-BAH, 2024 WL 308945, at *4 (D. Md. Jan. 26, 2024). Where, as here and in other cases around the country, "a proclivity for unlawful conduct has been shown," an injunction enjoining "any practices which were violations of those statutory provisions" is "often necessary to prevent further violations[.]" *McComb*, 336 U.S. at 192.

The proposed injunction's language, rather than being follow-the-law, makes clear that Defendants will violate this Court's order if they continue to carry out their unlawful policies. Pls. Br. at 29. Isolated instances of individual agents failing to make the requisite individualized determinations would not suffice to constitute a violation. Critically, the proposed injunction—like those in other jurisdictions—contains documentation and reporting requirements to facilitate compliance and monitoring. *See id.* at 29–30. Defendants cannot and do not argue that these provisions amount to a follow-the-law injunction.

## II. **Plaintiffs amply demonstrate irreparable harm.**

Defendants do not dispute that illegal arrests cause irreparable harm, nor could they: violations of constitutional rights—like freedom from unreasonable seizures and the right to travel

implicated here—"unquestionably" establish irreparable harm. *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Instead, Defendants rehash their standing arguments. As explained above, in addition to escalated enforcement in Plaintiffs' neighborhoods and communities—which undoubtedly puts them at substantial risk of arrest—Plaintiffs are experiencing continuing injuries which also constitute irreparable harm. *See* Sections I.A & I.B, *supra*.

Defendants also contend that the timing of Plaintiffs' motion—filed seven months after initiation of this lawsuit—negates irreparable harm. But such a time lag "does not as a matter of law preclude a finding by the court of irreparable harm." *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 139 (4th Cir. 2001). The cases cited by Defendants establish that there is no numerical cutoff—specific circumstances matter. In *Candle Factory*, the Fourth Circuit upheld a district court's finding of irreparable harm despite a *one-year* delay in filing for preliminary injunction, reasoning that the delay was "partially explained, and, importantly, [defendant] does not contend that the delay resulted in any prejudice to its interests." *Id.*

As in *Candle Factory*, Defendants make no showing that Plaintiffs' timing has prejudiced them.[15] Plaintiffs also explain their timing: they filed this motion because of a surge in unlawful enforcement actions, many outside of the Charlotte area, that have occurred since filing their original complaint. Pls. Br. at 7–9. Plaintiffs' preliminary injunction motion was accompanied by

---

[15] Defendants cite *Quince Orchard Valley Citizens Ass'n v. Hodel*, where the court denied a preliminary injunction to plaintiffs who delayed nine months before seeking relief. 872 F.2d 75 (4th Cir. 1989). There, the dispositive factors were the time sensitivity of the challenged construction project and the fact that during plaintiffs' delay the defendants incurred millions of dollars in costs. *Id.* at 79. Where, as here, Plaintiffs explain the reasons for their timing and Defendants show no prejudice, the lag between complaint and preliminary injunction motion does not undermine irreparable harm. *See, e.g., Candle Factory*, 23 F. App'x at 138–39; *Norris, v. City of Asheville*, No. 1:23-CV-00103-MR-WCM, 2024 WL 1261206, at *7 (W.D.N.C. Mar. 25, 2024) (six-month delay did not "preclude or even weigh against a finding of irreparable harm").

an amended complaint; both filings extensively detail these recent examples of Defendants' unlawful warrantless arrest practices. Prior to filing, Plaintiffs had to thoroughly investigate recent Defendants' enforcement actions and collect relevant evidence. *See Norris v. City of Asheville*, No. 1:23-CV-00103-MR-WCM, 2024 WL 1261206, at *7 (W.D.N.C. Mar. 25, 2024) (rejecting challenge to irreparable harm based on delay where plaintiffs "thoroughly investigated their claims" and filed an amended complaint before seeking a preliminary injunction). And Plaintiffs' motion documents how Defendants' continuing policies have recently caused and still risk harm to them *and* the proposed class, making relief timely sought for the class as a whole.

## III. The equities and public interest favor preventing government overreach.

Defendants' unsupported assertion that an injunction would "usurp[]" executive authority over immigration enforcement and thus inflict "substantial governmental harm," Defs. Br. at 33, misstates both the law and Plaintiffs' requested relief. The government is not harmed by a preliminary injunction curbing an unlawful policy. *Leaders of a Beautiful Struggle*, 2 F.4th at 346). "If anything, the system is improved by such an injunction." *Id.* (internal quotation omitted).

The injunction Plaintiffs seek does nothing to undermine Defendants' authority to make lawful immigration arrests. Quite the opposite; an injunction would ensure that Defendants' agents respect individual rights and comply with the required statutory and regulatory framework when carrying out warrantless arrests. *See id.* at 346 ("It is well-established that the public interest favors protecting constitutional rights."); *see also Escobar Molina I*, 811 F. Supp. 3d at 52–53 (the balance of equities and public interest favor Plaintiffs where "requested injunction would allow all aspects of immigration enforcement to continue, within the express bounds of the INA"). "[T]he public undoubtedly has an interest in seeing its governmental institutions follow the law[.]" *Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020) (citation modified).

Nor is the arrest documentation requested by Plaintiffs excessive, given the record of repeated unlawful and often violent arrests, including multiple arrests of U.S. citizens. *See Escobar Molina I*, 811 F. Supp. 3d at 64 ("Requiring defendants to put pen to paper and explain who made each arrest and why constitutes the bare minimum to ensure defendants are compliant with the Constitution, the INA, and this Court's order[.]"). Defendants admit that they are already required to create specific records related to warrantless arrests (Def. Br. at 2),[16] yet fail to explain how the documentation requested by Plaintiffs adds substantially to their existing recordkeeping burden.[17]

In similar situations, courts have ordered the kind of recordkeeping requested by Plaintiffs, deeming it essential to ensuring transparency and compliance. *See* Pls. Br. at 29. Where injunctions have not included such provisions, misconduct has continued and further court intervention has been necessary. *See, e.g.*, Order to Show Cause, *Melendres v. Arpaio*, No. 2:07-cv-02513, (D. Ariz. Feb. 12, 2015), ECF No. 880 (where preliminary injunction lacked monitoring and compliance provisions, unlawful immigration enforcement actions continued for a prolonged period).

## CONCLUSION

For the reasons stated here and in Plaintiffs' opening brief, this Court should grant Plaintiffs' motion for a preliminary injunction.

---

[16] Defendants' failure to produce documentation related to even one of the arrests recounted in support of Plaintiffs' motion strongly suggests that they are not maintaining even the records required by the Lyons Memorandum.

[17] Defendants also raise generalized concerns about disclosing individuals' sensitive information. If Defendants furnish specifics, the parties can likely negotiate—or the Court can direct—protective orders or other measures to protect such information from inappropriate disclosure.

Dated: November 23, 2026

Respectfully submitted,


Lucia Goin*
Kathryn Huddleston*
**ACLU Foundation**
**Immigrants' Rights Project**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
lgoin@aclu.org
khuddleston@aclu.org
T: (212) 549-2500

Oscar Sarabia Roman*
Noelle Smith*
**ACLU Foundation**
**Immigrants' Rights Project**
425 California Street, 7th Floor
San Francisco, CA 94104
osarabia@aclu.org
nsmith@aclu.org
T: (415) 343-0770

Jacob H. Sussman
NC Bar No. 31821
Anna Byers
NC Bar No. 61596
**Southern Coalition for Social Justice**
P.O. Box 51280
Durham, NC 27717
jsussman@scsj.org
anna@scsj.org
T (Sussman): (919) 323-3380 (ext. 129)

/s/ *Kristi Graunke*
Kristi Graunke
NC Bar No. 51216
Corina Scott
NC Bar No. 64573
Jaclyn Maffetore
NC Bar No. 50849
**ACLU of North Carolina**
**Legal Foundation**
P.O. Box 28004
Raleigh, NC 27611
kgraunke@acluofnc.org
cscott@acluofnc.org
jmaffetore@acluofnc.org
T (Graunke): 919-354-5066

Johanna M. Hickman*
DC Bar No. 981770
Adnan Perwez*
DC Bar No. 90027532
Steven Y. Bressler*
DC Bar No. 482492
Brian Netter*
DC Bar No. 979362
**Democracy Forward Foundation**
P.O. Box 34553
Washington, DC 20043
hhickman@democracyforward.org
aperwez@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org
T: (202) 448-9090


* Admitted *pro hac vice*